IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

———————————————————————

| | |
|---|---|
| FRANKLIN BENJAMIN, by and through his next friend, Andreé Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend, Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers; ANTHONY BEARD, by and through his next friend, Nicole Turman, on behalf of themselves and all others similarly situated, | Filed via ECF System <br><br> Civil Action No. 1:09-cv-1182-JEJ <br><br> Class Action <br><br> Complaint Filed June 22, 2009 |
| Plaintiffs, | Judge Jones |
| v. | |
| DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and HARRIET DICHTER, in her official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania, | |

———————————————————————

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Plaintiffs and the Class submit this Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment on their claims under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. The exhibits referenced in this Statement are those submitted in support of Plaintiffs' Motion for Summary Judgment.

## I.     **The Parties**

1.     Plaintiff Franklin Benjamin is a nearly 50-year-old resident of Phila-delphia, Pennsylvania who has been institutionalized in Ebensburg Center, a state-operated intermediate care facility for persons with mental retardation (ICF/MR) since 1966, when he was six years old.  Am. Compl. & Answer ¶¶ 8, 21 (Exh. 2, 3).

2.     Plaintiff Richard Grogg is a 46-year-old resident of York County, Pennsylvania who has been institutionalized in Selinsgrove Center, a state-operated ICF/MR, since 1988.  Am. Compl. & Answer ¶¶ 9, 26 (Exh. 2, 3).

3.     Plaintiff Frank Edgett is a 52-year old resident of Cumberland County, Pennsylvania who has been institutionalized in Selinsgrove Center, a state-operated ICF/MR, since 1987.  Am. Compl. & Answer ¶¶ 10, 32 (Exh. 2, 3).

4.     Plaintiff Sylvia Baldwin, a 34-year-old resident of Allegheny County, Pennsylvania, has been institutionalized in Polk Center, a state-operated ICF/MR, since 1990 when she was 14 years old with two brief discharges to community programs in 1999 and 2001.  Am. Compl. & Answer ¶¶ 11, 38, 39 (Exh. 2, 3).

5.     Plaintiff Anthony Beard, a 50-year-old resident of York County, Pennsylvania, has been institutionalized in Ebensburg Center, a state-operated ICF/MR, since 1967, when he was seven years old.  Am. Compl. & Answer ¶¶ 12, 44 (Exh. 2, 3).

6.     This Court certified this case to proceed on behalf of the following class pursuant to Federal Rule of Civil Procedure 23(b)(2):

> All persons who:  (1) currently or in the future will reside in one of Pennsylvania's state-operated intermediate care facilities for persons with mental retardation; (2) could reside in the community with appropriate services and supports; and (3) do not or would not oppose community placement.

Class Certification Order (Sept. 2, 2009) (Docket # 17).

7.     Plaintiffs' and class members' mental retardation substantially limits one or more major life activities, including caring for themselves, learning, concentrating, and thinking.  Am. Compl. & Answer ¶¶ 83, 89 (Exh.2, 3).

8.     Defendant Department of Public Welfare (DPW) is the Commonwealth agency that is responsible to provide services to Pennsylvanians with mental retardation, including Plaintiffs and class members, under the Mental Health and Mental Retardation Act of 1966, 50 P.S. § 4201(1).  Am. Compl. & Answer ¶ 13 (Exh. 2, 3).

9.     DPW's Office of Developmental Programs (ODP) administers the state-operated and state-funded programs for people with mental retardation in Pennsylvania.  Casey Dep. at 5-6 (Exh. 4).

10.     DPW receives federal funding, including funding for the provision of mental retardation services in ICFs/MR and in the community, through Title XIX of the Social Security Act (the federal Medical Assistance statute) and Title XX of

the Social Security Act (block grants).  DPW's Response to Pls.' First Request for

Admissions # 46 (Exh. 5).

11.    Defendant Harriet Dichter, Secretary of Public Welfare, is responsible

to administer and oversee DPW, including the oversight and administration of

Commonwealth-funded mental retardation services in Pennsylvania.  *See*

http://www.dpw.state.pa.us/About/Secretary; 50 P.S. § 4201.

## II.    DPW's Mental Retardation System

### A.    State-Operated ICFs/MR

12.    DPW operates five ICFs/MR, also known as "state centers":  (1)

Ebensburg Center, located in Cambria County; (2) Hamburg Center, located in

Berks County; (3) Polk Center, located in Venango County; (4) Selinsgrove

Center, located in Snyder County; and (5) White Haven Center, located in Luzerne

County.  Am. Compl. & Answer ¶ 54 (Exh. 2, 3).

13.    An ICF/MR is a type of licensed facility that is funded through the

joint federal-state Medical Assistance program.  *See* Am. Compl. & Answer ¶ 53

(Exh. 2, 3); Casey Dep. at 12, 14, 15 (Exh. 4); *see also* 42 U.S.C. § 1396d(d); 42

C.F.R. Pt. 483, Subpt. I.

14.    Since ICF/MR services are covered by Medical Assistance, the federal

government provides a funding match for their costs.  Casey Dep. at 14 (Exh. 4).

15. Historically, the federal match has been approximately 54 percent, but under the American Recovery and Reinvestment Act of 2009 (which is in effect until at least December 31, 2010) the federal match is close to 65 percent. *See* Casey Dep. at 14-15 (Exh. 4); Church Dep. at 66 (Exh. 6).

