<u>Exhibit A</u>

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FRANKLIN BENJAMIN, by and through his next
friend, Andrée Yock; RICHARD GROGG and
FRANK EDGETT, by and through their next
friend Joyce McCarthy; SYLVIA BALDWIN, by
and through her next friend, Shirl Meyers;
ANTHONY BEARD, by and through his next
friend Nicole Turman, on behalf of themselves
and all others similarly situated,

                           *Plaintiffs,*

          v.

DEPARTMENT OF PUBLIC WELFARE OF THE
COMMONWEALTH OF PENNSYLVANIA and GARY
ALEXANDER, in his official capacity as Secre-
tary of Public Welfare of the Commonwealth
of Pennsylvania,

                         *Defendants.*

**Civil Action No. 1:09-cv-1182-JEJ**

Class Action

Complaint Filed June 22, 2009

## OBJECTIONS OF DIANE SOLANO,
## BY AND THROUGH HER BROTHER AND GUARDIAN, CARL A. SOLANO,
## TO CLASS ACTION SETTLEMENT
## AND NOTICE OF INTENTION TO APPEAR AT HEARING

Carl A. Solano
SCHNADER HARRISON SEGAL & LEWIS LLP
   *Attorney and Guardian for Diane Solano*
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 751-2202

## TABLE OF CONTENTS

*Page*

INTEREST AND POSITION OF OBJECTOR DIANE SOLANO ............................................... 1

DIANE'S RIGHT TO PARTICIPATE AND OBJECT ................................................. 6

OBJECTIONS ................................................................................. 8

— OBJECTION TO CLASS CERTIFICATION ....................................................... 8

I.  THE CLASS IS NOT APPROPRIATE FOR CERTIFICATION UNDER RULE 23(B)(2) OF
    THE RULES OF CIVIL PROCEDURE ....................................................... 8

    A.  The Class Was Improperly Certified Under Rule 23(b)(2) Because It Is
        Not Cohesive and Is Improperly Defined............................................9

    B.  The Class Was Improperly Certified Under Rule 23(b)(2) Because It De-
        pends on an Opt-Out Provision Not Permitted Under the Rule .........................18

    C.  The Class Was Improperly Certified Because the Named Plaintiffs'
        Claims Are Not Typical of Those of All Other Class Members and Those
        Plaintiffs Are Not Adequate Representatives of the Class ...............................20

    D.  The Class Certification Did Not Comply with the Procedural Require-
        ments of Rule 23..................................................................23

— OBJECTIONS TO TERMS OF THE SETTLEMENT......................................................25

II. THE SETTLEMENT IMPROPERLY INFRINGES ON THE RIGHTS OF CLASS MEMBERS
    UNDER *OLMSTEAD* BY MOVING THEM TO COMMUNITY FACILITIES EVEN IF
    RELOCATION IS INAPPROPRIATE .......................................................25

    A.  The Settlement Compels the Relocation to Community Facilities of State
        Center Residents Who Need Comprehensive Care and Have Not Ex-
        pressed Any Desire To Be Relocated ................................................26

    B.  The Settlement Fails To Provide for Individualized Determinations of
        Whether Each State Center Resident Is Capable of Moving to Communi-
        ty Facilities and Whether Such Facilities Are Available To Accommo-
        date Each Resident's Needs........................................................30

    C.  The Settlement Fails To Provide Protections for State Center Residents
        Who Make Improvident Decisions To Relocate to Community Facilities ........33

III. THE SETTLEMENT IMPROPERLY INFRINGES ON THE RIGHTS OF CLASS MEMBERS UNDER *OLMSTEAD* BY FAILING TO CREATE PROCEDURES THAT WILL ENABLE INFORMED DECISION-MAKING ABOUT THEIR CARE OPTIONS .......................................... 34

    A. The Class Certification Notice Requires Class Members To Decide About Their Care Without Adequately Explaining the Consequences of Agreeing To Community Relocation .................................................... 34

    B. The Settlement Lacks Unbiased Procedures Necessary To Assure That Relocation Decisions Are Properly Made ......................................... 36

IV. THE SETTLEMENT IMPROPERLY INFRINGES ON THE RIGHTS OF CLASS MEMBERS UNDER *OLMSTEAD* BY FAILING TO PROTECT THOSE ELECTING TO REMAIN IN THE STATE CENTERS AND BY DEPRIVING THE STATE CENTERS OF RESOURCES........................ 38

    A. The Settlement Contains No Protections Against Closing of the State Centers or Reduction in the Quality of Care That They Offer ........................... 42

    B. The Settlement Improperly Mandates Transfers to Community Programs of State Funds That Are for the Benefit of State Center Residents .................... 43

V. THE SETTLEMENT PROVIDES FOR ATTORNEYS' FEES THAT ARE INAPPROPRIATE ............. 44

REQUEST TO BE HEARD ..................................................................... 45

## TABLE OF AUTHORITIES

*Page*

### *Cases*

*Alexander v. Rendell*, 2006 U.S. Dist. LEXIS 3378 (W.D. Pa. 2006) & 2009 U.S. Dist. LEXIS 1540 (W.D. Pa. 2009) ................................................................42

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ................................................9

*Barnes v. American Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998), *cert. denied*, 526 U.S. 1114 (1999) ............................................................................9, 11

*Bell Atl. Corp. v. Bolger*, 2 F.3d 1304 (3d Cir. 1993) ................................................20

*Benjamin v. Dep't of Publ. Welfare*, 2011 U.S. App. LEXIS 7124 (3d Cir. 2011) ........................42

*Benjamin v. Dep't of Publ. Welfare*, 267 F.R.D. 456 (M.D. Pa. 2010), *aff'd*, 2011 U.S. App. LEXIS 7124 (3d Cir. 2011) ............................................4, 26, 39

*Benjamin v. Dep't of Publ. Welfare*, 2011 U.S. Dist. LEXIS 40100 (M.D. Pa. 2011) .............10, 22

*Carlough v. Amchem Prods., Inc.*, 5 F.3d 707 (3d Cir. 1993) ..........................................7

*Chiang v. Veneman*, 385 F.3d 256 (3d Cir. 2004) ......................................................15

*Devlin v. Scardelletti,* 536 U.S. 1 (2002) ............................................................20

*Gaskin v. Pennsylvania*, 197 Fed. Appx. 141 (3d Cir. 2006) ..........................................7

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975) ........................................................8

*Gould v. Alleco*, 883 F.2d 281 (4th Cir. 1989), *cert. denied*, 493 U.S. 1058 (1990) ...................20

*Harris v. Pernsley*, 820 F.2d 592 (3d Cir.), *cert. denied*, 484 U.S. 947 (1987) ............................7

*In re Bear*, 44 Pa. D.&C. 4th 225 (C.P. Dauphin 1999) ................................................28

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009) ....................................8

*In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722 (3d Cir.), *cert. denied*, 534 U.S. 889 (2001) ................................................................44

*In re Easly*, 46 Pa. D.&C. 4th 374 (C.P. Venango 2000), *aff'd*, 771 A.2d 844 (Pa. Cmwlth.), *appeal denied*, 567 Pa. 731, 786 A.2d 991 (2001) ................................29

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008) ........................9, 15, 23

*In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333 (3d Cir. 2010) ..............................25, 29

*In re Prudential Ins. Co. Amer. Sales Prac. Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998), *cert. denied*, 525 U.S. 1114 (1999).............................................................................8

*In re Rite Aid Corp. Securities Litig.*, 396 F.3d 294 (3d Cir. 2005) ...........................................44

*In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585 (3d Cir. 2009)................................ 20-21

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004).............................................8

*Kyriazi v. Western Elec. Co.*, 647 F.2d 388 (3d Cir. 1981) ........................................................18

*Ligas ex rel. Foster v. Maram*, 478 F.3d 771 (7th Cir. 2007).......................................................15

Oral Arg. Recording, *http://www.ca7.uscourts.gov/fdocs/docs.fwx?submit=showbr &shofile=06-1327_023.mp3* (7th Cir., Oct. 30, 2006) ...........................................15

*Ligas ex rel. Foster v. Maram*, slip op. (N.D. Ill., July 7, 2009) (No. 05 C 4331) .......................15

*Ligas ex rel. Foster v. Maram*, 2010 U.S. Dist. Lexis 34122 (N.D. Ill. 2010) ....................... 40-41

*Marino v. Ortiz*, 484 U.S. 301 (1988)...........................................................................................7

*Neal ex re. Kanter v. Casey*, 43 F.3d 48 (3d Cir. 1994) .........................................................9, 21

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999)...................................................... *passim*

*Virginia Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632 (2011) ..................................44

*Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179 (3d Cir. 2006) .................................................24

*Wal-Mart Stores, Inc. v. Dukes*, 2011 U.S. LEXIS 4567 (U.S. 2011) ................................5, 14, 18

### *Statutes*

Americans with Disabilities Act, Title II, 42 U.S.C. §§ 12131 *et seq.*.................................. *passim*

Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. § 15001 *et seq.* ....................................................................................................................44

Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 *et seq.* .................................................................................................................................44

### *Court Rules*

Federal Rules of Civil Procedure

Rule 23(a)(2) ...........................................................................................................10

Rule 23(a)(3), (4) ....................................................................................................20

Rule 23(b)(2)......................................................................................3, 5, 8-9, 15, 18-20

Rule 23(c)(1)...............................................................................................................24

Rule 24 .......................................................................................................................40

### *Other Authorities*

J. Ackerman, "Western Center Will Be Staffed Until April 26," *Pittsburgh Post-Gazette*, *http://www.post-gazette.com/regionstate/20000416western4.asp* (Apr. 16, 2000).................42

Am. Psych. Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed., Text rev., 2000) ....................................................................................... 1, 12-13

Center on Budget and Policy Priorities, "States Continue to Feel Recession's Impact," *http://www.cbpp.org/cms/?fa=view&id=711* (June 17, 2011) .................................................13

Disability Rights Network of Pennsylvania, "About DRN," *http://drnpa.org/page/about-drnpa* (2011) ....................................................................................................................44

K.K. Walsh, *et al.*, "Cost Comparisons of Community and Institutional Residential Settings:   Historical Review of Selected Research," 41 MENTAL RETARDATION 103 (2003)..................................................................................................................... 14, 37-38

VOR, "Media Coverage Highlighting the Increasing Need for More Effective Federal and State Protections . . .," *http://www.vor.net/images/AbuseandNeglect.pdf* (2011) ...................34

_____

NOTE:  All Internet materials are as accessed on July 27, 2010.

