**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| FRANKLIN BENJAMIN, by and through his next friend, Andreé Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend, Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend Shirl Meyers; ANTHONY BEARD, by and through his next friend, Nicole Thurman, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) Filed via ECF System ) ) Civ. No. 1:09-cv-1182 (JEJ) ) ) (Judge Jones) |
| Plaintiffs, | ) |
| v. | ) Complaint filed June 22, 2009 ) ) Class Action |
| DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and GARY ALEXANDER, in his official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania; | ) ) ) ) ) ) |
| Defendants. | ) |

## STATEMENT OF SUPPORT BY THE UNITED STATES

The United States submits this Statement in support of final approval of the

proposed Settlement Agreement in accordance with this Court's Order of May 27,

2011.[1]  Order, May 27, 2011, ECF No. 106.  The proposed Settlement Agreement

---

[1] The Settlement Agreement can be found attached to the Unopposed Motion to Approve Consent Judgment, Exhibit 2, ECF No. 105-2.

seeks to remedy Defendants' violations of title II of the Americans with
Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, and Section 504 of
the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504").[2]  *See* Mem. &
Order, Jan. 27, 2011, ECF No. 88.  The Department of Justice has enforcement
authority for and issues regulations implementing title II and thus has a strong
interest in the resolution of this lawsuit.

The United States supports the proposed Settlement Agreement because it
advances the important public interest in community integration, *see Olmstead v.
L.C.,* 527 U.S. 581 (1999), and because it fairly, reasonably, and adequately
affords relief to class members.  Accordingly, this Court should grant final
approval of the Settlement Agreement.

---

The United States plans to attend the hearing on final approval of the proposed
Settlement Agreement scheduled for August 22, 2011, and requests this Court's
leave to participate in the hearing.

[2] In all ways relevant to this discussion, the ADA and Section 504 of the
Rehabilitation Act are generally construed to impose similar requirements.  *See
Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 635 F.3d 87, 91 n.5 (3d Cir.
2011); *Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare*, 402 F.3d 374, 379
n.3 (3d Cir. 2005).  This principle follows from the similar language employed in
the two acts.  It also derives from the congressional directive that implementation
and interpretation of the two acts "be coordinated to prevent[ ] imposition of
inconsistent or conflicting standards for the same requirements under the two
statutes."  *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468-69 (4th Cir. 1999) (citing
42 U.S.C. § 12117(b)) (alteration in original; internal quotation marks omitted).

# I.  STATUTORY AND REGULATORY BACKGROUND

Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).  The underlying goals of the ADA are to afford persons with disabilities "full participation, independent living, and economic self-sufficiency." *Id.* § 12101(a)(7).  Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." *Id.* § 12101(a)(2).  For those reasons, Congress prohibited discrimination against individuals with disabilities by public entities.  Specifically, title II of the ADA decrees that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

As directed by Congress, the Attorney General issued regulations implementing title II, which are based on Section 504.  *See* 42 U.S.C. § 12134(a). These regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).  The preamble to the

"integration regulation" explains that "the most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. § 35.130(d), app. A, at 572 (2010).

Twelve years ago, the Supreme Court held that under title II of the ADA and its integration regulation, "[u]njustified isolation . . . is properly regarded as discrimination based on disability." *Olmstead*, 527 U.S. at 597. The Court recognized that such segregation is a form of discrimination because the institutionalization of persons who can benefit from community settings "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and because "confinement in an institution severely diminishes the everyday life activities of individuals." *Id.* at 600-01.

Public entities are required to provide community-based services for persons with disabilities who would otherwise be entitled to institutional services when (a) community placement is appropriate; (b) the affected persons do not oppose such treatment; and (c) the placement can be reasonably accommodated, taking into account the resources available to the entity and the needs of others who are receiving disability services from the entity. *Olmstead*, 527 U.S. at 607. To comply with the ADA's integration requirement, a state must reasonably modify its policies, procedures, or practices when necessary to avoid discrimination. *See*

28 C.F.R. § 35.130(b)(7).  The obligation to make reasonable modifications may be excused only where a state demonstrates that the requested modifications would "fundamentally alter" the programs or services at issue.  *Id.*; *see also Olmstead*, 527 U.S. at 604-07.

