# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

-------------------------------------------------------- x
FRANKLIN BENJAMIN, et al., on behalf of    :
themselves and all others similarly situated,   :
                                     :
              Plaintiffs,   :
                                     :   No. 09-cv-01182
       -against-               :   (Jones, U.S.D.J.)
                                     :
DEPARTMENT OF PUBLIC WELFARE OF   :   (Am. Complaint
THE COMMONWEALTH OF             :   Filed 7/14/09)
PENNSYLVANIA, et al.,               :
                                     :
            Defendants.   :
                                     :
-------------------------------------------------------- x

**SUPPLEMENTAL OBJECTIONS OF CRAIG SPRINGSTEAD, MARIA MEO, DANIEL BASTEK, MICHAEL STORM, BETH ANN LAMBO, RICHARD KOHLER, MARIA KASHATUS, AND WILSON SHEPPARD TO PROPOSED SETTLEMENT AGREEMENT**

John E. Riley
William J. Murray, Jr.
VAIRA & RILEY, P.C.
1600 Market Street, Suite 2650
Philadelphia, Pennsylvania  19103
(215) 789-9405
(215) 751-9420 (fax)

And

Benjamin J. Hoffart
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York  10019
(212) 839-5300
(212) 839-5599 (fax)

*Attorneys for Craig Springstead, Grace Meo, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Kohler, Maria Kashatus, and Wilson Sheppard*

## Table of Contents

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................ 5

    A.  Commencement of the Lawsuit and the Unopposed Class Certification. .......................... 5

    B.  The Springstead Objectors. .................................................................................... 6

    C.  The Springstead Objectors' Attempts to be Heard. ........................................... 7

    D.  The Proposed Settlement ...................................................................................... 8

ARGUMENT ..................................................................................................................... 9

I.  THE SPRINGSTEAD OBJECTORS ARE CURRENT OR FUTURE MEMBERS OF THE CLASS AND HAVE STANDING TO OBJECT TO THE PROPOSED SETTLEMENT AGREEMENT. ............................................................................. 9

II.  THE PLAINTIFF CLASS IS NOT APPROPRIATELY CERTIFIED UNDER FEDERAL RULES OF CIVIL PROCEDURE 23(a) AND (b).............................................. 11

    A.  The class does not satisfy the commonality, typicality, and adequacy requirements of Federal Rule of Civil Procedure 23(a)................................................................... 12

    B.  The class is incohesive and is improperly defined by the mental state of its members, thereby creating an opt-out provision not permitted under Rule 23(b)(2). ................................................................................................................ 18

III. THE SETTLEMENT PROPOSED BY PLAINTIFFS AND DEFENDANTS WILL IMPROPERLY VIOLATE THE RIGHTS OF THE SPRINGSTEAD OBJECTORS AND OTHER CLASS MEMBERS AND CANNOT BE APPROVED UNDER RULE 23(e).................................................................................................................... 26

    A.  The proposed settlement will deny class members from selecting the form of care that is appropriate to their individual needs, a right that was recognized by the Supreme Court in Olmstead.............................................................................. 27

    B.  The settlement agreement requires Defendants to award DRN attorneys fees that are excessive and inappropriate. ...................................................................... 34

CONCLUSION................................................................................................................... 36

# TABLE OF AUTHORITIES

Page(s)

CASES

*Baby Neal ex rel. Kanter v. Casey*,
    43 F.3d 48 (3d Cir. 1994) .................................................................................. 11-12

*Barnes v. Am. Tobacco Co.*,
    161 F.3d 127 (3d Cir. 1998) .............................................................................18,19, 24

*Benjamin v. Dep't of Pub. Welfare*,
    No. 10-1908, 2011 U.S. App. LEXIS 7124 (3d Cir. Apr. 5, 2011) ...................11, 18

*Chiang v. Veneman*,
    385 F.3d 256 (3d Cir. 2004) .................................................................................25

*Ehrheart v. Verizon Wireless*,
    609 F.3d 590 (3d Cir. 2010) .................................................................................27

*Eisman v. Pan Am. World Airlines*,
    336 F. Supp. 543 (E.D. Pa. 1971) ........................................................................25

*Frederick L. v. Department of Public Welfare of Pennsylvania*
    364 F.3d 487, 497 (3d Cir. 2004) .........................................................................31

*Gen. Telephone Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982) .......................................................................................12, 13, 16

*Geraghty v. United States Parole Comm'n*,
    719 F.2d 1199 (3d Cir. 1983) ...............................................................................19

*Hayden v. Freightcar Am., Inc.*,
    No. 3:2007-201, 2008 WL 375762 (W.D. Pa. Jan. 11, 2008) ................................25

*In re Cendant Corp. Prides Litig.*,
    243 F.3d 722 (3d Cir. 2001) ............................................................................ 34-35

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2009) .............................................................................12, 20

*In re Ins. Brokerage Antitrust Litig.*,
    579 F.3d 241 (3d Cir. 2009) .................................................................................11

*In re Pet Food Prods. Liab. Litig.*,
    629 F.3d 333 (3d Cir. 2010)............................................................26

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,*
    148 F.3d 283 (3d Cir. 1998), *cert. denied* 525 U.S. 1114 (1999)...................................passim

*In re Schering Plough Corp. ERISA Litig.*,
    589 F.3d 585 (3d Cir. 2009).............................................................16

*Nat'l Org. for Women, Inc. v. Scheidler*,
    172 F.R.D. 351 (N.D. Ill. 1997)........................................................25

*Olmstead v. L.C. ex rel. Zimring*,
    527 U.S. 581 (1999)..................................................... passim

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541, 180 L. Ed. 2d 374 (June 20, 2011)........................................ passim

*Williams v. City of Philadelphia*,
    270 F.R.D. 208 (E.D. Pa. 2010)........................................................17

Sᴛᴀᴛᴜᴛᴇs

Developmental Disabilities Assistance and Bill of Rights Act of 2000 .......................................35

Fed. R. Civ. P. 23(a)(2)...................................................................13, 14, 16

Fed. R. Civ. P. 23(c)(1)(C) .................................................................12

Fed. R. Civ. P. 23 (a) ................................................................3, 12, 13

Fed. R. Civ. P. 23 (a)(3)....................................................................16

Fed. R. Civ. P. 23 (a)(4)....................................................................17

Fed. R. Civ. P. 23 (a) and 23(b)(2) .........................................................14, 27

Fed. R. Civ. P. 23 (b) .....................................................................12, 18

Fed. R. Civ. P. 23 (b)(2)................................................................... passim

Fed. R. Civ. P. 23 (e) ..................................................................... passim

Help America Vote Act, 42 U.S.C. 15401, *et seq* ...............................................35

Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801, *et
    seq.* .............................................................................35

Craig Springstead, by and through his father and guardian, Bertin Springstead, Maria

Meo, by and through her mother and guardian, Grace Meo, Daniel Bastek, by and through his

father and guardian, John Bastek, Michael Storm, by and through his guardian, Polly Spare, Beth

Ann Lambo, by and through her father and guardian, Joseph Lambo, Richard Kohler, by and

through his sister and guardian, Sara Fuller, Maria Kashatus, by and through her father and

guardian, Thomas Kashatus, and Wilson Sheppard, by and through his brother and next friend,

Alfred Sheppard (collectively, the "Springstead Objectors"), by and through their counsel, Vaira

& Riley, P.C. and Sidley Austin LLP, hereby submit these objections to the settlement proposed

by Plaintiffs Franklin Benjamin, Richard Grogg, Frank Edgett, Sylvia Baldwin, and Anthony

Beard (collectively "Plaintiffs") and Defendants Pennsylvania Department of Public Welfare and

the Secretary of the Department of Public Welfare (collectively "Defendants") in the above-

captioned matter.  The objections and arguments detailed herein are in further supplement to

objection letters provided to the Court and Plaintiffs' counsel, the Disability Rights Network

("DRN") pursuant to the procedure established by the notice provisions proposed by Plaintiffs

(Dkt. #105, Ex. 3) and approved by the Court (Dkt. #106).

## PRELIMINARY STATEMENT

After more than two years of watching people they have never met assure this Court that

they would be happier and healthier if forced out of the state-run ICFs/MR they have called

home for 20, 30, even 40 years, the Springstead Objectors finally have the opportunity to express

their own views to the Court and express their *choice* to remain in ICF/MR care.  As their letters

of objection and these supplemental objections make clear, the proposed settlement agreement

does not reflect the interests or choices of the Springstead Objectors and numerous other

residents of Pennsylvania's ICFs/MR.  Counsel for the named Plaintiffs who commenced this

action have never purported to represent the Springstead Objectors' interests and views, but

rather have been entirely hostile to the Springstead Objectors' efforts to make those interests and views known.  Defendants' counsel have not directly opposed the Springstead Objectors' efforts, but they also have never attempted to meaningfully protect the Springstead Objectors' rights and interests.  The result is a proposed settlement agreement that entirely ignores the fundamental interests and choices of the Springstead Objectors and dozens, if not hundreds, of other class members.  Despite neither Plaintiffs' nor Defendants' counsel showing any desire to protect or even respect the Springstead Objectors' rights and interests, this case has proceeded on behalf of a class that includes the Springstead Objectors and other dissenting class members, and the proposed settlement agreement now before the Court, if approved, will have a dire impact on the their right to choose the best form of care for their own highly individual needs.