16. As of July 2008, the five state ICFs/MR housed a total of 1,272 individuals, ranging from 129 at Hamburg Center to 347 at Selinsgrove Center. Am. Compl. & Answer ¶ 55 (Exh. 2, 3).

17. As of September 30, 2009, the five state ICFs/MR housed a total of 1,224 residents, ranging from 124 at Hamburg Center to 334 at Selinsgrove Center. Defs.' Response to Pls.' First Set of Interrogatories # 1(a) (Exh. 7).

18. DPW's projected census for the five state ICFs/MR in July 2010 is 1,190, ranging from an estimated 120 at Hamburg Center to 326 at Selinsgrove Center. Governor's Executive Budget for FY ("FY") 2010-2011 at E32.26 (Exh. 8).

19. All of the state ICFs/MR operate at significantly less than full capacity, with Hamburg Center operating at a little more than 50 percent capacity. Am. Compl. & Answer ¶ 57 (Exh. 2, 3); *accord* Governor's Executive Budget for FY 2010-2011 at E32.26 (Exh. 8).

20.    In the five fiscal years between FY 2004-2005 and FY 2008-2009, inclusive, 200 state ICF/MR residents died.  Defs.' Response to Pls.' First Set of Interrogatories # 5(b) (Exh. 7).

21.    The anticipated census reduction in FY 2009-2010, *see* Statement of Undisputed Material Fact ## 17, 18, is expected to be attributable almost exclusively to the deaths of residents and not to discharges to community services. *See* Church Dep. at 59-60 (Exh. 6).

22.    In the five fiscal years between FY 2004-2005 and FY 2008-2009, inclusive, 54 state ICF/MR residents were discharged to community-based supports and services:  (a) 7 in FY 2004-2005; (b) 4 in FY 2005-2006; (c) 23 in FY 2006-2007; (d) 14 in FY 2007-2008; and (e) 6 in FY 2008-2009.  Defs.' Response to Pls.' First Set of Interrogatories # 5(a) (Exh. 7).

23.    Pennsylvania's allocation to fund services at the five state ICFs/MR in FY 2008-2009 (July 1, 2008 through June 30, 2009) was approximately $290 million, an average annual cost of nearly $228,000 per resident.  Am. Compl. & Answer ¶ 58 (Exh. 2, 3).

24.    The average per person cost to provide services to state ICF/MR residents in FY 2009-2010 (July 1, 2009 through June 30, 2010) is approximately $240,000, and this amount is expected to increase to approximately $256,000 in

FY 2010-2011 (July 1, 2010 through June 30, 2011).  Defs.' Response to Pls.' First Request for Admissions # 36 (Exh. 5).

25.    The costs to operate the state ICFs/MR continue to increase annually, even though the population at those facilities declines each year.  Defs.' Response to Pls.' First Request for Admissions # 37 (Exh. 5).

### B.    Privately-Operated ICFs/MR

26.    DPW funds numerous privately-operated ICFs/MR that provide services to approximately 2,500 individuals.  Casey Dep. at 16 (Exh. 4).

27.    The average per person cost to fund services in FY 2009-2010 in privately-operated ICFs/MR in Pennsylvania is approximately $138,000 per year. Defs.' Response to Pls.' First Request for Admissions # 38 (Exh. 5).

### C.    Community Mental Retardation System

28.    DPW funds an array of community-based mental retardation services and supports, including residential services (such as small group homes or family living situations); day programming (such as vocational training, supported employment, development of community integration skills, and socialization); therapies (including behavioral supports); home health care (including up to 24 hours per day of skilled nursing); home modifications; assistive technology; and respite services.  Casey Dep. at 21-25, 45-48, 49-50 (Exh. 4).

29.    All Pennsylvanians with mental retardation are eligible for community services.  Casey Dep. at 26 (Exh. 4).

30.    Community-based mental retardation services in Pennsylvania are funded primarily through the Medical Assistance program, specifically two home and community-based waiver programs:   the Consolidated Waiver and the Person/Family Directed Support (P/FDS) Waiver.  Casey Dep. at 34, 38 (Exh. 4).

31.    Waivers allow DPW to use Medical Assistance funding to provide services that could not otherwise be funded by the state Medical Assistance plan, such as habilitation and home modifications.  Church Dep. at 65 (Exh. 6).

32.    The federal government pays a percentage of the costs of the Consolidated and P/FDS Waivers.  Casey Dep. at 34 (Exh. 4).

33.    The percentage of the costs paid by the federal government for the Consolidated and P/FDS Waivers is the same as the percentage it pays for state ICFs/MR -- normally about 54 percent and currently about 65 percent under the American Recovery and Reinvestment Act.  Casey Dep. at 39-40 (Exh. 4).

34.    To be eligible for the Consolidated or P/FDS Waiver, an individual must need the level of care provided by an ICF/MR and meet the financial eligibility criteria.  Church Dep. at 64-65, 69-70 (Exh. 6)

35.   The Consolidated Waiver is uncapped, which means that the consumer is entitled to receive the services he needs under that Waiver regardless of cost.  Casey Dep. at 38 (Exh. 4).