## <u>INTEREST AND POSITION OF OBJECTOR DIANE SOLANO</u>

These objections are filed on behalf of Diane Solano, a 56-year-old resident of White Haven Center.  White Haven is one of the intermediate care facilities for the mentally retarded (ICFs/MR) that are the subject of this litigation.  Because Diane is mentally incapacitated, she files these objections by and through her brother, Carl A. Solano, Esquire ("Objector").  Carl was appointed Diane's legal guardian on July 20, 2004, as the successor to Diane's parents, her original guardians.  *In re Diane Solano*, No. 3215 of 1998 (C.P. Luzerne 2004).

***Diane.***  Diane has been diagnosed as having "profound mental retardation."[1]  Her mental age is at or below 1 year.  The extent of her mental and intellectual incapacity is extreme:

• She is incapable of caring for herself.  She must rely on others for all daily needs, including food, clothing, bathing, and toilet activities.  She needs 24-hour care, seven days a week.

• She has limited comprehension skills, and can understand only the simplest directions, usually in connection with a routine that has developed over time;  she therefore cannot be provided with advance care or safety instructions, since they are meaningless to her.  She has no comprehension of everyday dangers and therefore would be at extreme risk from them.

• She is non-verbal and cannot communicate her wants or needs.  She therefore must depend on others anticipating her needs and providing for them.

• She is very quiet and passive, spending most of her time sitting in the lotus position, or moving from chair to chair.  She can easily be lost in a crowd.

---

[1]  "Profound mental retardation" is a medical diagnosis (diagnostic code 318.2) based on an intelligence quotient below 20 or 25.  Am. Psych. Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 42 (4th ed., Text rev., 2000).  The text uses this term instead of "intellectual disability" when formal accuracy is required.

Diane's developmental disabilities stem from Down's Syndrome, and, like other aging Downs victims, Diane has early stages of dementia and possible Alzheimer's disease.  She has also developed other physical conditions that require daily medications and physician and nursing care, including cataracts, diverticulosis, thalassemia minor, and osteoporosis.  She has special dietary restrictions and protocols that apply to her bedtime.

Diane has resided at White Haven Center all of her adult life, and it is what she knows as her home.  She moved to White Haven Center on August 25, 1965, and her daily behavior since that time shows that she knows and feels comfortable with White Haven's staff and physical surroundings.  From all outward indications, the familiarity of Diane's surroundings is an important and valuable part of her life.

Because of Diane's condition, her guardians consistently have concluded that White Haven Center is the most appropriate setting for her care.  In the 46 years she has lived there, Diane has received excellent care that has accommodated her special needs.  White Haven has been able to provide such care because it has both the facilities and the 24-hour staff support that is required to care for such individuals.  Objector is unaware of available "community" facilities that could provide similar support of the same quality.

*This litigation.*  This action was brought by State Center residents who claim that they are capable of living in community homes where they will benefit from increased socialization.  Objector does not oppose providing relief to these named plaintiffs and anyone situated similarly to them.  But the record in this litigation creates the false impression that large numbers of State Center residents (the members of the class certified in this case) are similar to these named plaintiffs when in fact they are not.  Data from the Department of Public Welfare (DPW) disclose that ***three-fourths of all State Center residents are diagnosed as having profound men-***

*tal retardation, just like Diane*.  And to the extent they are just like Diane, these class members are not capable of living in community facilities unless they are provided with a full range of medical, psychosocial, and personal-care services 24 hours each day.  The litigants have masked this fact by stating that "all" State Center residents can live in the "community" with "appropriate services and supports," but they have not explained that the only "services and supports" that would be "appropriate" for most State Center residents would be those providing comprehensive care on a 24/7 basis.  The facilities best equipped to provide such services are ICFs/MR like White Haven, and the parties have provided no evidence that there is a sufficient number of small "community" facilities that are similarly equipped to do this job.  Thus, for three-fourths of the State Center residents, this litigation may not result in deinstitutionalization;  rather, it may result in relocation from a state institution to a private one.  Alternatively (and much worse), it may result in transfer to a local facility that is incapable of providing the full level of care and support needed by these individuals.

Because of their "profound" level of disability, most of these class members are completely dependent on others to look out for their interests.  The summary judgment record establishes, however, that 82% of them do not have guardians.  This means that the settlement puts hundreds of people with profound intellectual disabilities at the mercy of this Court, which must oversee the litigation and review the terms of the parties' settlement to be sure that these highly vulnerable individuals are protected.  There is substantial reason for concern.  The parties stipulated to bind all State Center residents to their litigation's outcome by having the case certified as a Rule 23(b)(2) class action.  In doing so, they failed to acknowledge the substantial differences among the class members in the levels of care they require and in their abilities to live in the community.  And now, in their settlement, they have provided that those class members who cannot understand what this case is about and, therefore, are incapable of expressing opposi-

tion to being moved out of the State Centers and to some "community" facilities are automatically to be listed among those to be moved, even though many of them have lived in the State Centers for decades and know no other home and no other care-givers. Indeed, the parties have agreed to set quotas for the numbers of people they will ship out: 400 over the next five years.

*Diane's interest.* Objector opposes the settlement for all of the reasons set forth below. A principal reason is that the settlement threatens Diane's ability to continue to receive care and support at White Haven by improperly moving so many individuals out of the State Centers that continued provision of high-quality care there may be impaired. If (as discussed below) this case should not apply to all State Center residents because it was improperly certified as a class action, and if (as discussed below) it has resulted in a settlement agreement that improperly removes residents from the State Centers who should not be removed, then the litigation will adversely affect residents like Diane by decreasing the size of the Centers, diverting the resources devoted to them, and, ultimately, threatening to impair the Centers' continued ability to provide high-quality care to those who remain.

When a similar concern was raised last year by a group of putative intervenors, this Court viewed it as too speculative to give rise to a protectable interest meriting intervention. *Benjamin v. Dep't of Publ. Welfare*, 267 F.R.D. 456, 462 n.6 (M.D. Pa. 2010), *aff'd*, 2011 U.S. App. LEXIS 7124 (3d Cir. 2011) (not precedential). The concern no longer is speculative. Part IV of the settlement agreement calls for 400 residents of the State Centers — about one-third of their total population — to be moved out of the Centers within five years, with more to follow. Significantly, those 400 residents are ***not*** just individuals who, like the named plaintiffs, claim that their rights were infringed because they want to be relocated and were stymied in their efforts. Instead, many (perhaps most) will have no understanding of what is happening to them

4

and will be moved solely because they cannot speak for themselves and have no guardians to speak for them (making each such individual, in the words of p. 2 of the settlement notice, some-one who "does not say one way or the other if he or she wants to live in the community").   The settlement thus is being used improperly to depopulate the Centers by removing individuals in-capable of expressing a view about where they prefer to live.   Once it does so, the Common-wealth is likely to find it more difficult to devote the financial resources needed to maintain the current level of care at the State Centers in light of their dwindling population.   Again, this is not speculation:  Paragraph V.2.c. of the settlement agreement *explicitly provides for state funds to be diverted from the State Centers to "community" funding programs*.

The settlement thus places Objector in a bind.  His preference is to oppose partic-ipation in the class so that Diane can live in the White Haven Center, an opt-out option that this Court said in its intervention decision would protect residents' right under *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), to remain in their current housing.  But even assuming that this ability to opt out of what otherwise would be a mandatory Rule 23(b)(2) class survives the Supreme Court's statement in *Wal-Mart Stores, Inc. v. Dukes*, 2011 U.S. Lexis 4567, *40-*43 (U.S. 2011), that Rule 23(b)(2) opt outs are forbidden, exercise of that option now will leave Di-ane threatened because the settlement will dramatically change the nature of the State Centers, reallocate funding, and thereby threaten a reduction in the quality of care provided at White Ha-ven.  That possibility has forced Objector to reconsider his opposition and, reluctantly, to defer opting out of the class settlement because (in the words of the class definition) it is possible that he "would not oppose community placement" in the future if settlement-induced changes at the Centers leave him with no better alternative.

Diane should not be made the victim of this unpalatable choice.

5

## DIANE'S RIGHT TO PARTICIPATE AND OBJECT

Diane has a right to participate in these proceedings and to object because she is a member of the certified class.  Alternatively, she can participate as an intervenor.

*Membership in the certified class.*  On September 2, 2009, this Court certified the following class:

> All persons who:  (1) currently or in the future will reside in one of Pennsylvania's state-operated intermediate care facilities for persons with mental retardation; (2) could reside in the community with appropriate services and supports; and (3) do not or would not oppose community placement.

As a resident of the White Haven Center, Diane meets the first requirement of the class definition.  Though they had no basis to do so (as explained below in the objection to the class certification), the parties incorrectly stipulated that Diane and all other State Center residents meet the second requirement;  in Paragraph 65 of the answer to the amended complaint, DPW admitted an allegation that "*All* persons with mental retardation who are institutionalized in state-operated ICFs/MR, with appropriate supports and services, could live in more integrated community settings," and the class was certified on that basis.  If permitted to do so, Objector will challenge this incorrect determination, but for now it is binding on the parties.  Whether Diane is a member of the class therefore turns on the third prong of the class definition.

That third prong asks whether the putative class member "do[es] not or would not oppose community placement."  The first part of that question is easy:  Objector *does* presently oppose community placement because he believes that White Haven Center provides a more appropriate facility for Diane's care.  But the second part of this question — "would not oppose" — changes this inquiry considerably, since the question asks whether Objector's opposition might possibly change at some time in the future.   As discussed above, Objector would be

6

forced to change his view if the settlement forces a reduction in the quality of care at White Haven Center.   Therefore, despite his current belief that "community" relocation would not be in Diane's best interest, Objector's fiduciary obligations as Diane's guardian foreclose any unalterable statement that he "would not oppose" community placement in the future if conditions change to such an extent that he must consider that alternative.   For that reason, Diane is a member of the class and has a right to participate in these proceedings.

*Alternative motion to intervene.*   If the Court concludes that Objector does not have a right to participate because Diane is not a member of the class, Objector moves to intervene so that these objections may be heard.   *See Marino v. Ortiz*, 484 U.S. 301 (1988); *Gaskin v. Pennsylvania*, 197 Fed. Appx. 141 (3d Cir. 2006).   To comply with Chapter IV of this Court's Local Rules, Objector is filing the intervention motion as a separate document.   Objector makes that motion only as an alternative basis for presenting his objections.   *See generally Carlough v. Amchem Prods., Inc.*, 5 F.3d 707 (3d Cir. 1993) (intervention unnecessary for objecting class members).   As explained in the motion, these objections seek to advance an interest of Diane that may be affected or impaired by the settlement and that is not adequately represented by an existing party.   In this situation, the Court of Appeals has advised that even if an individual is not entitled to intervene for all purposes, it is appropriate to permit her limited intervention for the purpose of objecting to a class settlement.   *See Harris v. Pernsley*, 820 F.2d 592, 603 (3d Cir.), *cert. denied*, 484 U.S. 947 (1987) ("permitting persons to appear in court, either as friends of the court or as interveners for a limited purpose, may be advisable where third parties can contribute to the court's understanding of the consequences of the settlement proposed by the parties").