## II. SUMMARY OF FACTS

Plaintiffs filed this lawsuit on June 22, 2009, on behalf of themselves and all other persons who:  (1) do or will reside in one of Pennsylvania's large, state-run, congregate care institutions[3]; (2) could live in the community if provided with appropriate services; and (3) do not or would not oppose such a placement. Compl. ¶ 15, ECF No. 1.  Plaintiffs amended the complaint on July 14, 2009, alleging that Defendants violated title II of the ADA and Section 504 of the Rehabilitation Act by unnecessarily segregating class members in large congregate care institutions.  Amend. Compl. ¶ 4, ECF No. 9.  Specifically, Plaintiffs alleged that Defendants unnecessarily institutionalized Plaintiffs – for years, if not decades – who can and want to reside in the community if provided with appropriate services and supports.  *See id.* ¶¶ 16, 18, 21-48.  This Court certified the class on September 2, 2009.  *See* Order, Sept. 2, 2009, ECF No. 17.

---

[3] These facilities are known as "intermediate care facilities for persons with developmental disabilities" ("ICF/DD").

5

In November 2009, a group of individuals living in Pennsylvania's state-run congregate care institutions who opposed receiving services in the community then attempted to intervene in this suit.  Proposed Mot. to Intervene, Nov. 11, 2009, ECF No. 27.  The Court denied the motion, finding that definition of the class specifically excluded the prospective intervenors because they opposed community placement, and that they thus lacked a "significantly protectable interest in the litigation."  Mem. & Order at 11-12, Mar. 10, 2010, ECF No. 41.  The Third Circuit affirmed this Court's denial of intervention on April 27, 2011.  Op. at 3-4, ECF No. 101-1.

Plaintiffs moved for summary judgment granting their claims for relief on June 23, 2010, and Defendants cross-moved for summary judgment on June 29, 2010.  Mot. for Summ. J., June 23, 2010, ECF No. 49; Mot. for Summ. J., June 29, 2010, ECF No. 51.  The United States, as *amicus curiae*, submitted a brief in support of Plaintiffs' motion on July 7, 2010.  Br. in Supp., Jul. 7, 2010, ECF No. 62.  The Court then granted summary judgment in favor of the Plaintiff class, ruling that Defendants violated title II of the ADA and Section 504 by failing to offer community services to Plaintiffs and class members.  Mem. & Order, Jan. 27, 2011, ECF No. 88.  The parties subsequently negotiated a proposed Settlement Agreement and filed it with the Court.  *See* Mot. for Prelim. Approval, ECF No. 105; Settlement Agreement, ECF No. 105-2.  The parties now seek the Court's

approval of the Agreement as a fair, reasonable, and adequate settlement of the

Plaintiff class' claims.

## III.   ARGUMENT

Federal courts favor settlement of class action litigation, given the

"overriding public interest in settling complex litigation . . . ." *In re Warfarin*

*Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004).  There is an "especially

strong" presumption in favor of approval of voluntary settlements in "'class actions

. . . where substantial judicial resources can be conserved by avoiding formal

litigation.'"  *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010)

(quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*,

55 F.3d 768, 784 (3d Cir. 1995)).

Before approving a proposed settlement, a court must determine that the

agreement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  In *Girsh v.*

*Jepson*, the Third Circuit identified nine non-exclusive factors to evaluate the

fairness of a proposed settlement:

> (1) [T]he complexity, expense and likely duration of the litigation . . . ;
> (2) the reaction of the class to the settlement . . . ; (3) the stage of the
> proceedings and the amount of discovery completed . . . ; (4) the risks
> of establishing liability. . . ; (5) the risks of establishing damages . . . ;
> (6) the risks of maintaining the class action through the trial . . . ; (7)
> the ability of the defendants to withstand a greater judgment . . . ; (8)
> the range of reasonableness of the settlement fund in the light of the
> best possible recovery . . . ; [and] (9) the range of reasonableness of the

7

> settlement fund to a possible recovery in light of all the attendant risks
> of litigation . . . .

521 F.2d 153, 157 (3d Cir. 1975) (quoting *City of Detroit v. Grinell Corp.*, 495

F.2d 448, 463 (2d Cir. 1974)) (internal quotations omitted).  Since then, the Third

Circuit has expanded the *Girsh* factors to include additional, non-exclusive factors.