Given the lack of attention or respect Plaintiffs' and Defendants' counsel have afforded their desires, it is not surprising that the Springstead Objectors have been reluctant members of the class since it was certified by the Court.  While they are reluctant, they clearly are members of this class, meeting all three prongs of the present class definition.  The Springstead Objectors' current opposition, however, does not remove them from the class because the as-defined class also includes current ICF/MR residents who "*would not oppose* community placement."  While the Springstead Objectors currently oppose community placement and wish to stay in the ICF/MR centers they call home, they would not oppose community placement if certain circumstances, such as this lawsuit, deteriorate the high level of care currently provided in state-run ICFs/MR.  Unlike Plaintiffs' DRN counsel, the Springstead Objectors and their families are concerned with their living arrangements as a matter of life and death, and therefore cannot afford to be purely ideological in where that care is provided.  What is more, Plaintiffs' DRN

counsel has specifically admitted that the present class allows those opposed to community care to change their minds to become class members.

While the Springstead Objectors undeniably are part of the present class, the present class was not properly certified because Plaintiffs' and Defendants' counsel bypassed the evidentiary analysis required by Rule 23. Furthermore, Plaintiffs' and Defendants' counsel have provided (and the Court has relied upon) *demonstrably false* arguments – specifically, that all current ICF/MR residents are capable of residing in the community and that *no* state operated ICF/MR facility is the most integrated setting appropriate to the needs of *any* developmentally disabled person. While the named Plaintiffs may be ideal candidates to reside in and benefit from community care, the fundamental premises upon which this case was commenced simply do not apply to the Springstead Objectors and most other ICF/MR residents. Due to the highly individualized care needs of each and every ICF/MR resident, not to mention the individual choice of where that care should be provided, the named Plaintiffs are hardly representative or adequate under Rule 23(a). Nor do they satisfy the Rule 23(a) commonality, typicality, and adequacy requirements.

The present class also fails to satisfy the cohesiveness requirements of Rule 23(b)(2) because of the highly individualized assessments of which ICF/MR residents are capable of living in community placement and do not oppose such placement. Moreover, the class definition's third prong includes those ICF/MR residents who "would not" oppose community placement, thereby improperly defining the class based on the mental state of putative members and creating an opt-out provision not allowed for a Rule 23(b)(2) class.

These clear class definition issues aside, the settlement proposed by Plaintiffs and Defendants is fundamentally unfair and cannot be approved under Rule 23(e) because it will

prevent class members from selecting the form of care that is appropriate to their individual

needs, a right that was recognized by the Supreme Court in *Olmstead v. L.C. ex rel. Zimring*,

527 U.S. 581 (1999).  If this case is truly about the *choice* afforded to those with developmental

disabilities, the proposed settlement clearly is concerned only with the choices of a few and

ignores or repudiates the choices of other class members like the Springstead Objectors.

The Supreme Court's *Olmstead* decision stressed that the developmentally disabled have

the right to choose the best form of care appropriate to their individual needs.  The proposed

settlement will take away that choice.  Because they believe that ICF/MR care categorically

cannot be the best form of care for anyone, Plaintiffs and their DRN Counsel initiated this

litigation seeking relief that would forever reduce the availability of ICF/MR care in

Pennsylvania.  The proposed settlement currently before the Court, if approved, will achieve that

goal by depleting the ICF/MR population and starving state-run centers of necessary funding.

Contrary to *Olmstead* the proposed settlement with *take away* the choice of Pennsylvania's

developmentally disabled citizens and will force many class members, including the Springstead

Objectors to accept a form of treatment they do not desire.  Plaintiffs' DRN counsel seeks to

achieve this policy goal by crafting a class definition and settlement agreement exploiting the

vulnerabilities of ICF/MR residents who cannot speak for themselves and who have no guardian

to speak in their stead to indicate their opposition to community placement.

The Springstead Intervenors support the five named Plaintiffs' efforts to obtain

community placement for themselves, and do no oppose the community placement of any

current ICF/MR resident who wants and could benefit from residence in a community care

facility.  But no matter how well-intended the five named Plaintiffs may be, the Springstead

Objectors know too well the impact of unintended consequences and know that no single

solution – especially a one-sided settlement favoring community placement – can adequately meet the needs of Pennsylvania's entire developmentally disabled community.

For all the reasons discussed below and for the many reasons provided in the Springstead Objectors' letters of objection, the proposed settlement agreement should be rejected and the class decertified.

## **BACKGROUND**

### A.      **Commencement of the Lawsuit and the Unopposed Class Certification.**

This action was commenced on June 22, 2009, by the five named Plaintiffs alleging in their Complaint (Dkt. #1) that the manner in which Pennsylvania provides services to the developmentally disabled violates the Americans with Disabilities Act, the Rehabilitation Act, and the Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999).  In their first and Amended Complaints (Dkt. #9), Plaintiffs primarily complain that the Defendants' provision of services in public intermediate care facilities for the mentally retarded ("ICFs/MR") – comprehensive facilities that combine residential, recreational and medical care in one facility – violates the Supreme Court's *Olmstead* holding that persons with developmental disabilities have the right to *choose* to live in the "most integrated setting appropriate" to their needs and desires.  The five Plaintiffs alleged in their Amended Complaint that ICF/MR care is not "appropriate to the needs of *any* individual resident of those facilities," and sought relief on behalf of a class including:

> All persons who: (1) currently or in the future will reside in one of
> Pennsylvania's state-operated intermediate care facilities for persons with
> mental retardation; (2) could reside in the community with appropriate
> services and supports; and (3) do not or would not oppose community
> placement.

(Am. Compl., Dkt. #9, at ¶¶ 57, 65-66.)  No analysis or evaluation of the purported class was made at that time, or indeed, even today.  Accordingly, Plaintiffs' allegation that ICF/MR care is

not appropriate for anyone is based exclusively upon an ideological position, not medical analysis.

Based on this unsupported, but also unchallenged, assumption that community care is the only appropriate "choice" for the developmentally disabled and their families, Plaintiffs filed an Unopposed Motion to Certify a Class on August 31, 2009 without conducting any discovery, survey, or analysis to determine how many of the approximately 1,200 individuals in public ICFs/MR desire or actually could benefit from community care.  Moreover, no one made any effort to contact the legal guardians of ICF/MR residents, who – unlike Plaintiffs' counsel – are the individuals with the legal right to make such placement decisions.  Rather, Plaintiffs' Amended Complaint states that the class is intended to include all or virtually all of the more than 1,200 individuals residing in ICF/MR care at the time this case was initiated.  (Dkt. #9, at ¶ 16.)  Defendants conceded this point without caveat, exception, or clarification, and did not oppose Plaintiff's motion for class certification on this or any other ground.  The Court certified the class two days later.  (Dkt. #17.)

B.      **The Springstead Objectors.**

Craig Springstead is a 50-year-old resident of Selinsgrove Center, a public ICF/MR that has been his home for 28 years.  (Intervenors' Resp. to Am. Compl., Dkt. # 28, ¶ A.)  Mr. Springstead has been diagnosed with moderate mental retardation, bipolar disorder, mood disorder with psychotic features, generalized anxiety disorder, and intermittent explosive disorder.  (*Id.*)  Michael Storm is a 56 year-old resident of Hamburg Center, a public ICR/MR, who is developmentally disabled and is dependant upon both tracheotomy and feeding tubes. (*Id.*, ¶ D.)  Beth Ann Lambo is a 43-year-old resident of Polk Center, a public ICF/MR, where she has lived for 40 years.  (*Id.*, ¶ E.)  Ms. Lambo has been diagnosed with profound mental retardation, autism, and disruptive behavior disorder; she has a mental age of 18 months and is

unable to detect danger. (*Id.*) Richard Kohler is a 60-year-old resident of Selingsgrove Center – where he has lived since 1968 – who is developmentally disabled, deaf, and blind. (*Id.*, ¶ G.) Both Maria Kashatus and Wilson H. Sheppard are in their forties, have been residents of White Haven Center, a public ICF/MR, for most of their lives, and are developmentally disabled and non-verbal; in addition, Ms. Kashatus is restricted to a wheelchair. (*Id.*, ¶¶ H, I.) Maria Meo is a 51-year-old resident of Ebensburg Center, which has been her home since 1967. (*Id.*, ¶ B.) She is developmentally disabled but independent and able to make her wishes known. (*Id.*) Finally, Daniel Bastek is a 38-year-old resident of Hamburg Center, where he has lived for 20 years; he has been diagnosed with moderate mental retardation, bipolar disorder, and pervasive developmental disorder. (*Id.*, ¶ C.) The Springstead Objectors have not and do not oppose Plaintiffs' right to choose community care for themselves, but have and continue to object to Plaintiffs' blanket pursuit of class-wide relief that will impair the Springstead Objectorss' interest in preserving their individual right to choose ICF/MR care.