36.   The P/FDS Waiver is capped so that individuals cannot receive services that cost in excess of $26,000 per year.  Casey Dep. at 38 (Exh. 4).

37.   There is a limit on the number of individuals who can receive services under the Consolidated and P/FDS Waivers, but the federal government can grant permission to amend each Waiver to increase that limit and has readily approved those types of amendments in the past.  Casey Dep. at 40, 43 (Exh. 4); Church Dep. at 66-67, 69, 70 (Exh. 6).

38.   DPW contracts with Administrative Entities (AEs), which are the county mental health and mental retardation programs, to administer the Consolidated and P/FDS Waiver programs in specific geographic areas.  Casey Dep. at 58, 228 (Exh. 4).

39.   DPW does not provide community mental retardation services directly, but, rather, pays private providers to do so.  Church Dep. at 75 (Exh. 6).

40.   The average annual cost of residential and non-residential community-based mental retardation services in Pennsylvania was slightly less than $100,000 per person in FY 2008-2009.  Am. Compl. & Answer ¶ 61 (Exh. 2, 3).

41.     DPW funds community mental retardation services through the Consolidated Waiver that cost as much as $500,000 per person annually or more for individuals who have never been institutionalized.  Defs.' Response to Pls.' First Request for Admissions 2 (Exh. 5).

42.     There are approximately 2,000 people in the Consolidated Waiver who receive community mental retardation services that cost more than $200,000 per person annually.  *See* Response to Pls.' First Request for Admissions 3 (Exh. 5).

**III.    Unnecessary Institutionalization**

43.     All of the named Plaintiffs could live in the community if they were provided with appropriate supports and services.  Am. Compl. & Answer ¶¶ 23, 29, 35, 41, 46 (Exh. 2, 3).

44.     DPW's staff and agents have concluded that all of the named Plaintiffs are appropriate for discharge to the community.  Am. Compl. & Answer ¶¶ 24, 30, 36, 42, 47 (Exh. 2, 3).

45.     Defendants have admitted that all persons with mental retardation who are institutionalized in state ICFs/MR, with appropriate supports and services, could live in more integrated community settings.  Am. Compl. & Answer ¶¶ 65, 68 (Exh. 2, 3); Defs.' Response to Pls.' First Set of Interrogatories # 1(b) (Exh. 7).

46.     There are no types of services and supports that are provided in state ICFs/MR that cannot be and are not currently provided to individuals with mental retardation in the community system in Pennsylvania.  Defs.' Response to Pls.' First Request for Admissions # 1 (Exh. 5).

47.     According to DPW's Deputy Secretary for Developmental Programs, "although the average acuity in the state [ICFs/MR] is significantly higher than the average acuity in the community, there is no person we are serving in the state [ICFs/MR] for whom we are not serving a very similar person in the community." Defs.' Response to Pls.' First Request for Admissions # 1(a) (Exh. 5).

48.     The Commonwealth has embraced the principle of "normalization," which "defines the right of the individual with mental retardation to live a life which is as close as possible in all aspects to the life which any member of the community might choose."  Am. Compl. & Answer ¶ 67 (Exh. 2, 3) (quoting 55 Pa. Code § 6400.1).

49.     The principle of normalization is based on research that shows that people with disabilities, including those with mental retardation, do significantly better if they receive services in a "normal" environment, *i.e.*, the environment in which non-disabled people typically live.  Casey Dep. at 27-28 (Exh. 4).

50.     It is the stated policy of Pennsylvania to provide individuals with mental retardation services in the community.  Casey Dep. at 33 (Exh. 4).

51.     Individuals who live in institutions, such as the state ICFs/MR, cannot learn to live a normal life because institutions are abnormal settings and individuals who live in them come to rely on the structures of the institutional setting.   Casey Dep. at 31 (Exh. 4).

52.     Residents of the state ICFs/MR are more segregated than those individuals with mental retardation who receive community services since most state ICFs/MR are in more rural parts of the state; most state ICF/MR residents live in units ranging from about 16 to 20 people; day services usually are provided on the grounds of the facilities; and residents do not have as much opportunity as those living in the community to interact with a wide range of people and to have access to community activities.   Defs.' Response to Pls.' First Request for Admissions # 5 (Exh. 5).

## IV.   Lack of Opposition to Community Placement

53.     Plaintiff Benjamin has not indicated any opposition to discharge.  *See* Excerpt of DPW Chart for Ebensburg, Villa Unit, and Community Placement Plan for Mr. Benjamin (noting he has not indicated opposition to discharge) (Exh. 9).

54.     Plaintiff Benjamin's mother is willing to consider his discharge to an appropriate community placement and, therefore, is not opposed to discharge.  *See* Excerpt of DPW Chart for Ebensburg, Villa Unit, Community Placement Plan, and Annual Family Information (noting in chart and on Annual Family Information

document that Mr. Benjamin's mother has expressed a desire for him to move to the community) (Exh. 9).

55.    Plaintiff Grogg wants to be discharged from Selinsgrove Center and live in the community closer to his mother's home and his mother supports his choice.  Am. Compl. & Answer ¶ 31 (Exh. 2, 3).