# OBJECTIONS

Diane's objections fall into two categories:  objections to class certification (Part I below, pp. 8-24) and objections to the terms of the settlement (Parts II through V, pp. 25-44).

## OBJECTION TO CLASS CERTIFICATION

## I.   THE CLASS IS NOT APPROPRIATE FOR CERTIFICATION UNDER RULE 23(B)(2) OF THE RULES OF CIVIL PROCEDURE.

An objector to a class settlement may object on the ground that the class should not have been certified.  *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 257 (3d Cir. 2009); *see generally In re Prudential Ins. Co. Amer. Sales Prac. Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998), *cert. denied*, 525 U.S. 1114 (1999).  A court reviewing a class settlement must consider this issue separately from the fairness of the settlement itself, *Prudential*, at 308, although issues relating to the propriety of the certification may be considered in connection with the fairness analysis.  *See id.* at 323-24 & n.73 (3d Cir. 1998) (listing class certification issues among appropriate class settlement factors for consideration).[2]  This case should not have been certified as a class action because it does not meet the requirements of Federal Rule 23.  If the named plaintiffs are entitled to the relief they requested, they should receive it, but that does not mean that the same injunctive relief should apply to every other resident of a State Center.  Differences among the class members make such an across-the-board adjudication erroneous.

---

[2]   In *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975), the Court of Appeals identified a risk of maintaining class certification as a factor favoring approval of a class settlement, but the pertinent risk in that inquiry is that a ***properly certified*** class may be decertified if it becomes unmanageable for trial.  *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004); *Prudential*, 148 F.3d at 321.  *Girsh* does not approve settlement of a class that was not eligible for certification under Rule 23.

A.     **The Class Was Improperly Certified Under Rule 23(b)(2) Because It Is Not Cohesive and Is Improperly Defined.**

Plaintiffs obtained certification under Rule 23(b)(2), which provides for a mandatory class, without opt-outs, of similarly situated plaintiffs seeking injunctive or declaratory relief.  The Court of Appeals has emphasized that this type of a class must be cohesive, and that its members therefore must share a predominance of common issues that exceeds even that required under Rule 23(b)(3).  *Barnes v. American Tobacco Co.*, 161 F.3d 127, 142-43 (3d Cir. 1998), *cert. denied*, 526 U.S. 1114 (1999).  The relief sought in the action must benefit the entire class.  *Neal ex re. Kanter v. Casey*, 43 F.3d 48, 59 (3d Cir. 1994).

It was plaintiffs' burden to prove the cohesiveness of the class.  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307, 320-21 (3d Cir. 2008).  But plaintiffs didn't even try; their class certification motion and brief made no mention of cohesiveness or predominance.  Rather than opposing certification on that basis, however, defendants did not oppose the motion at all.  In this setting, this Court was required to give "rigorous consideration of all the evidence" and to "make a definitive determination that the requirements of Rule 23 have been met."  *Peroxide*, 552 F.3d at 320-21.  The fact that the certification motion was unopposed did not obviate this obligation, which protects unnamed class members from being bound by a mandatory class order that should not have been entered.  As the Supreme Court warned in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997), courts must give "undiluted, even heightened, attention" to issues of commonality and predominance in the settlement context because those inquires are designed "to protect absentees by blocking unwarranted or overbroad class definitions."  The Court did not hold a class certification hearing here before it certified the class.  A rigorous consideration of the evidence makes clear that the class that was certified was improper and that the class definition was, in the language of *Amchem*, "overbroad."

The class is defined as all residents of State Centers who "could reside in the community with appropriate services and supports" and "do not or would not oppose community placement." These requirements mirror elements of plaintiffs' cause of action under *Olmstead*, which requires that a proposed placement be appropriate for the affected individual, unopposed, and reasonably accommodated in light of available resources. 527 U.S. at 606. Indeed, in granting summary judgment on liability, this Court held that "the definition of the class itself satisfies the first two elements articulated in *Olmstead*." *Benjamin v. Dep't of Publ. Welfare*, 2011 U.S. Dist. LEXIS 40100 at *20 (M.D. Pa. 2011).[3] But, for the following reasons, the class defined by these elements is not susceptible to cohesive treatment or proof in a class action. Because the defects discussed here relate both to the definition of the class and to the cohesiveness of a class under that definition (as well as to general commonality under Rule 23(a)(2)), all of these issues are discussed here together.

*First*, a class *defined* according to whether or not each of its 1,272 members (the number of State Center residents at the time this case was filed) is able to reside in the community "with appropriate services and supports" necessarily requires individualized identification of *which* class members are in fact capable of meeting that requirement. Such identification, in turn, requires an individualized analysis of just what the "appropriate services and supports" are for each individual to live in the community and whether it is feasible for the Commonwealth to

---

[3]      The Court's grant of summary judgment turned largely on the unproven allegations presented on the class certification motion, such as that "all of the named Plaintiffs could live in more integrated community settings rather than institutions because they would still have available all services and supports that are currently available to them." 2011 U.S. Dist. LEXIS at *8. Though this statement referred to the "named plaintiffs," the Court apparently used it as a basis to grant summary judgment with respect to the entire class. As discussed in the text, however, there is no evidence supporting this conclusion with respect to all class members because of differences in the services and supports they would require. The issues discussed in the text thus implicate not only class certification, but also liability.

provide them.  These individualized questions dwarf any supposed common issues in this case. *Cf. Barnes*, 161 F.3d at 146 (class to provide medical monitoring relief for smokers may not be certified because each class member would have individualized medical monitoring needs).

Residents of the state centers have a range of abilities and needs that will compel differing answers to whether they are able to be relocated to a community facility, and they must have these abilities and needs assessed individually.  The amended complaint alleged (¶ 65) that "[a]ll persons with mental retardation who are institutionalized in state-operated ICFs/MR, with appropriate supports and services, could live in more integrated community settings," and the defendants admitted this allegation — making it a critical predicate for the class certification. But no evidence supports this allegation or admission.  In particular, plaintiffs presented no evidence that each resident of the State Centers is capable of living in the community with services and supports that ***actually*** can be provided in community facilities and that the Commonwealth ***actually*** can and will provide despite its present funding crisis.  Instead, they just avoided those questions entirely.  Because of that lack of proof, class certification was improper.

There should be no question that the services and supports needed by each individual to live in the community will vary with each individual's personal condition.  Some may be relatively minor, such as transportation to a job.  But for individuals like Diane who have profound intellectual and developmental deficiencies, the needs will be substantial.  Because of her profound disabilities, Diane and those like her need 24-hour care seven days per week.  A failure to provide such care would be catastrophic.  Diane is incapable of caring for herself in any way, and she is incapable of learning how to do so.  Her passivity, inability to comprehend dangers, and impossibility of complying with instructions make it essential that professional personnel always are available to tend to all of her needs, which range from significant medical and psy-

chosocial needs, to provision of daily hygiene and personal care, to quick responsiveness to emergencies.  Indeed, it is difficult to imagine a "community" facility equivalent to White Haven Center in which Diane and others like her could be placed, other than, perhaps, a day-care center or nursing home — unpalatable alternatives to say the least.[4]

Diane is not unique.  To the contrary, one of the important facts about this case that has not been discussed by the parties is that ***most of the residents of the State Centers have profound levels of intellectual retardation***, just like Diane.  April 2011 data from the five State Centers (as provided by the White Haven superintendent, Ex. A) show that of the 1207 residents then residing there, 890 (74%) were diagnosed as profoundly retarded, just like Diane.  The services and supports needed by these individuals necessarily include 24-hour care.  In addition, such profoundly retarded State Center residents are likely to have physical conditions that will require additional services and supports.  *See generally* Am. Psych. Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 44 (4th ed., Text rev. 2000) ("DSM-IV-TR").[5]

---

[4]     The most recent "Community Placement Plan" prepared by White Haven Center as part of Diane's 2010 Individual Support Plan provides, "In the event that the White Haven Center is no longer a living arrangement option, then a Community-based ICF/MR or Community Living Arrangement (CLA) with 24 hour-awake supervision would be necessary."  It continued that the facility would have to be a "single floor, barrier free dwelling," with staff in the immediate area and a bathroom "adapted to meet Diane's needs."  In other words, if relocated, Diane would have to be moved to an institutional facility similar to where she lives now at White Haven.

[5]     The Manual describes "profound mental retardation" as follows:

The group with Profound Mental Retardation constitutes approximately 1%–2% of people with Mental Retardation.  Most individuals with this diagnosis have an identified neurological condition that accounts for their Mental Retardation.  During the early childhood years, they display considerable impairments in sensorimotor functioning.  Optimal development may occur in a highly structured environment with constant aid and supervision and an individualized relationship with a caregiver.  Motor development and self-care and communication skills may improve if appropri-

*…Continued*

The April 2011 data show that, like Diane, 712 (59%) of the residents are non-verbal.   Nearly half (564 individuals) are unable to walk.   In addition, 56% (670 residents) have seizure disorders, 27% (330 residents) have cerebral palsy, 26% (316) have autism, 23% (283) are visually impaired, and 16% (188) require an enteral feeding tube for nutrition.   Ex. A.

Of course, if money were no object and unlimited funds were available to provide each State Center resident with any support that might be needed, the substantial needs of the State Centers' most disabled residents might not be of concern for purposes of class certification, since the Commonwealth would provide whatever services and supports any individual required. But the Court can take judicial notice of the continuing fiscal crisis facing the Commonwealth,[6] and there is no evidence in this record that the Commonwealth intends or is able to make unlimited funding available to provide, without limitation, *any* type of service or support that is necessary to permit every State Center resident's relocation to a community facility.   Indeed, defendants consistently have cited the "current budget environment" to explain their failure to do so up to now.   *See* Defs. Resp. to Pl. Undisp. Facts re Sum. J. (Dkt. #66, Att. 1) ¶¶ 103-05.

While the Commonwealth can provide 24-hour care cost-effectively to multiple residents sharing such similar needs in the State Centers, the settlement agreement, at ¶ V(4) on p. 11, provides that the community facilities to which residents would be relocated are each to have no more than four residents.   Plaintiffs have presented no evidence that there is an adequate

---

*Continued from previous page*

ate training is provided.  Some can perform simple tasks in closely supervised and sheltered settings.

DSM-IV-TR at 44.