*See In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283,

323 (3d Cir. 1998).[4]  While a district court must make findings as to each of the

nine *Girsh* factors before approving a settlement, a court may consider additional

factors where appropriate and "useful for a thoroughgoing analysis . . . ."  *In re Pet*

*Food Prods. Liability Litig.*, 629 F.3d 333, 350 (3d Cir. 2010) (citing *Prudential*,

148 F.3d at 323).  An analysis of the relevant factors indicates that the proposed

---

[4] The *Prudential* court laid out the following factors:

> [T]he maturity of the underlying substantive issues, as measured by
> experience in adjudicating individual actions, the development of
> scientific knowledge, the extent of discovery on the merits, and other
> factors that bear on the ability to assess the probable outcome of a trial
> on the merits of liability and individual damages; the existence and
> probable outcome of claims by other classes and subclasses; the
> comparison between the results achieved by the settlement for
> individual class or subclass members and the results achieved – or
> likely to be achieved – for other claimants; whether class or subclass
> members are accorded the right to opt out of the settlement; whether
> any provisions for attorneys' fees are reasonable; and whether the
> procedure for processing individual claims under the settlement is fair
> and reasonable.

148 F.3d 323.

Settlement Agreement is fair, reasonable, and adequate, and thus merits this Court's final approval.

### A. Continued Litigation Would Be Complex, Expensive, and Lengthy

A trial to determine the appropriate remedy for Defendants' discrimination would be complex, lengthy, expensive, and most importantly, unnecessary. A remedy phase would involve complex policy questions about how to structure and fund the appropriate relief that are more easily answered by experts in the field and policymakers than by the courts. *See In re AT&T Corp.*, 455 F.3d 160, 166, 170-71 (3d Cir. 2008) (where remaining factual issue following partial summary judgment was "not 'straightforward or simple'" first *Girsh* factor weighed in favor of approval of settlement); *see also* Mem. & Order at 22, Jan. 27, 2011, ECF No. 88 ("[T]he present posture of this case is such that we are in no position to issue an injunction given the need for extensive detail therein . . . ."). Addressing the question of remedy in an adversarial setting would also involve the testimony of numerous experts at significant expense, and a possible appeal to the Third Circuit, adding further expense and time. Here, all parties have agreed to the terms of the proposed Settlement Agreement, obviating the need for what would be a complex, lengthy, and expensive continuation to the litigation. The first *Girsh* factor thus weighs in favor of settlement.

**B. The Few Objections to the Settlement Agreement Should Not Be Accorded Significant Weight**

The Third Circuit has warned that courts should be "cautious about inferring support from a small number of objectors to a sophisticated settlement." *Prudential*, 148 F.3d at 318 (quoting *In re Gen. Motors*, 55 F.3d at 812). As of August 1, 2011, the Court received requests on behalf of 77 institutionalized individuals asking that they not be moved from their current placements. *See, e.g.*, Letters, ECF Nos. 107, 110, 114-19, 121-29, 130-31, 134. A handful of additional writers who do not represent class members state their general support for Pennsylvania's state-run institutions, and their wish for them to remain open. *See, e.g.*, Letters, ECF Nos., 120, 129, 132-33, 142, 190, 198, 204, 218. Out of a potential class of 1272 individuals, *see* Am. Compl. ¶ 16, ECF No. 9, only 58, or 4.6%, raise concerns about the Agreement. Of these, the most common concern is the payment of legal fees to Plaintiffs' counsel – not the substance of the Agreement. *See, e.g.*, Letters, ECF Nos. 110, 116-119, 124, 125, 126, 128, 134, 138-41, 143, 149, 151, 153, 155, 158-60, 163-64, 169, 172-73, 176-81.

Moreover, the few writers who raise concerns about the Agreement are not class members, nor do they represent class members. The parties have explicitly defined the class to include all persons who "do not or would not oppose community placement." Settlement Agreement Pt. II ¶ 3, ECF No. 105-2. These

writers uniformly oppose the idea of community placement for themselves or their affected family member.  They thus publically declare that they are opting out of the class; they do not, however, object to the adequacy of the remedy.  Such expressions of personal preference, however sincere, do not bear on the fairness, adequacy, and reasonableness of the remedy.  *See, e.g.*, *Gaskin v. Pennsylvania*, 389 F. Supp. 2d 628, 644 (E.D. Pa. 2005) (declining to consider concerns raised by non-class members in approving settlement remedying ADA, Section 504 claims); *see also* Fed. R. Civ. P. 23(e)(5) (expressly permitting only "class members" to object to the proposed Settlement Agreement).