C.    **The Springstead Objectors' Attempts to be Heard.**

Recognizing that neither Plaintiffs nor Defendants represented the interests of ICF/MR residents who do not want to be forced into community care, the Springstead Objectors – residents of ICFs/MR who do not wish to be forced out of their current homes and do not believe that community placement provides the best or most appropriate care option for them – moved to intervene. (Dkt. #27.)[1]

Plaintiffs opposed the Springstead Objectors' intervention (Dkt. #34), and on March 10, 2010, the Court denied the Springstead Objectors' motion based upon findings that (1) "the

---

[1]    At the time of their proposed intervention, the Springstead Objectors were defined and referred to as the "Springstead Intervenors." In addition to those residents currently defined as the Springstead Objectors, the Springstead Intervenors included Mr. Richard Clarke, a 52 year-old resident of the Polk center who passed away earlier this year.

definition of the [certified class] specifically excludes [those who] oppose community placement," (2) that Defendants adequately represented the Springstead Objectors' personal interests simply by defending the suit on the ground that DPW does not have funding to provide all of the accommodations sought by Plaintiffs, and (3) that the Springstead Objectors' views "would not sufficiently add anything to the litigation." (Mem. & Order, Dkt. #41.)

The Springstead Objectors timely filed an appeal of the Court's Order with the Third Circuit Court of Appeals on March 30, 2010. (Dkt. ## 42, 43.) Before the Third Circuit issued a briefing schedule, Plaintiffs and Defendants filed cross-motions for Summary Judgment with the Court on June 23, 2010 and June 29, 2010. (Dkt. ## 48, 51.) After settlement negotiations before a federal Magistrate Judge failed to resolve the case, the Court issued a Memorandum and Order on January 27, 2011, holding that Defendants are not in compliance with the integration mandates of the ADA and Rehabilitation Act, thereby granting, with respect to liability only, Plaintiffs' Motion for Summary Judgment and scheduling further proceedings to determine the appropriate scope of injunctive relief. (Dkt. #88.) On April 5, 2011, the Third Circuit Court of Appeals entered a judgment affirming the Court's March 10, 2010 Order denying the Springstead Objectors' proposed intervention. (Dkt. #98.)

D.     **The Proposed Settlement**

Shortly thereafter, on April 29, 2011, the Court indicated in an Order that Plaintiffs and Defendants had given the Court notice that a settlement had been reached. (Dkt. #102.) On May 26, 2011 Plaintiffs filed an Unopposed Motion for Preliminary Approval of the Proposed Class Action Settlement. (Dkt. #105.) The Court granted Plaintiffs' Motion, preliminarily approving the settlement the next day, May 27, 2011 (Dkt. #106), and scheduled a fairness hearing for August 22, 2011.

## ARGUMENT

I. **THE SPRINGSTEAD OBJECTORS ARE CURRENT OR FUTURE MEMBERS OF THE CLASS AND HAVE STANDING TO OBJECT TO THE PROPOSED SETTLEMENT AGREEMENT.[2]**

When granting Plaintiffs' unopposed motion for class certification, the Court certified a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure comprised of "more than 1200 class members" who:

> (1) currently or in the future will reside in on[e] of Pennsylvania's state-operated intermediate care facilities for persons with mental retardation; (2) could reside in the community with appropriate services and supports; and (3) do not or would not oppose community placement.

(Class Cert. Order, Dkt. #17.) Even though the Springstead Objectors currently object to Plaintiffs' efforts to obtain relief on their behalf, the Springstead Objectors are class members under all the objective criteria in the class definition. As to the subjective "do not or would not" future state of mind element of the class definition, the Springstead Objectors cannot predict with certainty the possible ramifications of the proposed settlement on ICF/MR care, and thus cannot conclude that DRN's effort's to undermine ICF/MR care may not deteriorate such care to the point that community care could be the best form of care for the Springstead Objectors in the future.

First, as described *supra*, each of the Springstead Objectors is a current resident of a state-operated ICF/MR, thereby satisfying the first prong of the class definition. Second, despite the lack of any discovery, evaluation, or evidence in support, Plaintiffs and Defendants somehow made the therapeutic determination that *all* current residents of ICFs/MR, including the Springstead Objectors, are capable of living in the community thus satisfying the class

---

[2] If the Court determines that the Springstead Objectors are not members of the class (and therefore are not entitled to present objections to the proposed settlement), the Springstead Objectors respectfully move to intervene in the action.

definition's second prong.[3]  (*See* Am. Compl., Dkt. #9, ¶ 65; Defs.' Mot. Sum. J., Dkt. #51, Ex. 6

("It is the Office of Developmental Program's belief that every person who currently resides in a

state center can be successfully supported in [a] community integrated setting with the right

supports.")).  Without being provided any alternative, the Court relied on the one-sided

"arguments" offered by the parties. (*See* March 10, 2010 Mem. & Order, Dkt. #41, at 12 (stating

that the Springstead Objectors have the "ability to reside in the community with appropriate

services and supports")).  Even though the Springstead Objectors strongly disagree with the

Court's finding that they are capable of living in community care, they are nevertheless bound by

it.

Finally, the Springstead Objectors satisfy the third prong of the class definition, because

even though they currently oppose community placement, it is possible they "would not oppose"

community placement if certain circumstances, such as this lawsuit, deteriorate the high level of

care currently provided in state-run ICFs/MR.[4]

Plaintiffs and their DRN counsel acknowledge that the class, as defined, permits those

currently opposed to community placement to change their minds.  Indeed, a large part of the

proposed settlement is devoted to a DRN-run "education" plan designed specifically to persuade

families and guardians to stop stubbornly insisting upon their right to choose ICF/MR care.

While discussing their plan before the Court of Appeals, Plaintiffs stated that

> residents, guardians, and their families may change their minds during the
> course of the implementation process, [and] state ICF/MR residents, involved
> families, and guardians have the right to be added to or removed from the
> Planning List during the course of implementation.

---

[3]  As further discussed in detail below, this cursory allegation serves as the foundation for Plaintiffs' claims, the Defendants' lack of a defense, and the current settlement.  It is also, as a practical matter, absolutely false.

[4]  As discussed fully *infra*, the Springstead Objectors respectfully submit that the settlement agreement proposed by Plaintiffs and Defendants will result in a substantial deterioration of the resources available to ICFs/MR and will ultimately lead to the closure of some or all ICF/MR facilities.

Brief of Plaintiffs-Appellees at 11, *Benjamin v. Dep't of Pub. Welfare*, No. 10-1908, 2011 U.S.

App. LEXIS 7124 (3d Cir. Apr. 5, 2011).  Indeed, Plaintiffs' DRN counsel explicitly

acknowledged before the Court of Appeals that the Springstead Objectors would "be included in

the class in the future if they change their minds and decide they want community services." *Id.*

at 26.[5]  Accordingly, the Springstead Objectors have standing to object to the proposed

settlement.

## II.   THE PLAINTIFF CLASS IS NOT APPROPRIATELY CERTIFIED UNDER FEDERAL RULES OF CIVIL PROCEDURE 23(a) AND (b).

In order to approve the proposed settlement, the Court "must determine that the

requirements for class certification under Federal Rule of Civil Procedure 23(a) and (b) are met

and must determine that the settlement is fair to the class under Federal Rule of Civil Procedure

23(e)." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 257 (3d Cir. 2009).  The Third

Circuit has stated that district courts should "apply[] the class certification requirements of Rules

23(a) and (b) separately from [a] fairness determination under Rule 23(e)." *In re Prudential Ins.*

*Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 308 (3d Cir. 1998), *cert. denied* 525

U.S. 1114 (1999).  To approve this settlement under Rule 23, the Court must determine that the

class is appropriate, that the requirements of all four subsections of Rule 23(a) are satisfied, and

that the requirements of at least one subsection of Rule 23(b) are satisfied.  *See Baby Neal ex rel.*

*Kanter v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994).  In the present case, none of these elements are

met.

---

[5]    Plaintiffs have also stated in their papers opposing the Springstead Objectors' proposed intervention, and again in papers they submitted to the Third Circuit, that a Rule 23(e) hearing before the Court is the appropriate forum for the Springstead Objectors to voice their objections to the current litigation.  See Pl. Mem in Opp. Intervention, (Dkt. #34 at 12, 17 n. 8); *see also* Brief of Plaintiffs-Appellees at 43, *Benjamin*, No. 10-1908, 2011 U.S. App. LEXIS 7124 (3d Cir. Apr. 5, 2011).