56.    Plaintiff Edgett wants to be discharged from Selinsgrove Center and live in the community and his sister supports that choice.  Am. Compl. & Answer ¶ 37 (Exh. 2, 3).

57.    Plaintiff Baldwin wants to be discharged from Polk Center and live in the community, and her mother supports that choice.  Am. Compl. & Answer ¶ 43 (Exh. 2, 3).

58.    Plaintiff Baldwin has met with DPW's Deputy Secretary for Developmental Programs, Kevin Casey, at least 10 times and sent him letters to discuss her desire to live in the community.  Casey Dep. at 82 (Exh. 4); *see also* Letter from Sylvia Baldwin to Kevin Casey (Exh. 10).

59.    Plaintiff Beard has not indicated any opposition to community discharge.  Excerpt of DPW Chart for Ebensburg, Horizon Unit Living Area East 2, and Community Placement Plan for Mr. Beard (noting he has not indicated opposition to discharge) (Exh. 11).

60.     Plaintiff Beard's mother wants him discharged to a community placement closer to her home in York County since she is no longer able to visit him at Ebensburg Center frequently.   Excerpt of DPW Chart for Ebensburg, Horizon Unit, Living Area East 2, Community Placement Plan, and Annual Family Information (noting in chart and on Annual Family Information document that Mr. Beard's mother has expressed a desire for him to move to the community) (Exh. 11).

61.     After this lawsuit was filed, DPW conducted an assessment, based primarily on existing documentation, to determine whether the state ICF/MR residents and/or their families opposed community placement.   Defs.' Response to Pls.' Request for Admission # 6 (Exh. 5).

62.     In assessing desire for or opposition to community placement, DPW staff primarily reviewed existing documentation in the files and specifically the Community Placement Plans.   *See* Lokuta Dep. at 60-61 (Exh. 12).

63.     The results of DPW's post-lawsuit assessment of desire for/opposition to discharge shows that 78 state ICF/MR residents stated that they were not opposed to discharge, and an additional 1,018 state ICF/MR residents did not indicate any opposition to discharge.   *See* Lokuta Dep. at 59-60 (Exh. 12); Discharge Opposition Summary Sheet (Exh. 13).

64.     According to the DPW assessment, family members of 114 state ICF/MR residents stated that they were not opposed to community placement, and that families of an additional 217 state ICF/MR residents did not indicate any opposition to community placement.  Thus, a total of 331 state ICF/MR residents' families did not express or otherwise indicate opposition to community placement. Discharge Opposition Summary Sheet (Exh. 13); Defs.' Response to Pls.' First Request for Admissions # 6 (Exh. 5).

65.     DPW staff concluded that the family of a White Haven Center resident, C.B., was opposed to community placement, even though documents state that changes in the family structure indicate that they would not prevent C.B.'s discharge to the community.  Casey Dep. at 121-123 (Exh. 4).

66.     DPW staff concluded that the family of a Selinsgrove Center resident, D.W., was opposed to community placement, even though the evidence in the record did not support that conclusion.  *See* Casey Dep. at 106-107 (Exh. 4).

67.     DPW staff concluded that the family of a Selinsgrove Center resident, J.B., was opposed to community placement, even though the evidence in the record did not support that conclusion.  *See* Casey Dep. at 108-110 (Exh. 4).

68.     DPW staff concluded that the family of a Selinsgrove Center resident, M.S., was opposed to community placement, even though documents indicate that her family is no longer involved.  *See* Casey Dep. at 112-113 (Exh. 4).

69.     DPW staff concluded that the family of an Ebensburg Center resident, H.R.C., was opposed to community placement, even though documents indicate that her parents are deceased and the Facility Director of Ebensburg Center is her substitute decision-maker.  Casey Dep. at 116-118 (Exh. 4).

70.     According to DPW's Deputy Secretary for Developmental Programs, although many families of state ICF/MR residents are likely to be apprehensive about discharge to community services, those apprehensions are not well-founded, and his personal experience and professional research both demonstrate that most families are satisfied with community services after their relatives are discharged. Defs.' Response to Pls.' First Request for Admissions # 7 (Exh. 5).

71.     It would be possible to overcome the opposition of many family members to discharge of their relatives in state ICFs/MR through effective education about community programs.  Defs.' Response to Pls.' First Request for Admissions # 9 (Exh. 5); Am. Compl. & Answer ¶ 70 (Exh. 2, 3).

72.     It is important for state center residents and their families to visit community programs in order to make an informed decision about whether they want community services, but state ICF/MR residents and their families generally do not have an opportunity to visit community programs unless and until funding for discharge becomes available.  Defs.' Response to Pls.' First Request for Admission # 10 (Exh. 5).

73.    Many individuals who had lived for years in now-closed state ICFs/MR and who were discharged to the community despite initial opposition by them or their families are now satisfied with the community services and supports they receive.  Am. Compl. & Answer ¶ 71 (Exh. 2, 3); *see also* Defs.' Response to Pls.' First Request for Admissions # 8 (Exh. 5) (noting that even families who had sued after their discharge from a now-closed state ICF/MR ultimately had no complaints about community services and did not want their family members returned to state institutions).

## V.    State ICF/MR Residents Lack of Access to Community Mental Retardation Services

74.    Despite the fact that the named Plaintiffs and some other state ICF/MR residents are appropriate for and not opposed to discharge to the community, Defendants have failed to offer them appropriate community alternatives.  Am. Compl. & Answer ¶ 72 (Exh. 2, 3).