[6]   The Commonwealth's projected budget deficit is nearly $4 billion.  *See* Center on Budget & Policy Priorities, "States Continue to Feel Recession's Impact," *http://www.cbpp.org /cms/?fa=view&id=711* (June 17, 2011) (Table 1, listing state budget gaps).

number of such small facilities capable of providing 24-hour care to individuals who need it, and they have provided no explanation of what funds would be available to make such care available. Plaintiffs have sought to hide this problem by emphasizing that the cost of community facilities for the developmentally disabled historically has been far below that of State Centers, *see*, *e.g.*, Am. Compl. ¶¶ 58, 61, without explaining why:  that those who have been relocated to the community before now generally have been less disabled and needed fewer supports and services than the far more seriously disabled residents who remain in the Centers and would be subject to the settlement agreement.  *See generally* K.K. Walsh, *et al*., "Cost Comparisons of Community and Institutional Residential Settings:  Historical Review of Selected Research," 41 MENTAL RETARDATION 103, 105, 117-18 (2003) (generally discussing differences in cost comparisons).

To be a "common question" for purposes of Rule 23, a question must be capable of generating "common answers" that will lead to resolution of the case.  *Wal-Mart*, 2011 U.S. LEXIS 4567, *19-*20 (quotation omitted).  But the part of the class definition that asks whether class members are capable of living in the community can generate no commonality at all because its predicate condition — that the class members will be provided with "appropriate services and supports" — will produce differing answers that depend on what supports are available.  Plaintiffs' effort to avoid this deficiency by merely referring to "appropriate services and supports" without further definition or explanation merely seeks to substitute a generality for the rigorous examination that class certification requires.  As the Supreme Court emphasized in *Wal-Mart*, at *19, generalized common issues are "not sufficient to obtain class certification" because the individualized differences that lie beneath the surface make those questions incapable of classwide resolution.  Whether a class member can obtain relief depends on just what services and supports are "appropriate" ***for that individual***, whether ***those*** services ***actually*** can be provided in the community with the resources that are available, and whether defendants have vi-

olated the class member's rights by failing to provide for community placement in light of the *actual* availability of those services and supports. Because those questions will produce different answers for each class member, a class should not have been certified.

      *Second*, even if an otherwise non-opt-out class under Rule 23(b)(2) could be defined by what is, in effect, an opt-out provision for residents opposing relocation (something that, as discussed below, is doubtful), satisfaction of the remaining part of plaintiffs' class definition — determination whether each resident "do[es] not" or "would not" oppose relocation — again would require individualized analyses that make cohesiveness and predominance of common issues impossible. The question turns on each individual's personal choice. By definition, that is an individualized question that will produce different answers for each class member. Indeed, the Court of Appeals has explicitly held that a class may not be defined by reference to the state of mind of its members, since a class definition must be based on common objective criteria. *Chiang v. Veneman*, 385 F.3d 256, 271-72 (3d Cir. 2004), *overruled on other grounds*, *Hydrogen Peroxide*, 552 F.3d at 318 n.18. **This defect alone makes class certification improper.**[7]

---

[7]     When this Court denied intervention by relocation opponents last year, it based its decision largely on plaintiffs' opt-out provision and the holding in *Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 774-75 (7th Cir. 2007) (*Ligas I*), that a district court could deny intervention if such a provision would protect the opponents. *See* 267 F.R.D. at 462-63. However, in dicta during the appeal, the Seventh Circuit commented on the opt-out provision's likely invalidity because it required individualized inquiries into class members' states of mind. *See* Oral Arg. Recording, *http://www.ca7.uscourts.gov/fdocs/docs.fwx ?submit=showbr&shofile=06-1327_023.mp3* (7th Cir., Oct. 30, 2006). *See also* 478 F.3d at 775 (questioning, but not ruling on, propriety of class definition). In light of those comments and after a conference with the district court, the parties **stipulated to amend the class definition to remove the opt-out provision** as part of a settlement. At a hearing on approval of that settlement at which it received 2,500 objections, including 240 by those who appeared in person, the court denied approval and **decertified the class**. *See Ligas ex rel. Foster v. Maram*, slip op. (N.D. Ill., July 7, 2009) ("*Ligas II*") (Ex. B to 11/12/09 Br. in Supp. of Motion to Intervene (Doc. #29)). As discussed later in these objections, the court then permitted class opponents to intervene.

Indeed, this part of the class definition is improper not only because it will produce differing individualized responses, but because in many cases it will produce no responses at all. The question depends on the ability of a class member to choose whether he or she opposes community relocation. While some State Center residents may be capable of making this decision or will have guardians or other designated decision-makers to decide for them, those State Center residents who have severe mental disabilities (such as those, like Diane, who are diagnosed as profoundly retarded) will not be capable of doing so. As Diane's Individual Support Team at White Haven concluded when it drafted a "Community Placement Plan" for her last year: "Diane's functioning level does not support the idea she can comprehend these matters. Therefore, it is highly unlikely she has any interest or awareness of community-based placement options." Individual Support Plan: Diane Solano, Sept. 21, 2010. Similar conclusions undoubtedly apply to other State Center residents too: they are intellectually unable to decide whether they "do not" or "would not" oppose community relocation, since the concept is meaningless to them.

This issue would be less important if these class members had guardians. But the evidence in this case is that 82% of the State Center residents (1004 out of the 1223 then surveyed) do not have guardians. *See* Pl. Motion for Sum. J. (Doc. #48), Ex. 13 (DRN Info. Report, 2009). Many of them have depended on their parents to make important decisions for them. As they have aged, they have seen their parents pass away; and because their siblings and other relatives may live far away and may have had little contact with them, no one else has stepped in to fill this need. And so they are at the mercy of everyone else.

So how could plaintiffs prove that the proposed class consists of members who "do not or would not oppose community placement" when substantial numbers of those pur-

16

ported class members are intellectually incapable of answering the question themselves and have

no guardians or other decision-makers to answer for them?  They couldn't, and they didn't try.

At the time of class certification, plaintiffs simply ignored this problem, counting on the fact that

certification was unopposed and, therefore, no one would raise the question.  And now that there

is a settlement, they have sought to deal with the issue by a sleight-of-hand.  Rather than actually

proving that the class consists only of class members who want to move out of the State Centers

into the "community," the settlement says that a State Center resident who *remains silent* on this

question is *conclusively presumed* to want to be relocated (or, at least, to not oppose it).  In the

words of the class settlement notice, at p. 2, "If a person does not say one way or the other if he

or she wants to live in the community, he or she will be placed on the Planning List unless an

involved family member or guardian does not want the person to live in the community."[8]  So, if

a State Center resident is intellectually incapable of saying whether he or she opposes relocation

and, accordingly, says nothing at all, plaintiffs will deem that resident to meet the class definition

on the theory that the silence means the resident "do[es] not or would not oppose community

placement."  Obviously, that is no proof of the class requirement at all.  And because, as dis-

cussed below, this requirement was included in the class definition to preserve residents' right to

remain in a State Center under *Olmstead*, plaintiffs' solution to their class definition problem vi-

olates the residents' civil rights to boot.

       The question of who is eligible to move to the community is the predominant

question in this litigation.  It depends on whether a class member is capable of relocation and

---

[8]    Similarly, plaintiffs' motion for preliminary class approval (p. 6) says, "State ICF/MR residents who do not express a preference for discharge will be placed on the Planning List unless they have involved family or guardians who are opposed."  *See also* Set. Ag. ¶ III(b) ("If the state ICF/MR resident does not express opposition to considering community placement, the resident will be placed on the State ICF/MR Planning List . . .").

whether, in view of their right of choice under *Olmstead*, he or she desires relocation.  Only upon resolution of these questions could it be found whether the Commonwealth violated federal law in depriving the class members of their rights.  Because these pivotal questions can only be answered individually, and not in common for the entire class, class certification was improper.  Plaintiffs failed to prove that predominant common issues make the class sufficiently cohesive for certification under Rule 23(b)(2).

      **B.**      **The Class Was Improperly Certified Under Rule 23(b)(2) Because It Depends on an Opt-Out Provision Not Permitted Under the Rule.**

The portion of the class definition that depends on whether a class member "do[es] not or would not oppose class certification" is, in effect, a provision enabling those State Center residents who do not want to be bound by the injunction or settlement resulting from the class action to opt out of it.  Objector welcomes this opportunity, since, as noted, he presently prefers that Diane remain in the White Haven Center.  But the validity of this opt-out provision is doubtful.  Rule 23(b)(2) makes no provision for opt outs, and the Court of Appeals has long held that participation in a class under Rule 23(b)(2) is mandatory.  *See Kyriazi v. Western Elec. Co.*, 647 F.2d 388, 393-95 (3d Cir. 1981).  The Supreme Court's decision in *Wal-Mart* has now emphasized this point.  The Court described Rule 23(b)(2) classes as "mandatory classes" from which there is "no opportunity . . . to opt out."  2011 U.S. Lexis 4567, *41.  *See id.* at *43.

In light of these precedents, that part of the class definition that permits State Center residents who otherwise would be part of the class to opt out of it by saying they oppose the requested relief appears invalid.  And that leaves class members who oppose the class action in a quandary.  They may wish to state opposition to community relocation and thereby to exclude

18

themselves from any provisions of the settlement.  But if the opt-provision is invalid, that exclusion may be ineffective.  That result is untenable.

Plaintiffs have said that they defined the class in a way that permits those opposing relocation to the community to not be a part of it so that they could preserve each class member's right under *Olmstead* to remain in a State Center if he or she so desires.  That indeed is a legitimate purpose;  any effort to deprive class members of their right to live where they choose would be constitutionally infirm.  But Rule 23(b)(2) makes clear that plaintiffs' class definition is not the proper way to protect class members' rights.  Rather, a class action that really did seek to vindicate all class members' federal rights under *Olmstead* would seek relief on behalf of *all* State Center residents who have been deprived of their right to live in the type of facility that they choose.  Such an inclusive class would seek to vindicate *all* residents' choices — both those of residents who want (and are able) to move to the community, and those who do not.  By doing so, it would more accurately apply *Olmstead*, under which mentally incapacitated individuals are entitled to live not only in non-institutional settings, but, if they so choose, to live in institutional settings too.  A case seeking enforcement of *all* class members' choices would require no opt-outs, since the injunction would democratically demand enforcement of all *Olmstead* options, not just those options that plaintiffs advocate and other class members oppose.

It is readily apparent why plaintiffs did not define their class so inclusively.  Though they say they recognize the rights under *Olmstead* of class members who want to stay in the State Centers, plaintiffs want to do nothing to advance those rights.  A resident can try to preserve his or her right to remain in a State Center only by affirmatively declaring opposition to relocation — something that profoundly retarded residents who lack guardians to speak for them

cannot do.  The settlement exposes plaintiffs' action as one to force relocation, not to enforce free choice.