In contrast, a class member eloquently captured the significance of the Agreement to the class, stating that "I have been waiting to leave [Hamburg Center] for over a year now, and not a day goes by when I don't express my desire to live in a group home."  Letter from Jemille Houston, ECF No. 113.  Another class member wrote, "I am from White Haven Center and been in White Haven Center for ten years and it is time to leave . . . .  I am happy that this settlement will help me move."  Letter from John Hoops, ECF No. 148.  In addition, The Arc of Pennsylvania, the State's largest advocacy organization for people with developmental disabilities, whose members include thousands of individuals with disabilities and their families – including many class members – supports the Agreement.  *See* Letter, ECF No. 171; *see also* Letters, ECF Nos. 184, 185

(statements of support from The Arc of Greater Pittsburgh/ACHIEVA).  This

Court should approve the proposed Agreement because it will provide class

members with a long-awaited remedy for Defendants' discrimination.  The

concerns of non-class members should not limit or delay this relief when those

who oppose community placement may opt out of the class.

### C. The Stage of Proceedings Weighs Heavily in Favor of Approval

The stage of the proceedings weighs heavily in favor of approval here.

Courts consider the stage of proceedings a proxy for evaluating the extent of

counsel's "appreciation of the merits of the case prior to settlement."  *In re AT&T*,

455 F.3d at 167 (noting that the district court found that counsel had a "'thorough

and exhaustive'" appreciation of merits following discovery, motion practice, and

two weeks of trial).  The parties reached the proposed Settlement Agreement

following two years of litigation, including extensive discovery, this Court's entry

of summary judgment finding Defendants liable for discrimination, and months of

settlement negotiations.  The parties have thus fully identified and evaluated the

merits of the legal issues, and had the benefit of this Court's ruling on the issue of

liability before they reached an agreement.

**D. Plaintiffs Face Risks in Establishing the Remedy Through a Contested Proceeding**

Although this Court established Defendants' liability, the structure, content, and form of relief remain uncertain if Plaintiffs proceed to a contested remedy phase. As noted above, designing a remedy in the context of this case is far more complex than a simple calculation of damages, as it involves questions of policy and allocation of limited government resources. A negotiated remedy thus provides Plaintiffs with a significantly greater degree of control over the many details involved in creating a safe yet expeditious community integration plan. *See Pet Food Prods.*, 629 F.3d at 351 (noting that the district court examined fourth and fifth *Girsh* factors together and found that uncertainty in establishing liability or damages weighs in favor of settlement approval).

**E. Modification of the Class Remains a Possibility**

Uncertainty in maintaining class certification also weighs in favor of settlement. A district court retains the authority to decertify or modify a class at any time if it proves unmanageable, or if it becomes apparent that members of a class have divergent interests. *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 260 (3d Cir. 2009); *In re Cendant Corp. Litig.*, 264 F.3d 201, 239 (3d Cir. 2001). Moreover, "proceeding to trial would always entail the risk, even if slight, of decertification." *Cendant Corp.*, 264 F.3d at 239. While the risk of

13

decertification here appears slight, it nonetheless remains a possibility.  This factor thus supports approval of the Settlement Agreement.

### F.  The Record Contains No Indication That Defendants Can Withstand a Greater Judgment

This factor addresses whether Defendants could withstand the imposition of a remedy that costs significantly more than the price of the proposed Settlement Agreement.  *See id.* at 240.  The parties negotiated the Settlement Agreement following development of a record that included many uncontested facts regarding the costs of providing services to individuals both in Defendants' congregate care institutions and in community placements.  *See, e.g.*, Defs. Statement of Undisputed Facts ("SUF") ¶¶ 10,15, 24-27, June 29, 2010, ECF No. 51-3.  In particular, there was no dispute that "[a]ll available funding for both State ICF/[DD] care and community care is expended for services to persons with mental retardation."  *Id.* ¶ 25; *see also* Pl. SUF ¶ 25, July 12, 2010, ECF No. 65-1; Mem. & Order at 22, Jan. 27, 2011, ECF No. 88 ("We are not blind to the budgetary constraints that Pennsylvania faces, and we are certainly mindful that DPW has limited resources . . . .").  Thus, the parties' discussions focused on how best to allocate the finite resources available to Defendants for providing services to individuals with developmental disabilities in a manner that vindicates the integration rights of those individuals.  The parties painstakingly negotiated such a

14

settlement over a period of more than two months following this Court's order granting summary judgment.[5]   The record thus contains no indication that Defendants could withstand a greater judgment.