When, as here, a class does not satisfy the Rule 23 requirements, the Court may amend or alter its class certification order at any time prior to final judgment and approval of a settlement. Fed. R. Civ. P. 23(c)(1)(C); *Gen. Telephone Co. of Sw. v. Falcon*, 457 U.S. 147, 160, n. 16 (1982).

A.    **The class does not satisfy the commonality, typicality, and adequacy requirements of Federal Rule of Civil Procedure 23(a).**

Under Federal Rule of Civil Procedure 23(a):

> [o]ne or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

A court may not certify a class "without finding that each Rule 23 requirement is met" and must find that each particular Rule 23(a) requirement is satisfied by a preponderance of the evidence. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307, 310 (3d Cir. 2009); *see also Falcon*, 457 U.S. at 161 (class certification is proper only when the court "is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied").  The present class was proposed by Plaintiffs, unopposed by Defendants, and, without the benefit of any evidence supplied by the parties, certified by the Court just two days later.  Upon careful analysis, however, the class fails to meet three of the four Rule 23(a) prerequisites to class certification.[6]

1.    *There are no questions of law or fact common to the class.*

In order to meet the "commonality requirement" of Rule 23(a), Plaintiffs must prove that there are questions of law or fact that are common to the class.  Fed. R. Civ. P. 23(a)(2).  While all of the class members here have developmental disabilities and live in ICFs/MR, these are

---

[6]    The Springstead Objectors assume, *arguendo*, that the numerosity requirement is met.  It should be noted, however, that all class members will have to be individually evaluated to determine their preference.  As such, it is unclear why joinder of all individuals who choose community care would be impractical.

common facts, not common questions. While the lack of commonality may have been arguable (but unargued) when the class was certified, recent decisions of the Supreme Court have made it manifestly apparent today.

The United States Supreme Court recently provided a detailed discussion of the commonality requirement in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (June 20, 2011). The *Wal-Mart* case involved 1.5 million workers alleging sex discrimination and seeking class certification under Rule 23(a) and 23(b)(2). *Wal-Mart*, 180 L. Ed. 2d at 385-86. When reviewing the Rule 23(a)(2) commonality requirement, the *Wal-Mart* court stated that "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" *Id.* at 389 (quoting *Falcon*, 457 U.S. at 157). Importantly, the court observed that possessing the "same injury" does not mean that the class members all "suffered a violation of the same provision of law," but requires that the common contention "be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke" *Id.* at 389-90. The court further observed that significant dissimilarities between class members may show that the required commonality does not exist. *Id.* at 395. Ultimately, the *Wal-Mart* court determined that there was no question of law or fact common to the *Wal-Mart* class because there was "nothing to unite all of the plaintiffs' claims." *Id.* at 395, n. 10.

In the current case, there is no common thread uniting all members of the class apart from the exceedingly generalized fact that all class members are ICF/MR residents. The class members have different emotional needs, different medical requirements, and different physical strengths and weaknesses. But Plaintiffs have sought to create an illusion of similarity by alleging that all current residents of ICFs/MR *could* live in community settings with "appropriate

13

services and supports."  However, this generalization obfuscates the dramatic differences between the mental and physical needs of individual class members and the drastically different types of "services and supports" that would be required for class members with such different needs to live in a community setting.

While the Court had no responsibility to assess the reasonableness or accuracy of the parties' stipulation that all ICF/MR residents can live in community care at the earlier stages of this case, it has the obligation to do so now.  The differences between representative named Plaintiffs and representative members of the class like the Springstead Objectors are illustrative of this non-commonality.  Notably, none of the named Plaintiffs are alleged to be classified as profoundly retarded.  Rather, Plaintiff Richard Grogg "is extremely independent and sociable," "holds a number of jobs," is "involved in his church," and "is so capable of managing his own money" that he does not require "a representative payee . . . to receive his Supplemental Security Income payments."  (Am. Compl., Dkt. #9, ¶¶ 26-28.)  Plaintiff Frank Edgett is "very social, engaging, and independent" and "enjoys community trips" and Plaintiff Sylvia Baldwin is described as "generally very independent."  (*Id.* ¶¶ 34, 40.)  Statistics kept by the ICFs/MR facilities indicate that, unlike the named Plaintiffs, the vast majority of ICF/MR residents experience profound developmental disabilities that make them unlikely candidates for community placement.  *See* ICF/MR Demographics, Hoffart Decl., Exs. A, B.  Beth Ann Lambo is one such ICF/MR resident diagnosed with profound mental retardation.  Ms. Lambo is a 43 year-old resident of Polk Center, where she has lived for over 40 years.  Her mental age has been placed at 18 months, she is unable to discern danger, and she suffers from epilepsy and an escalating seizure history.  (Prop. Intervenors Answer to Am. Compl., Dkt. #28, ¶ E.)  Moreover, unlike several of the Plaintiffs who are described as independent, many ICF/MR residents rely

14

on the assistance of ICF/MR staff for their daily needs.  For example, Michael Storm, a 56 year-old resident of the Hamburg Center is dependent on tracheotomy and feeding tubes and Maria Kashatus, a 41 year-old resident of the White Haven Center is non-verbal and relies on a wheelchair.  (*Id.* ¶¶ D, H.)  While the Plaintiffs seem to be ideal candidates for community care facilities, community placement is not a viable treatment option under any realistic scenario for Ms. Lambo, Mr. Storm, Ms. Kashatus, and many other current residents of ICFs/MR.

Not withstanding the obvious importance of determining precisely what supports and services will be necessary for each individual to *survive*, let alone be happy, in a community care environment, Plaintiffs' advocates seek to have the Court ignore those troublesome "details" and turn its attention to more important issues like the consolidation of budget lines and mandating Orwellian "educational" programs.  Sadly and ironically, in their zeal to wield *Olmstead* as a sword rather than shield and move class members into the "community," Plaintiffs try to jam the entire class into their Procrustean bed, stretching or squashing inconvenient differences in the name of "integration."

Due to the drastic differences between the ability of Plaintiffs and other class members to successfully transition to community care, Plaintiffs' allegations of harm and requests for relief are also not shared by many, if not the majority of other class members.  Notably, Plaintiffs' allegations that the Commonwealth of Pennsylvania has denied ICF/MR residents of the rights guaranteed under the ADA are not shared by *any* of the Springstead Objectors and many other residents of ICFs/MR who are members of the class.  Similarly, Plaintiffs' immediate desire to be placed in community care is not shared by the many residents of ICFs/MR who wish to remain in their current homes and care environments.

Since there is no "common contention" across all members of the class and no common issue of law or fact uniting the class members' interests, the class fails to satisfy the commonality requirement of Rule 23(a)(2).

       2.       *Plaintiffs claims are not typical of the claims of the class.*

Rule 23(a)(3) mandates that class representatives have the same interest and injury as the other members of the class. *Falcon*, 457 U.S. at 156. The Rule 23(a)(3) typicality requirement "is designed to align the interests of the class and the class representatives so that the latter will work to benefit the *entire class* through the pursuit of their own goals." *Prudential*, 148 F.3d at 311 (emphasis added). For typicality to exist between representative plaintiffs and the class:

> (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

*In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009).

As already discussed, Plaintiffs' factual circumstances, claims, and desires are drastically different from – and in some cases diametrically opposed to – the factual circumstances, claims (if any), and desires possessed by the Springstead Objectors and many other members of the class. Rather, Plaintiffs, in their self-interested desire for an immediate transition to community care have made sweeping claims about all other class members' ability to live in the community without consideration for class members' actual ability to live in community settings and without regard to the dangers community care would present.

3.     *Plaintiffs' repeated efforts to silence the voices of other class members serve as evidence that Plaintiffs do not and will not fairly and adequately protect the interests of all class members.*

Rule 23(a)(4) requires the Court to ensure that Plaintiffs "will fairly and adequately protect the interests of the class."  Among the factors courts consider when evaluating adequacy of representation is the presence of conflicts preventing the representative plaintiffs from adequately protecting class members' interests.  *Williams v. City of Philadelphia*, 270 F.R.D. 208, 215 (E.D. Pa. 2010).