75.    There is a waiting list for community-based mental retardation services in Pennsylvania that is divided into three categories: "emergency" (*i.e.*, those who need services immediately); "critical" (*i.e.*, those who are anticipated to need services within two years); and "planning" (*i.e.*, those who are anticipated to need services in more than two, but fewer than five, years).  Am. Compl. & Answer ¶ 62 (Exh. 2, 3); Defs.' Response to Pls.' First Request for Admission # 11 (Exh. 5).

76.    When   individuals   with   mental   retardation   who   are   not institutionalized in ICFs/MR seek community mental retardation services, DPW's agents must complete a Prioritization of Urgency for Need of Services (PUNS) form to determine the person's waiting list category.  *See* Am. Compl. & Answer ¶ 63 (Exh. 2, 3); Defs.' Response to Pls.' Request for Admission # 12 (Exh. 5); Casey Dep. at 62-65 (Exh. 4).

77.    Everyone in the community who applies for mental retardation services is supposed to receive an evaluation using the PUNS form.  Casey Dep. at 64 (Exh. 4).

78.    Individuals who have not had PUNS forms completed or whose PUNS forms conclude that they are fully served (*i.e.*, all their needs are being met) are not on the waiting list for community mental retardation services.  *See* Defs.' Response to Pls.' First Request for Admissions # 11 (Exh. 5); Casey Dep. at 194, 200, 211-212 (Exh. 4).

79.    Individuals in the community are placed in the emergency waiting list category if, *inter alia*, community supports are needed "to keep him/her from being placed in a state center [ICF/MR], nursing home, large ICF/MR or other congregate settings ...."  Prioritization of Urgency of Need for Services (PUNS) Form at 2 (Exh. 14).

80.     DPW's only policy with respect to the placement of state ICF/MR residents on the waiting list for community mental retardation services is to place on the critical waiting list only those state ICF/MR residents who have affirmatively requested community services *and* who the Administrative Entity is planning to move to the community.  Defs.' Response to Pls.' First Request for Admissions # 15 (Exh. 5).

81.     PUNS forms have been completed for only 113 state ICF/MR residents and, of that total, seven are on the emergency waiting list, six are on the critical waiting list, 65 are on the planning waiting list, and 35 have been determined to be fully served.   Defs.' Response to Pls.' First Request for Admissions # 14 (Exh. 5).

82.     Although Plaintiff Grogg is extremely independent, capable of living in the community with appropriate supports, and actively expresses a desire for discharge, a PUNS assessment prepared in July 2007 determined that he does not need community services and supports because "all [of his] needs [are] being met," and he was removed from the waiting list.  Am. Compl. & Answer ¶ 73(b) (Exh. 2, 3).

83.     No PUNS assessment has ever been prepared for Plaintiff Benjamin. Am. Compl. & Answer ¶ 73(a) (Exh. 2, 3).

84.     A PUNS assessment completed for Plaintiff Edgett placed him in the "planning" category, but Defendants admit that he is not likely to be removed from the waiting list and provided with community services even within five years.  Am. Compl. & Answer ¶ 73(c) (Exh. 2, 3).

85.     Plaintiffs Beard and Baldwin each have had a PUNS assessment and been placed, respectively, in the "emergency" and "critical" categories, but Defendants admit that they are unlikely to be removed from the waiting list and provided with community services even within two years.  Am. Compl. & Answer ¶¶ 73(d)-(f) (Exh. 2, 3).

86.     DPW's Deputy Secretary for Developmental Programs could not say how long even those few state ICF/MR residents who are on the emergency or critical waiting lists would have to wait before they were offered community services.  Casey Dep. at 177-178 (Exh. 4).

87.     Some state ICF/MR residents who have asked for community services or whose families have asked for community services have not had PUNS forms completed or have been determined to be fully served and, therefore, are not on the waiting list for community services.  Defs.' Response to Pls.' First Request for Admissions # 16 (Exh. 5).

88.     Defendants admit that the named Plaintiffs and class members are either not on any waiting lists for community services or are unlikely ever to be

removed from the waiting lists and provided with community services regardless of their level of need.  *See* Am. Compl. & Answer ¶¶ 73, 73(c) (Exh. 2, 3).

89.   Between FY 2004-2005 and 2008-2009, inclusive, DPW received $316.4 million to fund community supports and services for 6,784 individuals on the waiting list, consisting of:  (a) $33.9 million to serve 529 people in FY 2004-2005; (b) $53.8 million to serve 850 people in FY 2005-2006; (c) $38.0 million to serve 806 people in FY 2006-2007; (d) $107.4 million to serve 3,428 people in FY 2007-2008; and (e) $83.3 million to serve 1,171 people in FY 2008-2009.  Defs.' Responses to Pls.' First Set of Interrogatories # 6(a) (Exh. 7); ODP History of Waiting List Initiatives (Exh. 15).