Indeed, by limiting the right to stay in State Centers to just those who affirmatively opt out of the class, the class definition risks impairing the rights of those class members by depriving them of the ability to be heard regarding the settlement's terms, since non-parties generally lack standing to object to a settlement by the class.  *See Gould v. Alleco*, 883 F.2d 281, 284 (4th Cir. 1989), *cert. denied*, 493 U.S. 1058 (1990).  Of course, if this were a normal Rule 23(b)(2) class without opt-outs, all class members would have a right to object and be heard.  *See Devlin v. Scardelletti,* 536 U.S. 1, 7-10 (2002); *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1307-10 (3d Cir. 1993).  Plaintiffs cannot deprive class members of their right to object to a settlement that will directly affect where they live by employing an improper Rule 23(b)(2) class definition.

For all of these reasons, the Court should hold that the class defined by plaintiffs could not be certified.  Alternatively, the Court should order that any class consist of all State Center residents unlawfully deprived of a right to live in a type of facility that they choose, whether that is a State Center or somewhere else.

### C. The Class Was Improperly Certified Because the Named Plaintiffs' Claims Are Not Typical of Those of All Other Class Members and Those Plaintiffs Are Not Adequate Representatives of the Class.

Rule 23(a) requires that parties seeking class certification prove that their claims are "typical of the claims . . . of the class" and that they "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(3), (4).  These requirements are interrelated.  *See In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 602 (3d Cir. 2009).  They require that the named plaintiffs' claims be sufficiently similar in factual circumstances to those of the rest of the

class that the plaintiffs' representation will be fair to the rest of the class members.  *Id.* at 597-98; *see Neal*, 43 F.3d at 59 ("the interests of the class members [must be] so like those of the individual representatives that injustice will not result from their being bound by such judgment)."

Plaintiffs are residents of three of the five State Centers at issue in this litigation — Polk, Ebensburg, and Selinsgrove.   The amended complaint contains meager information about each plaintiff, but none is alleged to be profoundly retarded.   Indeed, plaintiff Grogg is alleged to be "extremely independent and sociable" and to have the ability to hold a job, be involved in his church, and manage his own money.   Am. Compl. ¶¶ 27-28.   Plaintiff Edgett is similarly alleged to be "social, engaging, and independent," *id.* ¶ 34, and plaintiff Baldwin is described as "generally very independent," *id.* ¶ 40.   Each of the plaintiffs is alleged to want (or not to oppose) community relocation, and each has a living relative (for plaintiff Edgett, a sister; for the rest, a mother) who is participating in the decision to seek such relief.

Plaintiffs have presented no evidence that they are typical of the other residents of the State Centers, and the few facts recited above demonstrate that they are different from many class members in ways that are significant to the issues in this case.   Their differences in degree of intellectual disability mean that they must have differences in the types of services and supports they will need to live in the community.   There is no allegation or evidence, for example, that any of them requires 24-hour care for personal hygiene or medical services.   If, as it appears, it is more feasible to provide the services and supports needed by these individuals for community living than to provide the more extensive services and supports that would be needed by, for example, a profoundly retarded resident like Diane, then these individuals are not typical of the many profoundly retarded class members (74% of the class) who are more like Diane than them and whose support needs are much more difficult to fulfill.

Similarly, the allegations make clear that none of the named plaintiffs is typical of those State Center residents who are intellectually incapable of choosing whether they want to be moved out of their State Center homes and who have no guardian or other designated decision-maker to speak for them — the class members who, under the settlement, will be moved out because their incapacity prevented them from answering the question about choice.   Such class members present far different issues than do those who, like the named plaintiffs, are capable of exercising an option about where to live.

In another important difference, none of the plaintiffs is a resident of the State Centers in Hamburg or in White Haven (Diane's home).   Although the original complaint included a White Haven resident, Wilson Sheppard, as a plaintiff, Mr. Sheppard withdrew as a plaintiff after learning more about the case, and he then was one of the residents who sought to intervene last year in opposition to the relief requested by the plaintiffs.   The apparent premise of plaintiffs' case is that all State Centers, including White Haven, are fungible for purposes of a demand that residents be moved elsewhere.   But there is no evidence of that.   One purported reason why continued residence in each State Center is supposed to be a bad thing is that the State Centers are located in rural communities isolated from community population centers.   2011 U.S. Dist. LEXIS 40100, at *8 (summary judgment opinion), *quoting* Pl. Stmt. of Undisputed Facts in Support of Sum. J. (Doc. #50) at 12.   But Diane's home, White Haven, is in the Poconos, and her parents placed her there because it was just a half hour's drive from their home north of Wilkes-Barre.   A rigorous factual examination would show that White Haven residents have access to and are provided opportunities to participate in multiple activities in the northeastern Pennsylvania community, from attendance at local hockey games, to church events, to local fairs;  they are not isolated.   The record provides no evidence of whether and to what extent the same is true for residents of the State Centers where the named plaintiffs reside.

22

Finally, and most fundamentally, the named plaintiffs have interests different from those of other class members regarding the appropriate relief. Because of their purported abilities to care for themselves independently, the named plaintiffs do not share the needs of other class members for comprehensive care in intermediate care facilities, and, indeed, seek relief limited to "discharge" from the ICFs. Other class members need ICF support, however, and want to maintain their receipt of it. Each of these groups would benefit from different forms of relief, but plaintiffs seek only a single type of relief — discharge — which is of no benefit to the others. Plaintiffs' request for only one form of relief places these two groups in conflict, since the settlement would remove residents from the State Centers and require a reallocation of funding that would harm the State Center residents who wish to remain. This conflict makes the named plaintiffs inadequate representatives of these other class members.

Plaintiffs were required to provide proof that their situations are typical of and not adverse to those of Diane and other White Haven residents, but they failed to do so. Accordingly, they failed to establish typicality and adequacy of their representation, and thus failed to prove that a class should be certified.

### D.     The Class Certification Did Not Comply with the Procedural Requirements of Rule 23.

A class may not be certified unless the Court holds a hearing at which the facts necessary for certification are proven. *See Peroxide*, 552 F.3d at 307. No hearing or other fact-finding proceeding on certification was held in this case. Rather, plaintiff moved for certification and defendants did not oppose the motion, causing the Court to enter an order granting certification the next day. Because the facts necessary to meet each of the requirements for class certification were not proven at a hearing, the certification was improper and should be vacated.

In addition, the class certification order failed to comply with the requirements of Rule 23(c)(1)(B) that the order "define the class and the class claims, issues, and defenses."  As the Court of Appeals held in *Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179, 187-88 (3d Cir. 2006), that rule requires "that the text of the order or an incorporated opinion must include (1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis."  Paragraph III of the Court's September 2, 2009 certification order repeated plaintiffs' proposed class definition, but, for the reasons already explained, that definition did not enable determination of the class members in a sufficiently "discernible, clear, and precise" way;  that is because the elements of the definition do not state things that all class members have in common, and because a significant number of putative class members are incapable of answering the third part of the definition (whether or not they oppose community relocation) at all.  In addition, no part of the Court's order listed the claims or issues to be treated on a class basis.

Objector understands that the defendants elected to defend this case only by asserting a fundamental alteration defense based on their late adoption of an *Olmstead* plan that the Court found inadequate.  But defendants' failure to raise other issues that impact class members in different ways does not mean that the case does not present those issues.  Whether all State Center residents can indeed live in the community because the services and supports they require can feasibly be provided is one of those issues, and the foregoing text identifies others.  Rule 23(c)(1)(B) required that these issues be identified so that there could be a clear recognition of whether they are susceptible to class adjudication.

OBJECTIONS TO TERMS OF THE SETTLEMENT

II.     THE SETTLEMENT IMPROPERLY INFRINGES ON THE RIGHTS OF CLASS MEMBERS
        UNDER *OLMSTEAD* BY MOVING THEM TO COMMUNITY FACILITIES EVEN IF RELOCA-
        TION IS INAPPROPRIATE.

In deciding whether to approve a class action settlement, this Court "acts as a fi-
duciary, guarding the claims and rights of the absent class members." *In re Pet Food Prods.*
*Liab. Litig.*, 629 F.3d 333, 349 (3d Cir. 2010) (citing cases). Its responsibility is especially keen
where, as here, those class members are intellectually incapacitated and, in many cases, lack
guardians or other decision-makers to protect their interests. It is particularly important, then,
that this Court rigorously scrutinize this settlement for protection of the class members' rights,
including their fundamental rights under *Olmstead*. Any infringement of those rights affects not
only the class members whose interests are impaired, but the interests of all other class members
(like Diane) who are victims of the effect that an improper settlement will have on their own in-
terests.

The Supreme Court made clear in *Olmstead* that mentally incapacitated individu-
als have a right to remain under institutional care and that they may not be deprived of that right.
*See Olmstead*, 527 U.S. at 583. As the lead opinion by Justice Ginsberg (joined by Justices
O'Connor, Souter, and Breyer) stated, "the ADA is not reasonably read to impel States to phase
out institutions, placing patients in need of close care at risk." *Id.* at 604. "[N]othing in the
ADA or its implementing regulations condones termination of institutional settings for persons
unable to handle or benefit from community settings"; "[n]or is there any federal requirement
that community-based treatment be imposed on patients who do not desire it." *Id.* at 602 (por-
tion of opinion also joined by Justice Stevens). In his concurrence, Justice Kennedy (joined by
Justice Breyer) cautioned that "[i]t may be . . . that those who remain institutionalized are indeed

the most severe cases" and that care must be taken to assure that inappropriate removal of individuals to community facilities not do more harm than good. *Id.* at 609-10. As he added, "It would be unreasonable, it would be a tragic event, then, were the [ADA] to be interpreted so that States had some incentive, for fear of litigation, to drive those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision." *Id.* at 610. He cautioned against pressuring States "into attempting compliance on the cheap, placing marginal patients into integrated settings devoid of the services and attention necessary for their condition," and placing "state decisions regarding the administration of treatment programs and the allocation of resources to the reviewing authority of the federal courts." *Id.* Justice Ginsberg agreed, observing that it is not "the ADA's mission to drive States to move institutionalized patients into an inappropriate setting," since, for some individuals, "no placement outside the institution may ever be appropriate." *Id.* at 605.

This Court recognized a right to institutional care when it denied intervention by those seeking to remain in the State Centers, but it held that the right was not then implicated because plaintiffs' opt-out provision protected those opposing community relocation from any infringement of their right. 267 F.R.D. at 460-63. The settlement now makes clear that the right is directly and adversely implicated, in several ways.

A.   **The Settlement Compels the Relocation to Community Facilities of State Center Residents Who Need Comprehensive Care and Have Not Expressed Any Desire To Be Relocated.**

A fundamental aspect of *Olmstead* is freedom of choice. An incapacitated individual may choose to live in a community setting, but is not required to do so and may not be compelled to do so against his or her wishes. 527 U.S. at 602. The terns of the settlement agreement, however, provide for relocation of State Center residents to community facilities

even where those residents have not stated any desire to be relocated and where they have re-
mained silent on the question because they are incapable of understanding what this issue is
about.  That is an infringement of those residents' rights.