### G. The Settlement Represents a Fair and Reasonable Agreement in Light of the Best Possible Recovery and All Attendant Risks of Litigation

The final two *Girsh* factors "evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case." *Warfarin Sodium*, 391 F.3d at 538.  Plaintiffs' case is strong, as demonstrated by this Court's ruling granting summary judgment on liability to Plaintiffs.  Yet as discussed above, Plaintiffs faced uncertainty about the scope of the remedy that the Court would order.

In light of the risks of continued litigation, the Settlement Agreement represents a fair and reasonable compromise between the parties that ultimately vindicates class members' right to receive community-based services under the ADA and *Olmstead*.  The Settlement Agreement increases community capacity for class members who choose to reside in community-based settings.  In doing so, the Settlement Agreement offers relief to individuals who are unnecessarily institutionalized.  Any compromises the proposed Settlement Agreement makes are

---

[5] The parties also engaged in extensive negotiations prior to this Court's grant of summary judgment.

reasonable in light of the inevitable risks, expense, and delays associated with proceeding to a contested remedy phase.[6]  The Settlement Agreement thus strikes a reasonable balance between the strength of Plaintiffs' claims and the benefits of a negotiated settlement.

## H. The Additional *Prudential* Factors Weigh in Favor of Approval

Finally, the relevant considerations the Third Circuit outlined in *Prudential* also weigh in favor of approval.  *See* 148 F.3d at 323.  First, the substantive claims at issue are fully mature:  this Court granted summary judgment resolving the issue of liability.  The parties then negotiated the remedy over the course of more than two months in sessions mediated by a magistrate judge.  The advanced stage of litigation here indicates that the Settlement Agreement merits this Court's approval, as the parties have had ample opportunity to assess the merits of the claims and evaluate the relief warranted.  *See Parks v. Portnoff Law Assocs.*, 243 F. Supp. 2d 244, 253 (E.D. Pa. 2003).  Additionally, the proposed Settlement Agreement accords class members the right to opt out of the settlement.  Indeed, it defines the class to exclude individuals who independently or through their involved families or guardians oppose community placement, and provides a

---

[6] As argued in this Statement of Support, the proposed Settlement Agreement accords fair, reasonable, and adequate relief to Plaintiffs and class members.  The Settlement represents a compromise and does not, therefore, represent the full extent of relief available under title II of the ADA and Section 504.

16

process through which individuals and their involved families or guardians have ample opportunity to express any opposition.  Settlement Agreement, Pt. II ¶2; Pt. III ¶2, ECF No. 105-2.  The relevant *Prudential* considerations therefore both indicate that the proposed Settlement Agreement merits this Court's approval.

## IV.   CONCLUSION

For the foregoing reasons, this Court should grant final approval of the Settlement Agreement.

Respectfully submitted,

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

SAMUEL R. BAGENSTOS
Principal Deputy Assistant Attorney General
Civil Rights Division

ALISON BARKOFF
Special Legal Counsel for
*Olmstead* Enforcement

JONATHAN M. SMITH
Chief
Special Litigation Section

MARY R. BOHAN
Deputy Chief
Special Litigation Section

s/ *Samantha K. Trepel*

SAMANTHA K. TREPEL
DC992377
Trial Attorney
Special Litigation Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC  20530
Tel: (202) 514-6255
Fax: (202) 514-4883
samantha.trepel@usdoj.gov

Attorneys for the United States

**CERTIFICATE OF SERVICE**

I certify that the foregoing Statement of Support by the United States was served through the electronic filing service on August 2, 2011, to the following individuals:

Robert W. Meek
Mark J. Murphy
Robin Resnick
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA  19107-4705

Stephen F. Gold
1709 Benjamin Franklin Parkway, 2nd Fl.
Philadelphia, PA  19103

Counsel for Plaintiffs and Class

Doris M. Leisch
Deputy Chief Counsel
Office of General Counsel
Department of Public Welfare
801 Market Street, Suite 6092
Philadelphia, PA  19107

Counsel for Defendants

John E. Riley
William J. Murray
Vaira & Riley, P.C.
1600 Market Street, Suite 2650
Philadelphia, PA  19103

Michael Rato
Owen H. Smith
Benjamin J. Hoffart
Sarah M. Goldstein

Sidley Austin LLP
787 Seventh Avenue
New York, NY  10019

                                        s/ Samantha K. Trepel
                                        SAMANTHA K. TREPEL
                                        Attorney for the United States