Throughout this litigation, Plaintiffs and DRN have doggedly pursued their community-only ideology without care or regard to the views or concerns of class members who cannot reside in community care or do not currently wish to leave their ICF/MR homes.  For example, when supporting their Motion for Summary Judgment, Plaintiffs criticized Defendants' "failure" to implement plans to close the Selingsgrove and Hamberg Centers – the desired homes and care environments of Messers. Springstead, Kohler, Storm, and Bastek – and use the resulting savings to "maximize funding" for those desiring community placement.  (Pl. Mem. in Supp. Sum. J., Dkt. #49, at 12, 28.)  The named Plaintiffs are each capable of living in community care, so their DRN counsel alleges that all ICF/MR residents are able to live in community care even though, as the Springstead Objectors' submissions to the Court detail, many current ICF/MR residents are not able to reside in community care facilities without jeopardizing their safety.  Moreover, when class members who do not desire immediate transfers to community care, such as the Springstead Objectors, have sought to provide the Court with their views on the claims Plaintiffs have asserted on behalf of the class, Plaintiffs' DRN counsel routinely have endeavored to prevent the expression of these views.  In one instance of opposition before the Third Circuit, Plaintiffs' counsel even argued at great length that *the Defendants* to this action, not Plaintiffs, represented the interests of class members such as the Springstead Objectors.  Brief of Plaintiffs-

Appellees at 39, *Benjamin*, No. 10-1908, 2011 U.S. App. LEXIS 7124 (3d Cir. Apr. 5, 2011).

After more than two years of making dangerous, sweeping, and inaccurate generalizations about

class members' ability to live in community care, and repeatedly opposing class members'

efforts to make their views known to the Court, Plaintiffs' actions clearly show that their

interests are not aligned with the interest of many other members of the defined class.

B.   **The class is incohesive and is improperly defined by the mental state of its members, thereby creating an opt-out provision not permitted under Rule 23(b)(2).**

The class also utterly fails to satisfy Rule 23(b).  Rule 23(b)(2) allows for the certification

of a class when "the party opposing the class has acted or refused to act on grounds that apply

generally to the class, so that final injunctive relief or corresponding declaratory relief is

appropriate respecting the class as a whole."  As the Supreme Court recently stated in *Wal-Mart*,

"[t]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy

warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only

as to all of the class members or as to none of them."  180 L.Ed. 2d at 396.  The Supreme Court

further observed that because it is intended only for those cases where a "single injunction or

declaratory judgment would provide relief to each member of the class," classes certified under

Rule 23(b)(2) provide no opportunity for class members to opt-out.  *Wal-Mart*, 180 L.Ed. 2d at

396-97.  The Third Circuit has observed that "[w]hile 23(b)(2) class actions have no

predominance or superiority requirements, it is well established that the class claims must be

cohesive."  *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998).  Simply, "[i]njuries

remedied through (b)(2) actions are really group, as opposed to individual injuries."  *Id.* at 143,

n. 18 (quoting *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1155 (11th Cir. 1983)).

The cohesiveness requirement serves two purposes.  "First, unnamed members with valid

individual claims are bound by the action without the opportunity to withdraw and may be

prejudiced by a negative judgment in the class action." *Barnes*, 161 F.3d at 143 (citing *Santiago v. City of Philadelphia*, 72 F.R.D. 619, 628 (E.D. Pa. 1976)).  Thus, "[t]he court must ensure that significant individual issues do not pervade the entire action because it would be unjust to bind absent class members to a negative decision where the class representatives' claims present different individual issues than the claims of the absent members present." *Id.* (quoting *Santiago*, 72 F.R.D. at 628).  Second, if significant individual issues were to arise on a regular basis "the suit could become unmanageable and little value would be gained in proceeding as a class action . . . ." *Id*. (quoting *Santiago*, 72 F.R.D. at 628)).  To avoid these problems the Third Circuit has provided to "the district court the discretion to deny certification in Rule 23(b)(2) cases in the presence of disparate factual circumstances." *Geraghty v. United States Parole Comm'n*, 719 F.2d 1199, 1205-06 (3d Cir. 1983).  There hardly could be a set of factual circumstances more unique and disparate than the individual medical, social, and psychological needs of each individual ICF/MR resident.

1.  *The class does not satisfy the cohesiveness requirement of Rule 23(b)(2) because it requires highly individualized assessments of which class members are capable of living in community care and which individuals do not or would not oppose community placement.*

The class certified by the Court in this case is defined as all current and future residents of Pennsylvania ICFs/MR who are able to "reside in the community with appropriate services and supports," and do not or would not oppose community placement.  While Plaintiffs' counsel has sought to portray the class as a homogenous, like-minded group by making sweeping generalizations about class members' ability and desire to live in community care facilities, the class definition will necessarily involve highly individualized, case-by-case determinations of which current and future ICF/MR residents satisfy the second and third prongs of the class definition.  Individual determinations concerning the ability to reside in community care and

desire to make such a transition will need to be made for each and every member of the class.

These individual determinations will pervade the entire action and severely mitigate any benefit

achieved by proceeding on a class basis.

        a.     **Ability to live in the community and provision of supports and services.**

Plaintiffs' counsel have sought to create the illusion of cohesiveness with respect to the

class definition's second prong by alleging in their Amended Complaint that all current residents

of ICF/MR, "with appropriate supports and services, could live in more integrated community

settings." (Am. Compl., Dkt. #9, ¶ 65.)  This illusion of cohesiveness was further perpetuated

when Defendants admitted this allegation in their Answer to Plaintiffs' Amended Complaint.

(Dkt. #39, ¶65.)[7]  Plaintiffs have not offered any evidence suggesting that all current ICF/MR

residents are capable of living in the community with the assistance of services and supports that

are *actually provided* in existing community care facilities or that are capable of being provided

in community care facilities.  Moreover, Plaintiffs and their DRN advocates seek to have the

Court ignore the reality that in some circumstances class members' medical conditions, aside

from any developmental disability, are so severe that they essentially would require construction

of a one-person ICF to safely meet their needs.

When certifying a class, the Court must "make whatever factual and legal inquiries are

necessary" and "consider all relevant evidence" to make factual findings "by a preponderance of

the evidence" and not just some "threshold showing by a party."  *Hydrogen Peroxide*, 552 F.3d

at 307.  Rather than providing the Court with the detailed evidence it needs to make an accurate

---

[7]    Defendants admission of this allegation is perplexing because as recently as 2008, DPW representatives were quoted as saying that not all ICF/MR residents would be able to transition to the community and that there would always be a need for ICFs/MR.  *See* Amanda O'Rourke, *State: 348 need Selinsgrove Center*, The Daily Item, Sunbury, PA (Aug. 3, 2008), *http://dailyitem.com/0100_news/x691296962/State-348-need-Selinsgrove-Center* (quoting DPW press secretary Stacey Witalec as stating "There will always be some individuals who have such a unique situation or a high level of care that's needed that it may not be appropriate for them to move into the community. There will always be a need [for ICFs/MR].")

and valid class certification decision, Plaintiffs have sought to circumvent the evidentiary requirements of Rule 23 altogether.

Unfortunately, many residents of ICFs/MR, including the Springstead Objectors, do not have the luxury of living under the hypothetical guise that they could live in a community setting if the Commonwealth were somehow to manage to provide some undefined combination of supports and services. Defendants have admitted the harsh reality that the Commonwealth of Pennsylvania has limited funds to provide supports and services to the developmentally disabled living in community care facilities and it is unrealistic to assume that new funding for so-called "appropriate supports and services" will become available even though the Commonwealth is operating at a significant budget deficit. (*See* Defs.' Mem. In Supp. Sum. J., Dkt. #66, at 14-15.)8 Here again, Plaintiffs seek to sidestep a significant barrier to their pursuit of class-wide relief by arguing that, historically, the costs of providing services to developmentally disabled residents of community care facilities has been less than the cost of providing those same services to residents in state-run facilities. However, when touting the supposed cost efficiencies of community care, Plaintiffs fail to take into account that the majority of the residents who are able to transition to community care facilities are more independent, less disabled, and require fewer supports and services than more seriously disabled individuals who are unable to leave the care of ICFs/MR. In reality, what Plaintiffs seek is for the Court to grant them a legislative change that they have been unable to obtain.

### b. Desire to live in community care.

The third prong of the class definition, which includes in the class those residents of ICF/MR who "do not or would not oppose community placement" calls for an individual,

---

8     In fact, it would appear that a more significant problem would (and should) be those developmentally disabled individuals who are not receiving appropriate services *anywhere*. It is unclear why Plaintiffs and their DRN counsel are untroubled by this issue.

personal choice from each putative member of the class.  As with the other elements of class

certification, Plaintiffs have provided the Court with no evidence showing how many current

ICF/MR residents wish to be transitioned to community care.  Instead, just like they assume that

all ICF/MR residents are capable of transitioning to community care, Plaintiffs simply assume

that most, if not all, ICF/MR residents "would not oppose" community placement, and any initial

opposition will disappear once the ICF/MR residents and family members are properly

"educated" on the subject.  (Pl. Mem. in Supp. Sum. J., Dkt. #49, at 5-6.)  Making matters worse,

Plaintiffs ask this Court to force the Commonwealth to budget for the move of hundreds of

people without knowing how many – if any – want to move.

In reality, ICF/MR residents, guardians, and families will respond with their own,

different and individual responses based on whether or not they desire community care.