90.   Of the 6,784 individuals on the waiting list who received services in FY 2004-2005 through FY 2008-2009, inclusive, 2,488 received residential services, consisting of:  (a) 381 in FY 2004-2005; (b) 526 in FY 2005-2006; (c) 350 in FY 2006-2007; (d) 1,036 in FY 2007-2008; and (e) 255 in FY 2008-2009. Defs.' Responses to Pls.' First Set of Interrogatories # 6(b) (Exh. 7).

91.   Of the 6,200 individuals on the waiting list who received services in FY 2006-2007 and FY 2009-10, inclusive, 2,160 were youngsters graduating from school, most of whom are not in imminent risk of danger without services.  *See* Defs.' Responses to Pls.' First Set of Interrogatories # 6(a) (Exh. 7) (number of people served on waiting list); ODP History of Waiting List Initiatives (Exh. 15)

(same); Person/Family Directed Supports Waiver for People Out-of-School (Exh. 16) (number of people graduating from school who received services); Casey Dep. at 174 (Exh. 4); Church Dep. at 168-171, 219-220 (Exh. 6)

92.    Of the 54 state ICF/MR residents who were discharged between FY 2004-2005 and FY 2008-2009, inclusive, 36 were discharged as a result of special funding allocated pursuant to the initiative to close Altoona Center, a former state ICF/MR.  *See* Summary of Deaths and Discharges in State Centers (Exh. 17).

93.    In FY 2009-2010, DPW received funding to provide community services to 793 individuals on the waiting list.  ODP History of Waiting List Initiatives (Exh. 15).

94.    The Governor's proposed budget for FY 2010-2011 includes a request for funding to serve an additional 150 people on the waiting list.  Church Dep. at 219-220 (Exh. 6).

95.    The Director of the Bureau of Financial Management of DPW's Office of Developmental Programs testified that he does not expect funding to be available to develop community supports and services for any state ICF/MR residents in FY 2009-2010 or 2010-2011.  Church Dep. at 59-60, 220-221 (Exh. 5).

96.    Each year, there are about 700 to 750 vacancies in the Consolidated Waiver, about two-thirds of which are in residential habilitation programs (such as group homes).  Defs.' Response to Pls.' First Request for Admissions # 17 (Exh. 5).

97.   DPW has instructed the Administrative Entities to consider only individuals who are on the emergency waiting list or who meet the criteria for placement on the emergency waiting list to fill residential vacancies.  McCool Dep. at 43 (Exh. 18).

98.   Defendants have no evidence that any state ICF/MR residents in the past 10 years have been placed as a result of vacancies in community-based programs.  *See* Defs.' Response to Pls.' Requests for Admissions ## 19-21 (Exh. 5); *see also* Lokuta Dep. at 5-8, 114-116 (Facility Director of White Haven, Center who also was the Acting Director at Polk Center and Selinsgrove Center, is not aware of any state ICF/MR residents who have been offered placements created through vacancies in community programs) (Exh. 12).

99.   DPW does not have a waiting list to provide community supports and services to residents of state ICFs/MR that moves at a reasonable pace.  Am. Compl. & Answer ¶ 80 (Exh. 2, 3).

100.  DPW has not adopted or implemented a plan to offer and provide community placements to any state ICF/MR residents who are not opposed to discharge that includes specific benchmarks to identify the number of state ICF/MR residents for whom community mental retardation services will be provided and the time lines in which they will be provided.  Defs.' Response to

Pls.' First Request for Admissions # 23 (Exh. 5); Am. Compl. & Answer ¶ 79 (Exh. 2, 3).

101.   DPW developed an integration plan for residents of Norristown State Hospital (NSH) in accordance with the ruling in *Frederick L. v. Dep't of Public Welfare*, 422 F.3d 151 (3d Cir. 2005), which provided that DPW would seek funding to provide community services to 30 NSH residents in FY 2006-2007; 30 NSH residents in FY 2007-2008; 60 NSH residents in FY 2008-2009; and 90 NSH residents in FY 2009-2010. Defs.' Response to Pls.' First Request for Admissions # 24 (Exh. 5).

102.   Although DPW implemented the first two years of the four-year integration plan for NSH residents, it received funding to serve only 30 (rather than 60) NSH residents in the third year, and DPW did not seek any further funding to implement the plan in the fourth year.  Defs.' Response to Pls.' First Request for Admissions # 25 (Exh. 5).

103.   The current budget environment is not the reason for DPW's provision of community services to only 58 state ICF/MR residents since the beginning of FY 2004-2005.  Church Dep. at 176 (Exh. 6).

104.  DPW's provision of community services to only 58 state ICF/MR residents since the beginning of FY 2004-2005 is not due to budget constraints, but, rather, is due to a policy decision to prioritize people on the waiting list who

live in the community.  Casey Dep. at 166-167 (Exh. 4); Church Dep. at 175-176 (Exh. 6).

105.   There is nothing in the current budget environment that precludes DPW from developing and implementing a plan to provide community services to state ICF/MR residents over some period of time in the future.  Casey Dep. at 167 (Exh. 4).

## VI.   Costs and Savings of Providing Community Services to Plaintiffs and Class Members

106.   DPW's budget proposals to the Governor's Office of the Budget generally consist of a carry-forward budget (*i.e.*, funds to maintain existing services at the same level) and requests to fund expansion projects (*i.e.*, new initiatives, including initiatives to serve people on the waiting list for community mental retardation services).  *See* Defs.' Response to Pls.' First Request for Admission # 26 (Exh. 5).