Paragraph III.2.a. of the Settlement Agreement (p. 6) says that placement on the
list of individuals eligible for relocation will be "based on discussions with the resident and in-
volved family or guardians to assess their position as to community placement."  It must be re-
membered, however, that three-quarters of the State Center residents are profoundly retarded,
meaning that many of them have intellectual capabilities equivalent to those of infants.  It there-
fore makes no sense to expect that they can comprehend any question about where they would
choose to live or can engage in any "discussion" about it.  As noted above, Diane's 2010 Com-
munity Placement Plan states that her "functioning level does not support the idea she can com-
prehend these matters," and it is likely that other profoundly retarded State Center residents are
in a similar situation.  It must also be remembered that 82% of the State Center residents have no
legal guardians to make decisions for them.[9]  Thus, there likely will be many residents for whom
there can be no response to a "discussion" question about a residential preference other than si-
lence.

The settlement notice says how the parties have elected to deal with these indi-
viduals:  "If a person does not say one way or the other if he or she wants to live in the communi-
ty, he or she will be placed on the Planning List . . . ."  Notice, p. 2.  The Settlement Agreement,

---

[9]     The settlement agreement provides that the parties will honor the decisions of guardians
or "involved family" members.  "Involved family" is defined restrictively to include only
those residents' family members "who are designated as the resident's substitute decision
makers in the [resident's Community Placement Plan] or other state ICF/MR records."
Set. Ag. ¶ II.15.  The record contains no information regarding how many State Center
residents have such "involved family" members.  In many cases, such family members
identified in ICF/MR records may be parents who are now deceased.

¶ III.b. (p. 6), confirms that this is the automatic default selection, stating: "If the state ICF/MR resident does not express opposition to considering community placement, the resident will be placed on the State ICF/MR Planning List" unless a guardian or family decision-maker expresses opposition.

Making this the default selection for these individuals is a convenient way to remove individuals from the Centers, but it infringes the rights of these individuals to stay where they are. Though the individuals may not be able to express a preference, there is no reason to believe they would be indifferent to relocation if they could comprehend what is happening to them. The bureaucratic references to "ICFs/MR" in the parties' submissions mask a central fact: the State Centers at issue here are these individuals' *homes*, and, for many of these residents, they are the only homes they have known. Diane has resided at White Haven for *45 years*. State Center census data suggests that many other residents also have lived there for many decades; indeed, some of the named plaintiffs made similar allegations about themselves. Diane's daily behavior shows that she knows and feels comfortable with the White Haven staff and physical surroundings, and their familiarity appears to be an important and valuable part of her life. It is reasonable to assume that the same may be true for other Center residents. In this situation, care must be taken not to rip these vulnerable individuals from the security and stability that they have known for so long. As the court stated in another Pennsylvania decision dealing with the forced relocation of a profoundly retarded individual, *In re Bear*, 44 Pa. D.&C. 4th 225, 260 (C.P. Dauphin 1999):

> This court asks what would it do to the quality of life of a profoundly retarded man, physically disabled as well, to remove him from his home of 44 years, from what little joys of life he has living in the comfort of his surroundings, cared for by people who know and love him and provide for his every need? Surely, justice demands we allow him the dignity not to disrupt and uproot him from this.

*See also In re Easly*, 46 Pa. D.&C. 4th 374 (C.P. Venango 2000), *aff'd*, 771 A.2d 844 (Pa. Cmwlth.) (en banc), *appeal denied*, 567 Pa. 731, 786 A.2d 991 (2001).

The sentiment expressed by the Court in *Bear* underlies the concerns of many guardians who have opposed relocation of their loved ones from the State Centers. It is the basis for the views of many of the objectors here. But for those State Center residents whose parents or other relatives consistently opposed relocation but are now dead, the settlement's provision for automatic relocation of residents incapable of expressing a preference flies in the face of those deceased loved ones' wishes. It appears this is deliberate. The summary judgment record includes deposition testimony that plaintiffs' counsel elicited from former DPW Deputy Secretary Kevin Casey that if a family member stated opposition to community relocation, that opposition should no longer be honored once the family member dies or is otherwise unavailable. Pl. Motion for Sum. J. (Doc. #48), Ex. 4 (K. Casey 1/20/2010 Dep. at 114-24).

This Court's obligation as a "fiduciary" for unnamed class members, *Pet Food*, 629 F.3d at 349, bestows a special responsibility to protect vulnerable members of the class from being relocated merely because they are incapable of speaking for themselves. The Court should order that the provisions in the settlement agreement that automatically place on the Planning List for relocation any State Center resident who remains silent regarding a preference for relocation is invalid and that no State Center resident shall be moved unless that resident clearly expresses that he or she is willing to move.

**B.**   **The Settlement Fails To Provide for Individualized Determinations of Whether Each State Center Resident Is Capable of Moving to Community Facilities and Whether Such Facilities Are Available To Accommodate Each Resident's Needs.**

Although *Olmstead* recognizes that institutional housing may be necessary for many incapacitated individuals and that nothing in federal law "condones termination of institutional settings for persons unable to handle or benefit from community settings," 527 U.S. at 602, 605, the parties have made no provision for individualized determinations of whether it would be appropriate to move each State Center resident to the community.  Instead, as discussed in connection with the impropriety of class certification, the parties dealt with this issue by trading blanket allegations that ***all*** State Center residents are capable of moving, so long as otherwise unidentified services and supports are available.  It nevertheless appears that the defendants themselves doubt the propriety of relocating all State Center residents.  In the last-minute *Olmstead* Plan they proposed in connection with their cross-motion for summary judgment (Ex. 4 to the motion (Dkt. #51, Att. 6), at p. 4), defendants included a proviso that no person would be moved to the community if it were determined that the individual would not benefit from the relocation — thereby suggesting a recognition that some class members may not benefit.  *See also* Def. Memo. in Support of Defs. Motion for Sum. J. (Dkt. #53) at 14.

This issue is too important to be treated as cavalierly as the parties have done up to now.  An inappropriate relocation can cause a profoundly retarded individual serious harm if the community facility cannot provide the full level of care that the individual requires.  Indeed, even if it *can* provide such care, any decision to relocate such individuals must be made with caution in light of the psychological stress it may cause for them to be taken away from the homes and personnel they have known for much of their lives in circumstances where they may

30

be incapable of understanding what is happening.  As the Supreme Court cautioned, relocation should not be condoned if there is no showing that the individual would benefit from it.

Yet, the settlement agreement makes no provision for such individualized findings, and apparently is based on an *assumption* that relocation is appropriate for everyone.  This Court should reject the settlement for this reason, and should require that individualized determinations of capability and benefit be made.  Though *Olmstead* provides for deference to "the reasonable assessments of [a State's] own professionals in determining whether an individual 'meets the essential eligibility requirements' for habilitation in a community-based program," 527 U.S. at 602, that presupposes there will be *individualized* assessments.  Here, although the settlement calls for development of Community Placement Plans and Individual Support Plans "that specify the community placements, services, and supports the individuals need to successfully transition to the community," Set. Ag. ¶ V.3. (p. 11), it nevertheless starts with an assumption that everyone is capable of moving.  The Court should hold that any such assumption is inadequate and improper and that individualized determinations are required.

The Court also should hold that these determinations must be based on a critical and unbiased review of the entire record relating to the individual, including an assessment of the accuracy of any information in the individual's file.  Diane's personal experience is that some State Center residents may have had records placed in their files that contain misleading information about their capabilities to live in community settings.  In particular, in 2002-03 DPW developed a "Community Plan" for Diane that incorrectly claimed Diane was "involved in several informal discussions [about community living] each year"; said that she was developing "skills" in "Financial Management," such as "hold[ing] a quarter or a similar sized object in her hand";  also claimed that she would hold a writing implement and scribble "to make a mark when asked to

31

sign her name" and "use a push button switch to activate an appliance"; and purported to discern her pleasure from participating in such things as going to restaurants and on shopping trips, "community camping experiences," church services and "bible study group," and fishing.

The plan provoked such shock and concern on the part of Diane's parents, who were then her guardians, that they wrote complain about it. Ltr., Nick & Catherine Solano to Walter Rapasky (Apr. 11, 2003). They explained that "Diane is unable to 'be involved' in any 'discussion' about anything — and especially not about changing her housing to 'community living,' a concept she is unable to comprehend." They disputed the Plan's description of Diane's supposed "Life Skills," explaining that "[m]any of the items listed as among Diane's 'skills' are things that we do not recognize as being possessed by our daughter and that we fear will lead those reviewing the summary to misunderstand Diane's condition."[10] They concluded: "[W]e believe that the plan does a disservice to Diane to suggest or imply that she is something that she

---

[10]     In particular, their letter explained:

> . . . There may have been some time when Diane happened to have a pen-
> cil in her hand and happened to make a mark on a piece of paper while she
> had it, but we seriously doubt that she did so with any recognition that she
> was drawing or scribbling, and we are confident that she had no intent to
> "sign her name" when she did so. . . . [Nothing should] be interpreted to
> mean that Diane can run appliances, or even turn on a light switch; we are
> aware of no such capability. . . .
>
> . . . It may be true that Diane will hold "a quarter or similar sized object in
> her hand," just as she sometimes may hold a pencil, or a rock, or a blade
> of grass. But that does not mean that she has any appreciation of what a
> quarter is, and we are disturbed by your characterization of this ability as
> "pre money management" (Plan, p. 5); it has nothing to do with any ability
> of Diane to "manage money" or even to comprehend what money is. . . .
>
> . . . [T]he summary makes it sound as though Diane has some sort of ac-
> tive social life. . . . [I]f Diane is brought somewhere, she will stay there;
> but that does not mean that she understands where she is or has an interest
> in being there. . . .

is not, and we request that it be re-worded so that it does not create an impression that Diane has greater capabilities than she actually possesses."  No one disputed this assessment by Diane's parents, and the objectionable items in the "Community Plan" were not subsequently repeated. Diane's experience raises the possibility that similar reports were made about other State Center residents, some of whom may not have had vigilant guardians like Diane's who would set the record straight.  For this reason, the Court should require that any determination of eligibility for community relocation be made critically and be subject rigorous and unbiased review.

C.     **The Settlement Fails To Provide Protections for State Center Residents Who Make Improvident Decisions To Relocate to Community Facilities.**

The settlement also provides no clear protections for State Center residents who have inappropriately been relocated to community facilities and need to return.  Though there are repeated assurances in the settlement documents that residents who elect to remain in State Centers can change their minds and get placed on the relocation Planning List, the agreement says nothing about those who are sent to community facilities that fail to provide for their needs.  But if it turns out that community facilities are not providing these individuals with the care and services they require, there must be some assurance that these individuals will be able to return to the State Center facilities that were providing them quality care before they were removed.  The Court should refuse to approve the settlement so long as the agreement contains no provisions containing such assurances.