Plaintiffs' strident generalization about ICF/MR residents' non-opposition to community care

also hides the fact that many ICF/MR residents are non-verbal or are so significantly disabled as

to be unable to truly evaluate or indicate their care preferences and do not have a guardian or

family member to speak on their behalf.  Of the 1,223 individuals living in ICF/MR care as of

September 30, 2009, 1004 of these individuals – 82% – did not have a guardian to assist in their

decision or communicate their willingness or opposition to living in community care.  (DRN

Information Report, State Centers, Summary Sheet, Pl. Mot. Sum. J., Dkt. #48, Ex. 13.)

Moreover, the statistics maintained by ICF/MR Centers indicate that as of April 19, 2011, 890 of

the 1,207 residents of Pennsylvania's ICFs/MR were classified as profoundly mentally retarded.

*See* Center Statistics, Hoffart Decl., Exs. A, B.  These same statistics show that 712 of the 1,207

individuals living in ICF/MR in April of 2011 were non-verbal.  *Id.*

Here again, rather than providing the Court with an honest and accurate picture of the class, Plaintiffs relied on their own generalized allegations, which the Defendants once again failed to oppose.  Plaintiffs have offered no proof that the more than 1,200 residents of ICF/MR purportedly in this class uniformly desire to be transitioned to community care.  Instead, Plaintiffs have endeavored to create a class identification procedure bypassing the individual assessments of whether ICF/MR residents desire community placement.  (*See*, *e.g.*, Pl. Mot. for Prelim. Class Approval, Dkt. #105, ¶11.a. ("State ICF/MR residents who do not express a preference for discharge will be placed on the Planning List unless they have involved family or guardians who are opposed.")).  This assertion conclusively refutes the idea that this case has to do with what the individual wants.  Instead, the case is driven by what DRN wants.  They assume in their narrow and arrogant manner that they know best.  Unable to convince the Commonwealth legislature of their infallibility, DRN seeks to have this Court endorse their purported ability to know what's best for 1,200 people they have never met.

Plaintiffs' advocates' belief in their superiority and Defendants' indifference, however, are inadequate substitutes for the evidence of cohesion required to properly certify a class under Rule 23(b)(2) and which is lacking here.  In their efforts to certify a class, Plaintiffs did not address cohesion because, in fact, no cohesion exists.  While the Defendants have granted the Plaintiffs a wide berth to pursue class certification, Defendants' immediate surrender (which the Plaintiffs argue should count as the Springstead Objectors' adequate representation in this matter) did not and does not relieve the Court of its obligation to find by a preponderance of all available evidence that the class proposed by Plaintiffs is sufficiently cohesive to warrant certification as a non-opt out Rule 23(b)(2) class.

2.      *The class includes an opt-out provision that is invalid under Rule 23(b)(2) and is impermissibly defined by the mental state of putative class members.*

The third prong of the class definition proposed by Plaintiffs that identifies class members based on their current or future opposition to community care constitutes an opt-out provision that is not valid under Rule 23(b)(2).  Participation in a Rule 23(b)(2) class is not discretionary and members of a Rule 23(b)(2) class cannot simply opt-out of the class relief. *Wal-Mart*, 131 S. Ct. at 397 ("The Rule provides no opportunity for (b)(1) or (b)(2) class members to opt out, and does not even oblige the District Court to afford them notice of the action."); *Barnes*, 161 F.3d at 142-43 ("[I]n a (b)(2) action, unnamed members are bound by the action without the opportunity to opt out.").  As the class in the present action is certified under Rule 23(b)(2), the prong of the class definition purportedly allowing class members to opt-out of the class by opposing and continuing to oppose community placement is invalid.

Previously in this litigation, Plaintiffs' DRN counsel have argued that the class definition was constructed to preserve class members' right under the Supreme Court's *Olmstead* decision to select the form of care that is best for their individual needs.  (*See*, *e.g.*, Pl. Mem. in Opp. Intervention, Dkt. #34, at 6 ("Plaintiffs formulated the case in this narrow way in recognition that the right to community services afforded by the ADA and RA has been limited to those individuals who are not opposed to such services." (citing *Olmstead*, 527 U.S. at 607))). The Court has also found, that the class definition mirrors and satisfies the requirements of *Olmstead*. (*See, e.g.*, Jan, 27, 2011 Mem. & Order, Dkt. #88, at 16 ("the definition of the class itself satisfies the first two elements articulated in *Olmstead*")).  A class certified under Rule 23(b)(2) however, is not the proper vehicle to preserve and protect class members' rights under *Olmstead*.

Notably, the plaintiffs in *Olmstead* did not bring claims on a class basis.  Rather, the *Olmstead* decision concerned only the individual rights of the two named plaintiffs and did not

address class certification questions. *See Olmstead*, 527 U.S. at 602-03 ("[i]n this case . . . there is no genuine dispute concerning the status of [the two plaintiffs] *as individuals* 'qualified' for noninstitutional care . . . [as] neither woman opposed such treatment.") (emphasis added). Because *Olmstead* sought only to protect the individual rights of persons with mental disabilities, linguistic similarity between the class definition and the Supreme Court's *Olmstead* holding is not an appropriate basis for class certification.

Moreover, even outside of a Rule 23(b)(2) non-opt-out class, the Third Circuit and other courts have frowned upon class definitions characterized by the subjective mindset of class members. *See, e.g., Chiang v. Veneman*, 385 F.3d 256, 271 (3d Cir. 2004) ("defining a class by reference to those who 'believe' they were discriminated against undermines the validity of the class by introducing a subjective criterion into what should be an objective evaluation."). Federal District Courts in Pennsylvania have also long held that class certification is inappropriate when based on potential class members subjective mental state. *See Eisman v. Pan Am. World Airlines*, 336 F. Supp. 543, 547 (E.D. Pa. 1971) ("courts have dismissed class actions where the vague and indefinite description of the purported class depends on the subjective state of mind of a particular individual, rendering it difficult, if not impossible, for the Court to determine whether any given individual is within or without the alleged class"); *Hayden v. Freightcar Am., Inc.*, No. 3:2007-201, 2008 WL 375762, at *9, *11 (W.D. Pa. Jan. 11, 2008) (citing to and adopting Third Circuit's *Chiang* reasoning). This principle is not unique to the Third Circuit or Pennsylvania courts. *See, e.g., Nat'l Org. for Women, Inc. v. Scheidler*, 172 F.R.D. 351, 358 (N.D. Ill. 1997) ("when [class] membership is defined solely by state of mind, the case is generally deemed unascertainable"); Wright, Miller & Kane, Federal Practice &

Procedure § 1760 (3d ed. 1998) ("a class defined with reference to the state of mind of its members will not be allowed to proceed under Rule 23").

The danger of granting wide-ranging relief to a class that is based on the mental state of its members, such as the class here, should be especially acute in this case where the class is defined by the subjective, future mindset of mentally retarded persons who will be required to affirmatively voice opposition to community placement – to the Plaintiffs' DRN advocates' satisfaction, of course – in order to avoid being moved from their current homes.  While the Springstead Objectors and several other ICF/MR residents currently have guardians who are able to speak on their behalf, documents submitted by Plaintiffs in support of their motion for summary judgment indicate that not only do the vast majority of ICF/MR residents not have guardians to make elections about appropriate forms of care, but that DRN is *counting on that fact* to meet its annual "integration" targets.  (*See* Motion for Class Approval at II.a. (stating that guardianless class members who say nothing will be placed on the ICF/MR Planning list and forced from their current homes); s*ee also* DRN Information Report, State Centers, Summary Sheet, Pl. Mot. Sum. J., Dkt. #48, Ex. 13 (indicating that, as of September 30, 2009, 219 ICF/MR residents had guardians, compared to 1004 ICF/MR residents without guardians)).

## III.    THE SETTLEMENT PROPOSED BY PLAINTIFFS AND DEFENDANTS WILL IMPROPERLY VIOLATE THE RIGHTS OF THE SPRINGSTEAD OBJECTORS AND OTHER CLASS MEMBERS AND CANNOT BE APPROVED UNDER RULE 23(e).

Even assuming *arguendo* that the class could have been properly certified pursuant to Rules 23(a) and 23(b)(2), "a class action cannot be settled without the approval of the court and a determination that the proposed settlement is fair, reasonable and adequate." *Prudential*, 148 F.3d at 316.  Under Rule 23(e) the Court bears the "important responsibility of protecting absent class members . . . ."  *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 349 (3d Cir. 2010).

When exercising this important responsibility under Rule 23(e), the Court assumes a fiduciary relationship with absent class members to protect and guard their rights.  *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010).  That need for judicial protection is especially acute when, as here, the absent class members are developmentally disabled individuals, many of whom have no guardians.