107.   Historically, it is easier for DPW to secure approval from the Governor's Office of the Budget for its carry-forward budget than for expansion projects.  Defs.' Response to Pls.' First Request for Admission # 27 (Exh. 5).

108.   The Pennsylvania Legislature makes separate appropriations for the following:  state ICFs/MR; privately-operated ICFs/MR; community mental retar-dation services funded through the home and community-based waivers; and

"base-funded" community-based services (*i.e.*, non-waiver services).  Church Dep. at 11-12 (Exh. 6).

109.   Although DPW in a given fiscal year cannot move money among different appropriations (*e.g.*, it cannot use state ICF/MR appropriations to fund community services), DPW can revise its funding requests in subsequent fiscal years to take into account changing needs.  Church Dep. at 12-13, 16 (Exh. 6).

110.   Although funding for community supports and services for state ICF/MR residents has generally been made available only through expansion initiatives (relating to closures or downsizing of state ICFs/MR), DPW has been able to use the carry-forward budget to provide community supports and services to a small number of state ICF/MR residents by reducing the funding provided to the state ICFs/MR to maintain budget neutrality.   Defs.' Response to Pls.' First Request for Admission # 28 (Exh. 5).

111.   According to the Director of the Bureau of Financial Management and Budget for DPW's Office of Developmental Programs, it would be possible to use the carry-forward budget to fund community supports and services for additional state ICF/MR residents than DPW previously has done.  Church Dep. at 136 (Exh. 6).

112.   DPW does not have information about the costs to provide community supports and services to all of the remaining state ICF/MR residents.  Church Dep. at 98, 99-100 (Exh. 6).

113.   The average annual cost of providing community services and supports through the Consolidated Waiver to the 58 individuals most recently discharged from the state ICFs/MR is $166,113.  Church Dep. at 103-106, 108-109 (Exh. 6); Chart Summarizing Costs of Community Services for Discharged ICF/MR Residents (Exh. 19).

114.   Eighteen of the 58 individuals most recently discharged from state ICFs/MR are from Philadelphia, which has significantly higher costs than elsewhere in the Commonwealth, and 10 are from Allegheny County, which also has higher costs than most other counties.  Church Dep. at 113-114 (Exh. 6); Chart Summarizing Costs of Community Services for Discharged ICF/MR Residents (Exh. 19).

115.   The annual costs of providing community services to the 58 individuals most recently discharged state ICF/MR residents range from just under $59,000 to more than $500,000.  Church Dep. at 110-111 (Exh. 6); Chart Summarizing Costs of Community Services for Discharged ICF/MR Residents (Exh. 19).

116.   Despite the range of community services costs for the 58 most recently discharged state ICF/MR residents, the cost of services for 75 percent of those individuals was less than $169,000.   *See* Chart Summarizing Costs of Community Services for Discharged ICF/MR Residents (Exh. 19).

117.   Although the costs of community services for state ICF/MR residents may be higher on average than the community services costs for people who were never institutionalized, there is an equivalent group of people who were never institutionalized whose community services costs are at the higher end of the spectrum.  Church Dep. at 112-113 (Exh. 6).

118.   The average cost in FY 2008-2009 to provide community supports and services to individuals previously discharged from state ICFs/MR between 1999 and 2002 was $120,000 per person.  Church Dep. at 123, 125-132 (Exh. 6); Action Memorandum dated Mar. 27, 2009, Att. 3 at 3, 4, 10, 11 (Exh. 20).

119.   The average cost to provide state ICF/MR residents with community services would be less than the average cost to provide them with services in the state ICFs/MR.   *See* Defs.' Response to Pls.' Request for Admissions # 36 (admitting average per person cost to serve individuals in state ICFs/MR is $240,000 per year); Church Dep. at 108-109 (average per person cost to serve individuals discharged from state ICFs/MR under the Altoona Center closure initiative was approximately $166,000 per year), 125-132 (average per person cost

in FY 2008-2009 to serve individuals discharged from state ICFs/MR between 1999 and 2002 was about $120,000), 195-197, 206-207 (estimates of $145,000 and $180,000 per person used by DPW for community services for residents of Hamburg Center, the residents of which have a higher acuity level than in other state ICFs/MR) (Exh. 6).

120.   Transition costs refer to the money needed for the short-term period when DPW must fund services to individuals in state institutions while simultaneously funding the development of community services to enable their discharge (*e.g.*, finding a community home, hiring community staff).  Church Dep. at 177-178 (Exh. 6).

121.   The amount of transition costs is affected by the number of individuals discharged because if only a few people are discharged, staffing cannot be reduced.  In contrast, savings can be achieved more easily by closing units, buildings, or entire institutions.  *See* Church Dep. at 179-180 (Exh. 6).

122.   DPW has no information about what, if any, transition costs it actually incurred when it has closed state ICFs/MR, including Altoona, Western, Embreeville, and Laurelton Centers.  Church Dep. at 178 (Exh. 6).

123.   DPW prepared various plans to assess the costs that would be incurred and the savings that would be generated if it closed Selinsgrove Center and Hamburg Center and discharged residents to community supports and services and

private ICFs/MR beginning in FY 2008-2009.   Defs.' Response to Pls.' First Request for Admissions # 42 (Exh. 5).