The agreement also makes no provision for reports that will enable the Court to determine whether individuals moved to community facilities have received proper care.  This is a glaring omission.  Part VI. of the Agreement contains detailed provisions for status reports on such things as progress in depopulating the State Centers, diversion of funding from the State

Centers to community programs, and reinstitutionalization of the residents because of commit-ments to psychiatric hospitals or incarceration. But it says nothing about reports showing wheth-er the residents are being provided with proper care. A primary reason for concern about relocat-ing profoundly retarded individuals is that historically there have been instances of abuse, neg-lect, and criminal victimization of such individuals in community settings. *See* VOR, "Media Coverage Highlighting the Increasing Need for More Effective Federal and State Protections . . .," *http://www.vor.net/images/AbuseandNeglect.pdf* (2011). The Court should require that the periodic reports required under Paragraph VI.2. include reports of any class members who have incurred physical or other harm after being relocated to a community facility.

III.    **THE SETTLEMENT IMPROPERLY INFRINGES ON THE RIGHTS OF CLASS MEMBERS UNDER *OLMSTEAD* BY FAILING TO CREATE PROCEDURES THAT WILL ENABLE INFORMED DECISION-MAKING ABOUT THEIR CARE OPTIONS.**

Apart from directly impairing class members' rights under *Olmstead*, the settle-ment impairs their ability to exercise those rights by requiring them to make decisions about their care without providing them with the full range of information needed to make those decisions free of undue or improper influence.

A.    **The Class Certification Notice Requires Class Members To Decide About Their Care Without Adequately Explaining the Consequences of Agreeing To Community Relocation.**

The class notice says that if a class member does not express opposition to com-munity relocation, he or she will be placed on a "Planning List" and then will be taught about community placement. Meanwhile, defendants "will develop and put in place . . . a 'community integration plan'" that will relocate 400 or more State Center residents over the next five years.

The notice (as well as the settlement agreement) is vague about two important is-
sues. The first concerns how agreement to participate in the settlement affects class members'
rights to stay in the State Centers. As already explained, Objector presently believes the White
Haven Center is the best facility for Diane and wants her to stay there, but he may have to partic-
ipate in the settlement to assure that he can change his mind if the settlement forces a deteriora-
tion in the quality of care in the Centers. Can he conditionally participate in the settlement, or,
once he agrees to do so, does he waive the right to have Diane remain in the White Haven Center
indefinitely? The class notice does not say. Paragraph IV.3. of the settlement agreement (at p.
9) says there will be a second opportunity to state a position on "discharge" after receipt of
"training" about community relocation, and that the Planning List will be amended in light of
any restatement of position. This implies that a failure to opt out of the settlement does not
waive any right to continue residing in a State Center, but nothing in the agreement explicitly
says that. The settlement needs to be clarified to assure class members that they will never waive
their right to State Center residency merely by participating in the settlement — especially since
many, like Objector, may be participating only out of a reluctant resignation that they need to
protect their options.

The second issue concerns how an actual community placement will take place.
The settlement notice says (at p. 3), "Before people on the Planning List move to the community,
DPW will work with them, or their involved families or guardians, and other involved persons to
come up with a comprehensive plan for each person that say[s] what type of placement and other
services each person needs to successfully move to and stay in the community." The Settlement
Agreement contains similar provisions and suggests that only community facilities housing four
or fewer residents will be offered (subject to a right to choose to live in a larger facility). Set.
Ag. ¶ V.3., 4. (p. 11). Does this mean that residents (or their guardians) will have an absolute

right to choose the specific facility in which the resident will be placed?  Or does it mean that the individual may choose only a "type" of facility?  It is essential that class members or their families have the absolute final say about where they will live.  The Court should require that this be made explicit.

These defects in the class notice underscore a more fundamental deficiency in this case.  There never has been any showing that those State Center residents needing comprehensive care of the type they are receiving in the State Centers can feasibly be provided with that care in community facilities — particularly, the four-person facilities that the settlement says will be used.  The settlement notice provides no information about what facilities are available and what services and supports they can provide in light of available financial and other resources.  Without this information, no class member can make an informed choice about how to respond to the settlement and whether to oppose community relocation.  The settlement agreement, ¶¶ IV.1., V.3., defers providing this information until after a class member agrees to participate in the class and to undergo "training" about community options.  In view of this deferral of critical information, any class  participation is necessarily tentative.

**B.      The Settlement Lacks Unbiased Procedures Necessary To Assure That Relocation Decisions Are Properly Made.**

Because choice is such an essential part of any remedy under *Olmstead*, implementation of the settlement begins with procedures to determine whether State Center residents want to consider relocation to the community.  The Settlement Agreement provides that this assessment will be made by DPW's Office of Developmental Programs, using the services of the resident's social worker or Community Transition Specialist and the "Facility Advocate."  Set. Ag. ¶ III.2.a, c.  The "Facility Advocate" is an employee of plaintiffs' counsel, the Disability

Rights Network (DRN), who is "to advocate for residents." Set. Ag. ¶ II.10.  There is no reason why DRN should have any role in this decision.  Whether a State Center resident should consider community relocation is a sensitive question that should be made by DPW's professional staff. That decision should not be a matter of "advocacy" — and, particularly, not advocacy by the organization that seeks to promote just one choice (relocation) and that is seeking to be paid hundreds of thousands of dollars in legal fees in this case for its advocacy of that single choice.  The settlement's provision for participation by DRN in this decision taints the process, and the Court should not approve the settlement with this provision.

Similarly, the Agreement's provisions for "education" of class members about community placement options appear designed to provide one-sided information that would induce selection of community options, rather than balanced information needed for unbiased decision-making.  The eight-member "Community Partnership Steering Committee" (the name itself suggests a purpose to steer residents toward a community option) is to include a DRN representative, a provider representative, and a representative of the Administrative Entities that contract with DPW to administer the community system.  Set. Ag. ¶ IV.1.a.  The other members are a State Center resident and family member, a community resident and family member, and someone from the Office of Developmental Programs.  *Id.*  The deck therefore is stacked with members who will advocate for community placement.  The curriculum is similarly one-sided, focusing on community placement and "opportunities to participate in community life."  Set. Ag. ¶ I.V.b., e., f.  While there is no question that State Center residents should be provided with accurate information about the benefits of community options, the settlement makes no provision for information about any of the risks of community living or the legitimate concerns regarding

safety and care in community settings.[11]   These most vulnerable individuals need *neutral* infor-

mation, not propaganda, and the Court should refuse to approve the settlement without obtaining

assurances that balanced information will be provided.

IV.   **THE SETTLEMENT IMPROPERLY INFRINGES ON THE RIGHTS OF CLASS MEMBERS UNDER *OLMSTEAD* BY FAILING TO PROTECT THOSE ELECTING TO REMAIN IN THE STATE CENTERS AND BY DEPRIVING THE STATE CENTERS OF RESOURCES.**

The foregoing objections focus on inadequate, inappropriate, or deleterious as-

pects of the settlement with respect to class members opting for community care and regarding

the procedures for deciding whether to opt for such care.   In addition, however, the settlement

adversely affects those State Center residents who opt to remain in the State Centers.

Plaintiffs consistently have sought to avoid discussion of these residents and to

---

[11]        As one commentator has summarized —

> [P]ositive outcomes reported in the literature associated with deinstitutio-
> nalization and community-based services include increased choice, beha-
> vioral improvement, improved social interaction of certain segments of the
> population, integration in rural settings, and inclusion in various day-to-
> day activities.   However, such positive findings need to be considered in
> relation to findings of increased mortality in community settings, problems
> in vocational services and employment, and problems of Individual Habi-
> litation Plan objectives and behavioral technology.   Recent work has also
> highlighted problems in access, utilization, and quality in community-
> based health care and personal care for people with mental retardation and
> developmental disabilities, [along with] higher rates of verbal abuse and
> relatively greater exposure to crime among individuals who lived in dis-
> persed community settings.

Walsh, 41 MENTAL RETARDATION at 116 (citations omitted).   The commentary concluded
that "as institutions increasingly provide services to people with severe and profound
cognitive deficits, complex needs, challenging behaviors, and diminishing skills, con-
cerns about quality of *care* may outweigh those of satisfaction," while "[i]n community
settings . . . with a more heterogeneous and able population, it may be that quality of life,
satisfaction, and interest in self-determination takes on more importance."   *Id.* (emphasis
in original).

pretend that the litigation has nothing to do with them.  By providing an option to refuse community care, plaintiffs claim that they have insulated these residents from any adverse consequences of this case.  And by so doing, they claim, they have foreclosed any right of these residents to be heard here, since (plaintiffs say) these residents are not affected by the settlement.

That is not true.  The litigation will have a direct effect on those State Center residents who elect to remain in the State Centers.  In the first place, it specifically provides for a transfer of State funds from the State Centers to community care, thus depriving the State Centers of needed resources.  Beyond that, it threatens to change the nature of the State Centers by depleting their populations and impairing their ability to continue to provide high-quality care.  These consequences clearly give these State Center residents an interest in having objections to the settlement heard.  Contrary to what may have been the case when the Court declined to permit intervention by those preferring to remain in the State Centers (and when the Court of Appeals affirmed that decision), the settlement makes clear that these consequences no longer are speculative and that they deserve consideration.

Though plaintiffs may wish to deny it, all *Olmstead* issues are interrelated, and their law suit cannot wall off just one form of relief and claim no effect on the rest.  Class members are being asked to make critical decisions about whether to stay in the State Centers or to move out, and their choices necessarily require a comparison of the risks and benefits of each.  Those risks and benefits will depend in part on the resources available, and those resources will depend on how any remedy is structured and what this Court orders.  In light of these different factors, the class members do not (as plaintiffs argue) divide neatly into those favoring the State Centers and those seeking community placement.  The third part of plaintiffs' class definition — the part on which they rely to exclude relocation opponents from having a say in the case — asks

only whether class members "would not oppose community placement" in all circumstances, thus inviting class members (like Objector) to acknowledge that there might be situations in which they would not object, depending on all of the circumstances at the time.  Those circumstances include the relative risks and benefits under *Olmstead*.

This interrelationship of issues under *Olmstead* is why the district court in *Ligas ex rel. Foster v. Maram*, 2010 U.S. Dist. Lexis 34122 (N.D. Ill., Apr. 7, 2010) ("*Ligas III*"), the long-running Illinois litigation to which this Court referred in its 2010 opinion denying intervention, **permitted** those opposed to community relocation to be heard when considering a proposed class settlement in that case, even though it had denied them intervention in the case's earlier phase.  In this Court's intervention decision, it relied on the Seventh Circuit's affirmance of the denial of intervention in *Ligas* on the basis of an opt-out provision in the class definition that was similar to the one used by plaintiffs here.  267 F.R.D. at 462-63.  But after that affirmance, the opt-out provision was removed to comply with Rule 23, and the district court then decertified the *Ligas* class.  *See* fn. 7, *supra*.  The plaintiffs in *Ligas* then proposed a new class definition and a new settlement, and again those opposing relocation moved to intervene.  This time (in an opinion issued just one month after this Court's denial of intervention here), the court **granted** the intervention motion, agreeing that the intervenors had an interest under *Olmstead* in assuring that their needs of institutional residence "be considered in determining the State's obligation to provide the 'community-based' services" at issue.  *Ligas III*, 2010 U.S. Dist. Lexis 34122, at *11.