    A.    **The proposed settlement will deny class members from selecting the form of care that is appropriate to their individual needs, a right that was recognized by the Supreme Court in *Olmstead*.**

In *Olmstead*, the Supreme Court held that that the Americans with Disabilities Act affords persons with developmental disabilities the right to choose to live in the "most integrated setting appropriate," taking into account the available resources and the individual's desires and needs.  527 U.S. at 595.  Although *Olmstead* certainly supports Plaintiffs' right to choose community care for themselves, it also expressly rejected the one-size-fits-all approach advocated by Plaintiffs and recognized that community-based care is not always the most appropriate form of care for all mentally-disabled individuals:

> Unjustified isolation, we hold, is properly regarded as discrimination based on disability.  But we recognize, as well, the States' need to maintain a range of facilities for the care and treatment of persons with diverse mental disabilities.

*Olmstead*, 527 U.S. at 597.  Both *Olmstead* and the applicable federal regulations affirm the Springstead Objectors and other ICF/MR residents have a right to choose institutional care over community-based care.  *Id.* at 602 (holding there is no "federal requirement that community- based treatment be imposed on patients who do not desire it") (citing 28 C.F.R. § 35.130(e)(1) (1988) ("Nothing in this part shall be construed to require an individual with a disability to accept an accommodation . . . which such individual chooses not to accept."); 28 C.F.R pt. 35, App. A, p. 450 (1998) ("[P]ersons with disabilities must be provided the option of declining to accept a particular accommodation.")).  As the Olmstead court observed, "it [is not]

the ADA's mission to drive States to move institutionalized patients into an inappropriate

setting" and "for [some] individuals, no placement outside the institution may ever be

appropriate." *Olmstead*, 527 U.S. at 605.

> 1. *To avoid having community placement imposed upon them under the proposed settlement, class members incapable of making or communicating care decisions will be required to affirmatively oppose community placement.*

Pages 5-7 of the proposed settlement agreement (Dkt.#105, Ex. 2) provide a detailed

protocol for the "Identification of Class Members."9  These identification procedures indicate

that ICF/MR residents' opposition to community placement will be determined prior to

September 30, 2011, "*and at least annually thereafter.*"  (*Id.* at III.2.)  Under the proposed plan,

the determination will be performed by a ICF/MR social worker or someone described as a

"Community Transition Specialist"10 working with a DRN-employed Facility Advocate.  (*Id.* at

III.2.a.)  This annual assessment and placement on the State Planning list prioritizing the resident

for placement in a community care facility will be based on "discussion with the resident, and

involved family or guardians to assess their position as to community placement."  (*Id.*)  If an

ICF/MR resident "does not express opposition to *considering* community placement" he or she

will be placed on the State Planning List.  (*Id.* at III.2.b.)  ICF/MR residents that do not

affirmatively express opposition to community placement will be removed from the State

Planning List only when involved family members or guardians make their affirmative

opposition to community placement known.  (*Id.* at III.2.b.1 & III.2.b.2.)

---

9      Indeed, Plaintiffs' own nomenclature underscores, better than the Springstead Objectors can, the manifest impropriety of this class.  It is hornbook law that a class certified under Rule 23 should be objectively identifiable.  Yet, here Plaintiffs expressly acknowledge that only after certification, settlement, and judgment will they make any attempt to (unilaterally) evaluate who wants to move to community care.

10     While the proposed settlement plan does not define "Community Transition Specialist," the Springstead Objectors believe that this person's role in the assessment process is self-evident provided the title.

While *Olmstead* found that the ADA guarantees that the developmentally disabled may choose to live in the most integrated settings appropriate to individuals' desires and needs, the proposed settlement plan envisions that ICF/MR residents who have expressed *no indication* that they desire community placement will be placed on the State Planning list.  By establishing a class identification procedure that requires ICFs/MR residents, their guardians, or family members to affirmatively oppose community placement to exclude themselves from class relief, the Plaintiffs misconstrue the tenet of affirmative choice that is the hallmark of the Supreme Court's *Olmstead* decision.  As the *Olmstead* court made clear, there is no "federal requirement that community-based treatment be imposed on patients who do not desire it." 527 U.S. at 602.

In reality, the proposed settlement provides that the majority of decisions concerning whether institutional or community care represents the "most integrated setting" appropriate to class member's needs will be made, not by class members, but by persons employed by DRN, Plaintiffs' counsel in the present action.  As the statistics maintained by the state ICFs/MR show, 890 of the 1,207 current residents of ICFs/MR are classified as possessing a profound mental disability.  These same statistics show that 712 of the 1,207 current ICF/MR residents are classified as "non-verbal."  Thus, nearly 75% of the current residents of state-run ICFs/MR will be unable to express any opposition to community placement.

Moreover, the vast majority of class members unable to voice their opposition to community placement do not have legal guardians to state that opposition on the class member's behalf.  As the statistics Plaintiffs provided in support of their motion for summary judgment reveal, 1004 of the 1,223 residents of state-run ICF/MRs – 82% of the ICF/MR population – did not have a legal guardian.  The settlement agreement also fails to provide any assurance that guardians' or family members' opposition to community care will have any permanence in the

event that the guardian or family member passes away or is otherwise unable to voice their annual opposition to community care for their ward or loved one.11  Thus, the procedure outlined in the proposed settlement agreement realistically provides that the choice between ICFs/MR and community care will be made for most class members by employees of DRN who categorically believe that state-operated ICFs/MR are not the most integrated settings appropriate to the needs of *any* individual resident of those facilities.  (*See* Pl. Amend. Compl., Dkt. #9, ¶ 66.)

> 2.    *The integration plan detailed in the proposed settlement agreement would significantly depopulate state-run ICF/MR centers and deprive ICFs/MR of necessary funding, thereby constructively imposing community care upon on class members irregardless of their desire or opposition to being placed in a community care facility.*

Pages 9-12 of the proposed settlement agreement detail a "integration plan" that requires Defendants to transfer residents and funding away from state-run ICFs/MR.  This integration plan compelling Defendants to move *at least* 400 ICF/MR residents – roughly 35% of the current ICF/MR population – into community care over the next five years.  (Proposed Settlement Agreement, Dkt. #105, Ex.2, V.1.a-e.)  The integration plan further provides that Defendants will continue to transition at least 75 ICF/MR residents into community care "each fiscal year thereafter until all state ICF/MR residents in the ICF/MR Planning List have been discharged." (*Id.*, V.1.e.)  The integration plan also requires Defendant DPW to make community care funding "one of its top budget priorities," to consider "consolidating the budget lines for state ICFs/MR and Community Waiver services," and, prior to consolidating the budget lines, to "shift

---

11    Moreover, even though the proposed settlement agreement purports to maintain choice for class members, the "Identification of Class Members" procedures requiring ICF/MR residents and their involved family and guardians to annually oppose community placement inevitably will chill class members' choice to live in ICF/MR care.  Annual assessments of whether class members oppose or desire community placement necessarily imply that the choice to live in ICF/MR care is somehow wrong.  The Springstead Objectors and their guardians further object to the settlement agreement on the basis that these annual assessments will operate to steer the particularly vulnerable residents of ICFs/MR onto the State ICF/MR Planning List.

funds from the carry-forward budget for state ICFs/MR to the Community Waiver services

budget."  (*Id.*)12

Without question, these provisions of the settlement agreement will impair the quality of

care in state-run ICFs/MR and will result in closure of at least some ICFs/MR.  While Plaintiffs

will no doubt argue that the proposed settlement agreement says nothing about closing centers or

making ICF/MR care unavailable, Plaintiffs are staunch proponents of closing ICF/MR facilities

and using the funding from shuttered facilities to promote community care initiatives. (*See* Pl.

Mem. in Supp. Sum. J., Dkt. #49, at 11-12 (criticizing DPW for failing to close the Hamburg and

Selinsgrove Centers to "maximize funding" for community care initiatives)).

The Third Circuit Court of Appeals has expressly stated that disadvantaging ICF/MR

residents by transferring funds to foster community placements is not acceptable under

*Olmstead.*  In *Frederick L. v. Department of Public Welfare of Pennsylvania*, a case involving

the community placement of mental health patients from a state-run facility to community

settings, the Third Circuit observed:

> Assuming a limited pool of budgetary resources, if DPW had siphoned off
> monies appropriated for institutional care for mental health patients in order to
> increase community placements, DPW would have run afoul of *Olmstead*
> prohibition on favoring those "who commenced civil actions" at the expense
> of institutionalized mental health patients who are not before the court. Any
> effort to institute fund-shifting that would disadvantage other segments of the
> mentally disabled population would thus fail under *Olmstead*.

364 F.3d 487, 497 (3d Cir. 2004).

---

12      It should also be noted that, even assuming *arguendo*, that in this lawsuit the claims and forced moves sought
by Plaintiffs were appropriate, there is no legal "claim" or right vindicated by the consolidation of budget
lines or the stripping of ICF/MR funding.  In DRN's view of the world, it does not matter if individuals who
want to move to the community such as Plaintiffs are permitted to do so; their federal rights apparently are
still entreated upon by the *mere existence* of viable ICF/MR care for those who desire to remain in their
homes.