124.   DPW's plans to close Selinsgrove and Hamburg Centers (referenced in Statement of Material Undisputed Fact # 123) showed that, although there would be higher costs in state dollars in the first two post-closure fiscal years, the Commonwealth would experience savings of state dollars in subsequent years, and those savings would increase each year since the cost of services in the state ICFs/MR is increasing faster than the cost of services in the community.   Defs.' Response to Pls.' First Request for Admissions # 42 (Exh. 5).

125.   According to the Director of the Bureau of Financial Management for DPW's Office of Developmental Programs, the savings that DPW would realize over time if it closed Selinsgrove Center and/or Hamburg Center could be used to expand funding to provide services to individuals on the waiting list who are living in the community.   Defs.' Response to Pls.' First Request for Admissions # 43 (Exh. 5).

126.   It would have cost DPW approximately $6 million in state dollars in FY 2008-2009 to implement its plans to close Hamburg Center and Selinsgrove Centers, which is less than the approximately $83 million that DPW received that year to provide services to individuals on the waiting list.   Church Dep. at 216 (Exh. 6).

127.   In an e-mail dated December 6, 2007, Estelle B. Richman, then Secretary of Public Welfare, informed Kevin Casey, the Deputy Secretary for DPW's Office of Developmental Programs, that DPW would not implement the plans to close Selinsgrove Center or Hamburg Center in order to maximize the funding available to expand community services and supports for people on the waiting list living in the community.   Defs.' Response to Pls.' First Request for Admissions # 45 (Exh. 5).

128.   In 2008, DPW received federal approval to implement a "Money Follows the Person Rebalancing Demonstration Project" (MFP Project).   *See* Am. Compl. & Answer ¶ 78 (Exh. 2, 3).

129.   As originally approved by the federal government, the MFP Project would allow DPW to receive an enhanced federal Medical Assistance match of 77 percent to fund community supports and services for 87 residents of state ICFs/MR moved to the community (30 in calendar year 2009 and 57 in calendar year 2010). *See* Am. Compl. & Answer ¶ 78 (Exh. 2, 3).

130.   The enhanced federal match under the MFP Project would be available for one year after the individuals relocated from the state ICFs/MR to the community.   *See* Am. Compl. & Answer ¶ 78 (Exh. 2, 3).

131.   DPW's MFP Project for state ICF/MR residents was expected to be used to enable DPW to close Hamburg Center.   *See* Casey Dep. at 192 (Exh. 4).

132.   After DPW decided not to close Hamburg Center, it sought and received approval from the federal government to allow it to use the MFP Project to relocate individuals from privately-operated ICFs/MR (rather than state ICFs/MR) to community services.  *See* Casey Dep. at 184, 192 (Exh. 4).

133.   No state ICF/MR residents have been or will be discharged under the MFP Project.  Kuhno Dep. at 19-20, 25 (Exh. 21).

134.   The federal government has extended the MFP program through federal fiscal year 2016.  Patient Protection and Affordable Care Act, Pub. L. 111-148, § 2403(a) (2010).  DPW has no plans to expand its MFP program during that period to provide community services to residents of state ICFs/MR.  *See* Pls.' Fourth Set of Interrogatories # 1 and Defendants' Response (e-mail of Allen Warsahw) (Exh. 22).

## VII.   Impact of Continued Institutionalization

135.   Some state ICF/MR residents who want to live in the community but are not discharged are upset because they are unable to live closer to and have more contact with their aging parents while their parents are still alive.  Sassaman Dep. at 48-50, 52-53 (Exh. 23).

136.   Some state ICF/MR residents who want to live in the community but are not discharged become hopeless and regress.  Sassaman Dep. at 50-51 (Exh. 23).

137.   DPW's failure to discharge Plaintiff Grogg has caused him to become less motivated and to "shut down" for periods of time because he cannot be closer to his mother and brother in the community.  Sassaman Dep. at 52-53 (Exh. 23).

138.   DPW's failure to discharge Plaintiff Benjamin has harmed him because the communal living at Ebensburg Center, including the noise and the light, exacerbates his migraine headaches and causes him to hurt himself.  McIntire Dep. at 48-50 (Exh. 24).

139.   State ICF/MR residents are not always provided with individualized treatment that focuses on their particular needs and desires.  Sassaman Dep. at 32-33 (Exh. 23); Wagner Dep. at 31-37 (Exh. 25); Dobbins Dep. at 72-73 (Exh. 26).

Respectfully submitted,

Dated:  June 23, 2010         By:   /s/ *Robert W. Meek*
                                    Robert W. Meek -  PA 27870
                                    Mark J. Murphy - PA 38564
                                    Robin Resnick - PA 46980
                                    Disability Rights Network of PA
                                    1315 Walnu  Street, Suite 500
                                    Philadelphia, PA  19107-4705
                                    215-238-8070
                                    215-772-3126 (fax)
                                    RMeek@drnpa.org

Stephen F. Gold
1709 Benjamin Franklin Pkwy.
2nd Floor
Philadelphia, PA  19103
215-627-7100
215-627-3183 (fax)
stevegoldada@cs.com

Counsel for Plaintiffs and the Class