The court in *Ligas* explained that the Supreme Court in *Olmstead* was "very much aware of competing claims on limited State resources" and required those resources to be taken into account along with "the needs of others with mental disabilities."  *Id.* at *13-*14, *quoting (second quote)* 527 U.S. at 607.  In view of these considerations, the court concluded that "the

Proposed Intervenors have a right under *Olmstead* to have their needs considered" in assessing the proposed settlement.  *Id.* at *14 (emphasis added).  Otherwise, their "future ability to have their needs considered in balance with the State's obligations to other individuals with mental disabilities would be significantly impaired 'as a practical matter.'"  *Id.* at *16-*17 (quoting Fed. R. Civ. P. 24).  Since the State planned to reduce institutional capacity upon approval of a settlement relocating residents to "community" facilities, the litigation implicated the intervenors' interests in their "care and placement," the quality of the essential services and supports provided to them, and the "financial viability of their selected living arrangement" — what the court collectively called an interest "in the equitable distribution of State resources among individuals with mental disabilities."  *Id.* at *18-*20.  The court also held that the intervenors had an interest in participating in decisions about certification of a new class, since, even if the intervenors were excluded from the class under the plaintiffs' re-revised class definition, the *Ligas* parties were soliciting institutional residents to see if they would withdraw their opposition to relocation, and such class identification procedures would impact the intervenors' rights.  *Ligas III*, at *23-*25.

The same is true here.  As in *Ligas*, this litigation implicates all class members' interests in their "care and placement," the quality of the essential services and supports provided to them, and the "financial viability of their selected living arrangement."  All class members, including those who presently may not favor relocation, therefore have a right to be heard.

The Third Circuit's affirmance of this Court's denial of intervention does not call for a contrary conclusion.  Nothing in that decision — which was based on intervention law, not class settlement law — says or suggests it would be an abuse of discretion for this Court to consider relocation opponents' interests when assessing the settlement's fairness.  The settlement had not been negotiated at the time of the Court of Appeals' decision, and its terms, such as the

required transfer of funds from the State Centers, were not known.  The Court of Appeals be-

lieved that the only class members who would be placed on a planning list would be those who

"affirmatively expressed their desire to be discharged to the community," 2011 U.S. App. LEXIS

7124, at *4, not those who simply remained silent when asked.  The facts have changed since the

Court of Appeals' decision, and the applicable legal standards are different as well.  Intervention

aside, this Court's obligations as a "fiduciary" for all class members require that it consider all

class members' interests in assessing the proposed settlement here.

> **A.    The Settlement Contains No Protections Against Closing of the State Centers or Reduction in the Quality of Care That They Offer.**

Although *Olmstead* makes clear that the Commonwealth must continue to make

institutional facilities available to those who need them, and although the settlement purports to

enforce class members' rights under *Olmstead*, nothing in the settlement provides any assurance

that the State Centers will remain available to class members.  The entire focus of the settlement

is on depletion of the Centers' resources by transferring funds and removing residents — wheth-

er those residents want to be removed or not.  The settlement thus threatens to impair the Cen-

ters' continued ability to provide high-quality care to those who remain.

To protect all class members' rights under *Olmstead*, this Court should insist that

there be no impairment of care at the Centers.  It is the fear that the Centers will close[12] or will

---

[12]    The fear is not unfounded.  The Commonwealth has been closing centers across the state as their populations decline.  *See, e.g., Alexander v. Rendell*, 2006 U.S. Dist. Lexis 3378 (W.D. Pa., Jan. 30, 2006) & 2009 U.S. Dist. Lexis 1540 (W.D. Pa., Jan. 12, 2009) (closing of Altoona Center against residents' wishes); J. Ackerman, "Western Center Will Be Staffed Until April 26," *Pittsburgh Post-Gazette*, *http://www.post-gazette.com /regionstate/20000416western4.asp* (Apr. 16, 2000) (reporting closure of Western Center while "several dozen parents stood helplessly behind police barricades . . . as their mentally retarded children who had lived there for decades were driven away").

be so starved of resources that they cannot continue to function effectively that has caused so

many class members and their guardians to speak out in opposition to this settlement.  The Court

has the authority to allay the fears of these class members by refusing to approve any settlement

that fails to include assurances that defendants will continue to abide by their obligation under

*Olmstead* to continue to provide quality institutional care and, in doing so, will continue to oper-

ate the State Centers and provide them with sufficient financial and other resources to permit the

Centers to provide the same high-quality care that they provide today.

### B.   The Settlement Improperly Mandates Transfers to Community Programs of State Funds That Are for the Benefit of State Center Residents.

Rather than assuring continuance of quality care by the State Centers, the settle-

ment contains a provision that will deprive the Centers of the financial resources needed for that

care.  Paragraph 2.b. calls for defendants to consider consolidating the budget lines for the State

Centers and community services.  Paragraph 2.c. then provides, "Unless and until DPW consoli-

dates the budget lines for state ICFs/MR and Community Waiver services, DPW to the extent

feasible will shift funds from the carry-forward budget for state ICFs/MR to the Community

Waiver services budget."  The settlement thus obligates defendants to take money away from the

State Centers and to turn it over to community services programs instead.

Objector has no opposition to any requirement that the Commonwealth provide

adequate funding for community services.  But there is no basis in this lawsuit for that funding to

be taken from that allocated to the State Centers.  Although the funding reallocation is to be

made only "to the extent feasible," the settlement agreement does not explain what this means

and there is nothing in the agreement to establish that feasibility is tied in any way to continued

provision of quality care.

This provision of the settlement thus is likely to result in a reduction in the quality of services provided by the State Centers because of a reduction of funds. Since such a result is directly forbidden by *Olmstead*, this Court should refuse to approve the settlement so long as this provision remains in it.

## V.    THE SETTLEMENT PROVIDES FOR ATTORNEYS' FEES THAT ARE INAPPROPRIATE.

Under the settlement, defendants will pay DRN $432,500 in attorneys' fees. There is nothing in the settlement agreement documenting how this number was reached and nothing to suggest that the parties made any effort to comply with the criteria for fee awards set forth in the Third Circuit's extensive case law on the subject. *See In re Rite Aid Corp. Securities Litig.*, 396 F.3d 294, 299-307 (3d Cir. 2005) (citing cases); *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722 (3d Cir.), *cert. denied*, 534 U.S. 889 (2001). That case law calls for application of a lodestar approach to fee calculation in the absence of a common fund, but the settlement documents contain no lodestar calculations.[13]

The Court should refuse to approve the settlement unless it receives proof that the award is fair and reasonable. Otherwise, the money the Commonwealth has agreed to spend on fees can better be spent on providing care to the class members in this case.

---

[13]   Indeed, the settlement documents contain no information demonstrating that DRN is eligible for any fee award at all. DRN exists by virtue of the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. § 15001 *et seq.*, and Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 *et seq.*, pursuant to which DRN is financed by federal funds. According to its web site, 98% of its funding comes from these and other federal statutes. *See* Disability Rights Network of Pennsylvania, "About DRN," *http://drnpa.org/page/about-drnpa* (2011). Just recently, several members of the Supreme Court commented about the questionable constitutionality of the statutory framework under which DRN and similar organizations have been established. *See Virginia Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1641 n.7 (2011); *id.* at 1642-05 (Kennedy, J. concurring).

## REQUEST TO BE HEARD

I intend to appear at the class settlement hearing and request permission to be heard.

Respectfully submitted,

/s/ *Carl A. Solano*

Carl A. Solano, I.D. No. PA 23986
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 751-2202
Fax:  (215) 972-7363
E-mail:  *CSolano@Schnader.com*

Dated:  July 28, 2011.

Exhibit A

E-Mail Exchange Between Fred Lakuta, Superintendent of White Haven Center, and
Tom Kashatus, President of White Haven Center Relatives and Friends Association

```
Level of MR           Ham      Ebe     Polk    Sel     WHC     Total
Mild                  4        2       19      14      8       47
Moderate              7        4       35      25      10      81
Severe                22       18      64      46      39      189
Profound              91       255     188     245     111     890

Age
22-14                 8        17      41      22      23      111
46-55                 51       160     85      81      58      435
56-60                 27       82      40      107     27      283
61-65                 13       17      51      62      20      163
66-over               25       3       90      58      40      216

Special Needs
Autism                24       81      134     35      42      316
Cerebral Palsy        53       56      68      137     16      330
Hearing Impairment    11       37      30      85      12      175
Ambulatory            32       141     124     179     82      558
Partial/non Ambulatory 92      138     97      151     86      564
Seizure Disorder      60       174     174     187     75      670
Non-Verbal            83       199     166     168     96      712
Visual Impairment     19       45      143     50      26      283
Enteral Feeding       49       45      28      51      15      188
Tracheotomies         10       7       3       7       2       29
Duel Diagnosis        119                              119
MM Plan               31                               31

-----Original Message-----
From: Tom Kashatus [mailto:tomkash@verizon.net]
Sent: Tuesday, April 19, 2011 7:51 AM
To: Lokuta, Fred C.
Subject: Statistics & Demographics

        Fred,       Is it possible that I can have a recap of the
demographics of White Haven Center so that I can brush up for the WVIA
panel discussion?  I don't know if this comes under privacy or
not.        Tom K
```

## CERTIFICATE OF SERVICE

I, CARL A. SOLANO, certify that on July 28, 2011, I served a copy of these objections by first-class mail, postage prepaid, addressed to:

> Clerk of Court
> UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
> Federal Building & United States Courthouse
> 228 Walnut Street
> Harrisburg, Pennsylvania 17108-0893

> Robert W. Meek, Esquire
> DISABILITY RIGHTS NETWORK OF PENNSYLVANIA
> 1315 Walnut Street, Suite 500
> Philadelphia, Pennsylvania 19107-4705
> *Attorney for Plaintiffs*

> Doris M. Leisch, Esquire
> Deputy Chief Counsel
> OFFICE OF GENERAL COUNSEL, DEPARTMENT OF PUBLIC WELFARE
> 801 Market Street, Suite 6092
> Philadelphia, Pennsylvania 19107
> *Attorney for Defendants.*

/s/ *Carl A. Solano*
Carl A. Solano

Dated:  July 28, 2011.

1