Plaintiffs have, and presumably will continue to, argue that community placements save money and do not impact the services offered in ICFs/MR.  However, Defendants have noted that the cost savings of community placements are largely illusory.  As Defendants stated in their papers supporting their Motion for Summary Judgment, "[e]ven when a community placement is less expensive, discharge of a resident from a State center does not result in an immediate savings of the average cost for that resident."  (Defs. SOF, Dkt. #52, at ¶29.)  Therefore the cost of care of an ICF/MR resident "does not become available for community care upon the resident's discharge" and "Defendants generally accrue no net savings from an institution to community transfer unless a State center or at least a unit within that facility is closed as a result of that transfer."  (*Id.* at ¶¶32, 33.)

Defendants have noted that severe financial constraints already limit the services DPW currently is able to provide.  (Defs.' Mem. in Supp. Sum. J., Dkt. #53, at 4.)  Depleting ICFs/MR of residents and limited, necessary funding undoubtedly will result in the closure of ICF/MR facilities and impair the level of care they provide to the developmentally disabled.  Thus, the "viable integration plan" provided by the settlement agreement will, contrary to the tenets of *Olmstead*, impose community care upon the Springstead Objectors and other class members for whom ICF/MR care is the most appropriate and integrated form of care for their unique and individual needs.

      3.    *The educational initiatives of the proposed settlement agreement are decidedly pro-community care, do not provide a full range of information and seek to impose community care upon class members by impeding their ability to conduct a meaningful evaluation of available care options*

The "Education about Community Placement Options" found on pages 7-9 of the proposed settlement agreement call for the establishment of a "Community Partnership Steering Committee . . . to develop and implement a program to educate state ICF/MR residents and their

involved families and guardians about community placement." (Settlement Agreement, Dkt #105, Ex. 2, at IV.1.) The settlement agreement provides that the Community Partnership Steering Committee, true to its name, is to be comprised predominately of community care advocates: a DRN representative, a provider representative, a representative of the groups that administer community care programs for DPW, a community care resident, a community care resident's family member, and a representative of the Office of Developmental Programs. (*Id.* at IV.1.a.)

    In addition to its name and membership, the identified activities and goals of the Community Partnership Steering Committee further reveal that the Committee's purpose is to conduct an aggressive campaign steering ICF/MR residents into community care elections. The settlement agreement does not provide for programs educating ICF/MR residents about the drawbacks or limitations of community care, does not provide education programs letting ICF/MR residents and involved family and guardians how to get the most benefit from ICF/MR care, and does not establish any mechanism by which ICF/MR residents and their involved family and guardians can ensure that they remain in ICF/MR care. Moreover, the settlement agreement's education program does not provide for any mechanism educating class members initially desiring community placement how they can change their mind and return to ICF/MR care in the event community settings prove to be inappropriate to their needs.13

---

[13] The settlement agreement's reporting provisions will also fail to provide class members with complete and accurate information necessary for a meaningful evaluation of available care options. The reporting provisions found on pages 12-13 of the settlement agreement mandate that DPW will semi-annually report to Plaintiffs' counsel and the Court on the steps it has taken to implement the Integration Plan, the number of persons discharged to community care from the State ICF/MR Planning list, and the implementation of the settlement agreement's education and outreach plans. To their credit, Plaintiffs' counsel will also receive reports about the identity of class members who, after discharge to the community, were admitted to psychiatric hospitals or state ICFs/MR or were arrested or jailed. These reports (in an appropriately redacted form) should be made available to all ICF/MR residents or their guardians contemplating community care and should also include information on deaths, injuries, and any other harm resulting from relocation to community-based forms of care.

The Springstead Objectors fully support education programs providing ICF/MR residents and their involved family and guardians with accurate information about the benefits of community care.  However, the Springstead Objectors object to the one-sided, biased education program called for by the settlement agreement that will deprive residents of all information necessary to make meaningful choices about the most appropriate form care for their individual needs.  An education program designed to prompt residents to choose community care, is little more than a coercive version of the imposition of community care expressly rejected by the Supreme Court in *Olmstead*.

B.       **The settlement agreement requires Defendants to award DRN attorneys fees that are excessive and inappropriate.**

The Springstead Objectors respectfully submit that DRN, a publicly funded organization, should not be entitled to *any* attorneys fees, let alone the excessive fees contemplated by the settlement agreement.  Pursuant to federal law, the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. § 15001, *et seq.*, Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801, *et seq.*, the Help America Vote Act, 42 U.S.C. 15401, *et seq*, and several other provisions of federal law, DRN receives considerable federal funds.  DRN's own website indicates that 98% of its funding comes from governmental sources.  About DRN, Disability Rights Network of Pennsylvania, *http://drnpa.org/page/about-drnpa*.  The Springstead Objectors respectfully question the propriety of a $432,500 legal fee payment from the Commonwealth treasury to compensate an organization already receiving public funds.

The settlement agreement also fails to provide any basis for how the fee award was calculated.  In the absence of a common fund, Third Circuit case law calls for the use of a lodestar fee determination process.  *In re Cendant Corp. Prides Litig.*, 243 F.3d 722, 732 (3d Cir. 2001) ("There are two primary methods for calculating attorneys' fees: the percentage-of-

recovery method and the lodestar method.  . . . 'The lodestar method is more commonly applied

in statutory fee-shifting cases, and is designed to reward counsel for undertaking socially

beneficial litigation in cases where the expected relief has a small enough monetary value that a

percentage-of-recovery method would provide inadequate compensation.'") (quoting *Prudential*,

148 F.3d at 333).  In order to apply the lodestar method, "[a] court determines an attorney's

lodestar by multiplying the number of hours he or she reasonably worked on a client's case by a

reasonable hourly billing rate for such services given the geographical area, the nature of the

services provided, and the experience of the lawyer."  *Id.* at 732 n.11 (quoting *Gunter v.

Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000)).  No such calculation is

provided by the settlement agreement and Plaintiffs have offered no other proof or

documentation supporting an award of $432,000 in a case in which Plaintiff's counsel took

extremely limited discovery and only received token opposition from Defendants.

        The Springstead Objectors object to this fee award and respectfully submit that these

funds could better benefit the developmentally disabled residents of Pennsylvania if they were

used to provide services or supports to residents of ICFs/MR or community care facilities.  The

Springstead Objectors take particular note that, at the average costs for the provision of

community services Plaintiffs quoted in their papers supporting their summary judgment motion,

this fee award of $432,000 would provide nearly enough funding to provide community care for

four of the five named Plaintiffs for one year.  (*See* Pl. SOF, Dkt. #50, ¶116 (stating that the cost

for 75% of the individuals recently charged to community care the annual care cost for those

individuals was less than $169,000 per person)).

## CONCLUSION

The Springstead Objectors respectfully request to be heard at the August 22, 2011

fairness hearing and further request that the Court (1) deny the current motion seeking approval

of the settlement, (2) decertify the class, (3) allow the named Plaintiffs' action to proceed on an

individual, not class, basis, and (4) grant any other relief that the Court deems fair and equitable.

Respectfully submitted,


Dated:  Philadelphia, Pennsylvania        **VAIRA & RILEY, P.C.**
      August 1, 2011

By:  /s/ John E. Riley
        John E. Riley
        PA ID# 22504
        William J. Murray, Jr.
        PA ID# 73917
      1600 Market Street, Suite 2650
      Philadelphia, Pennsylvania  19103
      (215) 789-9405
      (215) 751-9420 (fax)


**SIDLEY AUSTIN LLP**

Benjamin J. Hoffart
787 Seventh Avenue
New York, New York  10019
(212) 839-5300
(212) 839-5599 (fax)

*Attorneys for Craig Springstead, Grace Meo,*
*Daniel Bastek, Michael Storm, Beth Ann Lambo,*
*Richard Kohler, Maria Kashatus, and Wilson*
*Sheppard*

36

<u>**CERTIFICATE OF SERVICE**</u>

I, BENJAMIN J. HOFFART, certify that on August 1, 2011, I served a copy of these Supplemental Objections by Federal Express, addressed to:

Clerk of Court
UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, Pennsylvania 17108-0893


Robert W. Meek, Esq.
DISABILITY RIGHTS NETWORK OF PENNSYLVANIA
1315 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19107-4705
        *Attorney for Plaintiffs*

Doris M. Leisch, Esq.
Deputy Chief Counsel
OFFICE OF GENERAL COUNSEL, DEPARTMENT OF PUBLIC WELFARE
801 Market Street, Suite 6092
Philadelphia, Pennsylvania 19107
        *Attorney for Defendants*.

Dated:  August 1, 2011                          /s/ Benjamin J. Hoffart
                                                Benjamin J. Hoffart

37