## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANKLIN BENJAMIN, *et. al.*, | : | 1:09-cv-1182 |
| | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| DEPARTMENT OF PUBLIC , | : | Hon. John E. Jones III |
| WELFARE OF THE | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA and GARY | : | |
| ALEXANDER, in his official capacity | : | |
| as Secretary of Public Welfare of the | : | |
| Commonwealth of Pennsylvania | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

### September 2, 2011

## I.    INTRODUCTION

Plaintiffs, a class of individuals with intellectual disabilities (formerly

known as mental retardation) who are institutionalized in state intermediate care

facilities for persons with mental retardation ("ICF/MRs") initiated this litigation

in June 2009.  Plaintiffs alleged that they were appropriate for, and not opposed to,

community-based services, and that Department of Public Welfare and the

Secretary of Public Welfare (collectively, "Defendants" or "DPW") violated Title

II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131-12134, and

Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, by failing to

provide those services to institutionalized individuals.  Plaintiffs sought both

declaratory and injunctive relief.  On January 27, 2011, the Court resolved cross

Motions for Summary Judgment in Plaintiffs' favor, finding that Defendants were

violating the integration mandates of the ADA and RA by relegating

institutionalized individuals to a class of persons who receive community

placements only after another class, those who are not institutionalized, was fully

served.  (*See* Doc. 88.)  Because of the exhaustive detail that would be required in

any resulting injunctive relief ruling, and mindful that the parties were in a better

position to come to closure on an acceptable policy, we encouraged the parties to

mediate in aid of seeking a final resolution.  The parties thereafter reached a

settlement with the commendable assistance of U.S. Magistrate Judge Martin C.

Carlson, and, thus, before the Court is Plaintiffs' Unopposed Motion for Final

Approval of the Proposed Class Action Settlement Agreement (Doc. 260) and

Plaintiffs' Unopposed Motion for Attorneys' Fees, Litigation Expenses, and Costs

(Doc. 262).  For the reasons that follow, the Court will approve the proposed

settlement and award the requested fees.

## II.    BACKGROUND

### A.   Procedural History

As aforementioned, the Plaintiffs initiated the action on June 22, 2009.

Pursuant to an unopposed motion predicated upon Federal Rule of Civil Procedure

23(b)(2), we thereafter certified the following class:

> All persons who: (1) currently or in the future will reside in one of
> Pennsylvania's state-operated intermediate care facilities for persons
> with mental retardation; (2) could reside in the community with
> appropriate services and supports; and (3) do not or would not oppose
> community placement.

(Doc. 17.)  Defendants subsequently filed a Motion to Dismiss (Doc. 20) that the

Court denied by our Order of January 25, 2010.  (Doc. 38.)

While the Motion to Dismiss was pending, a group of individuals filed a

Motion to Intervene in the litigation.  (Doc. 27.)  These individuals, referred to

throughout this litigation as the "Springstead Intervenors", alleged that, although

they were opposed to community-based services and support, they were

nonetheless *de facto* members of the certified class.  The Springstead Intervenors

alleged that the resolution of the class action in Plaintiffs' favor would limit the

Springstead Intervenors' rights to choose ICF/MR care.  We denied the Motion to

Intervene on March 10, 2010, finding that the Springstead Intervenors were

explicitly excluded from the class by virtue of their opposition to community-based

care.  (Doc. 41.)  The Springstead Intervenors appealed that decision, and the

3

United States Court of Appeals for the Third Circuit affirmed our denial in April 2011. *See Benjamin v. Dep't of Pub. Welfare*, 2011 WL 1243683 (3d Cir. 2011) (unpublished opinion).

The parties completed extensive discovery and filed cross-Motions for Summary Judgment. (Docs. 48, 51.) In January 2011 we issued a Memorandum and Order that denied Defendants' Motion for Summary Judgment, granted Plaintiffs' Motion for Summary Judgment, and declared that DPW violated the integration mandates of the ADA and RA. (Doc. 88.) As noted, because at that juncture the Court was reluctant to draft such extensive injunctive relief as would be required, and in effect construct a policy that was better left for the parties to develop in the first instance, we encouraged the parties to attempt to resolve the remedy amicably.

Again, and as noted, we referred the parties to mediation with Magistrate Judge Martin Carlson in February 2011. The parties met twice with Judge Carlson and continued arms-length negotiations on their own. The parties eventually finalized the Proposed Settlement Agreement, and we granted preliminary approval of said Agreement on May 27, 2011. (Doc. 106.) Notice was either hand-delivered to nearly all ICF/MR residents or mailed to involved family and guardians of residents by June 24, 2011, and interested persons had the opportunity

to object to the Settlement by August 2, 2011.  The Court received numerous

objections, discussed in more detail below, and conducted a fairness hearing in

accordance with Federal Rule of Civil Procedure 23(e) on August 22, 2011.

**B.     The Proposed Settlement and Attorneys' Fees**

Plaintiffs appropriately summarize the salient terms of the Proposed

Settlement in their Brief in Support of the Motion for Final Approval (Doc. 261),

and we shall highlight the significant points herein.

As articulated in the Agreement and expanded upon during the testimony at

the fairness hearing, DPW is in the process of creating, and will continue to create,

a Planning List that includes all state ICF/MR residents who are not opposed to

discharge – this includes those who wish to be discharged and those who assert no

preference.  To evaluate who is not opposed to discharge, DPW's Office of

Developmental Programs ("ODP") and others will assess residents', guardians',

and involved family members' opposition to discharge utilizing the ICF/MR

Community Planning List Assessment Protocol (the "Assessment Protocol") that

was introduced in the hearing as Exhibit 1.  The assessment is intended to be an

individualized evaluation, and residents who do not indicate opposition to

community placements will be placed on the planning list unless their guardians

oppose.[1]  DPW will perform this assessment every year in conjunction with the residents' IEPs.

Related to the assessments that will be performed to develop the Planning List, DPW will create a committee to develop a training program to educate residents and their families about community placements.  This committee will distribute literature regarding the community placements and will offer visitations to some of the placements.

Thereafter, DPW will develop and implement an Integration Plan to provide community placements in the following order: (1) at least 50 persons on the Planning List in Fiscal Year 2011-2012; (2) at least 75 persons on the Planning List in FY 2012-13; (3) at least 100 persons on the Planning List in each FY 2013-2014 and 2014-2015; and (4) at least 75 persons on the Planning List in FY 2015-16 and every FY thereafter until all persons on the Planning List have been discharged.  Throughout the course of the implementation of the Settlement Agreement, DPW will provide to Plaintiffs regular status reports, and the Court will retain continuing jurisdiction over the case for purposes of enforcement of the Settlement Agreement.

---

[1]A substitute decision-maker can likewise oppose community placement for an individual who expresses no preference; thus preventing their inclusion on a waiting list.  A substitute decision-maker cannot, however, override the decision and prevent inclusion on the list if the resident affirmatively indicates a preference for community placement.

The Court received letters of opposition to the Settlement Agreement from at least one (1) state ICF/MR resident and from the families or guardians of approximately 101 other state ICF/MR residents.  We likewise received letters of objection from several Commonwealth lawmakers as well as others who will not be directly impacted by the litigation, and several letters of support from state ICF/MR residents and others.  Most of the articulated objections clearly stem from two apparent fears: that some state ICF/MR residents will be unable to voice their opposition to community placements and will be wrongly placed in the community and that, ultimately, the Settlement Agreement will result in the closure of all state ICF/MRs because of a decrease in the resident population.  Several objectors likewise objected to any award of fees to counsel for Plaintiffs or to the measure of any fees awarded.

Plaintiffs also filed an unopposed Motion for Attorneys' Fees, Litigation Expenses, and Costs.  (Doc. 262.)  Plaintiffs seek a total award of $432,500; an amount that is, according to Plaintiffs, only 86.6 percent of their actual fees, litigation expenses, and costs incurred through June 30, 2011.  Defendants do not oppose the Motion for Attorneys' Fees and Costs.

## III.    DISCUSSION

### A.    The Proposed Settlement Agreement

Rule 23(e) provides, in pertinent part:

The claims, issues, or defenses of a certified class may be settled . . .
only with the court's approval.  The following procedures apply to a
proposed settlement. . .

(1)     The court must direct notice in a reasonable manner to all class
        members who would be bound by the proposal.

(2)     If the proposal would bind class members, the court may approve
        it only after a hearing and on finding that it is fair, reasonable, and
        adequate.

(3)     The parties seeking approval must file a statement identifying any
        agreement made in connection with the proposal.

. . .

(5)     Any class member may object to the proposal if it requires court
        approval under this subdivision (e); the objection may be
        withdrawn only with the court's approval.

F.R.C.P. 23(e).  As noted above, the class was properly certified in September

2009, so the Court need not make a certification determination as it would with a

settlement class.  Because the Court directed reasonable notice and allowed for

objections, the only requisite, but clearly important, step remaining is a

determination that the proposal is fair, reasonable, and adequate.

As the Third Circuit has often stressed, when considering a class settlement

the district court must "act[] as a fiduciary, guarding the claims and rights of the

absent class members." *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir.

2010).  A "presumption of fairness" applies in a class action settlement if a court

finds that the negotiations were conducted at arm's length, that there was sufficient

discovery, that the proponents of settlement are experienced, and that only a small percentage of class members object.  *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004).   Here, the presumption of fairness attaches to the Proposed Settlement Agreement.  First, and as referenced above, the parties did conduct extensive arms-length negotiations between themselves and with the guidance of Magistrate Judge Carlson.  Second, because the settlement was reached after the Court entered summary judgment in Plaintiffs' favor, extensive discovery – including expert discovery – had already occurred, and the Court and the parties are all well-acquainted with the factual basis for the salient assertions made by Plaintiffs.  Third, it is beyond peradventure that Plaintiffs' and Defendants' counsel are seasoned litigators with decades of combined experience in the subject matter at bar.  Finally, the number of objectors are a small fraction of the total population of the state ICF/MRs, and an infinitely smaller fraction of those who meet the strict definition of the class.

### 1.    The *Girsh* Factors

In *Girsh v. Jepson*, the Third Circuit articulated nine factors for courts to further consider when determining the fairness of a proposed settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of

maintaining the class through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

521 F.2d 153, 157 (3d Cir. 1975); *see also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010).  The Third Circuit later identified other factors that are useful to consider, including whether any provisions for attorneys' fees are reasonable.  A court *must* make findings as to each of the nine *Girsh* factors before approving a settlement under Rule 23(e).  *See Pet Foods*, 629 F.3d at 351.  For the reasons articulated below, we find that the Proposed Settlement Agreement is fair, adequate, and reasonable and we shall adopt it.

The first factor – the complexity, expense, and likely duration of the litigation weighs in favor of approving the Settlement Agreement.  Though the litigation is in its latter stages, it would take an extensive hearing, further submissions, and large amounts of the Court's time to develop any sort of injunctive remedy.  Not only will the Court expend considerable resources, the parties will incur even greater fees and costs, and those Plaintiffs who wish to live in the community and who have been denied the opportunity to do so would remain institutionalized without recourse for DPW's clear violations as previously determined by us.

"In an effort to measure the class's own reaction to the settlement's terms

directly, courts look to the number and voicferousness of the objectors." *General*

*Motors Pick-Up Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 812 (1995) ("*GM*").

Thus, when considering the second *Girsh* factor, the reaction of the class appears

almost entirely favorable.  Notably, only one state ICF/MR resident voiced an

opposition to the Proposed Settlement Agreement, and it appears that the entirety of

his objection was that he wished to continue to live at the Selinsgrove Center.

(Doc. 115.)  Accordingly, neither this one individual's objection nor the remaining

objections from non-class members truly demonstrate the balance of the class's own

reaction to the Proposed Settlement Agreement's terms.  Indeed, the non-class

members oppose any discharge at all.[2]  Therefore, this factor weighs in favor of

approving the Proposed Settlement Agreement.[3]

The stage of the proceedings and the amount of discovery completed weighs

in favor of approval of the Proposed Settlement Agreement.  The parties must have

---

[2]We understand that all state ICF/MR residents are affected in some way by the Proposed Settlement Agreement because all residents will be subject to evaluation, but any effect on those who wish not to be discharged is negligible compared to the effect that a wholesale denial of the Settlement Agreement will have on those who do not oppose discharge.

[3]Assuming *arguendo* that the record objections by non-class members were cognizable and demonstrative of the reaction of the actual class members, we nonetheless believe that the objections miss the mark.  The objections voice misguided fears that the intended or inevitable consequences of the Proposed Settlement Agreement are that DPW will force ICF/MR residents into community placements against their wishes, and that all state ICF/MRs will close.  We do not believe the former to be the case, and find the latter to be pure speculation that is beyond the scope of our fairness evaluation.

an "adequate appreciation of the merits of the case before negotiating." *Id.* at 813.

To ensure the parties have that appreciation of the merits and the respective

consequences of the litigation, it is important to evaluate both the amount and type

of discovery conducted.  As mentioned before, the parties completed extensive

discovery, including expert discovery, for an extensive period before the Proposed

Settlement Agreement was submitted for approval by the Court.  Indeed, the

extensive discovery conducted was sufficient to support cross motions for summary

judgment and *actual* judgment.  Further, our decision on the merits clearly supports

the inference that the parties adequately appreciated the merits of their respective

positions.

The fourth factor, the risks of establishing liability, is not in play relative to

our analysis.  There are essentially no risks attendant here because the liability of

DPW was previously established by the Court's January 27, 2011 Order granting

Plaintiffs' Motion for Summary Judgment.

The fifth factor, which involves the risks of establishing damages, or, more

relevant to our case, securing the requested relief, weighs in favor of allowing

settlement.  Although the Court found for Plaintiffs on the issue of liability, the

nature of the relief or precise contours of any injunction that would be crafted by

the Court are far from certain.  Indeed, it is our reluctance to impose a judge-made

policy on Defendants which triggered the mediation that ultimately brought this proposed settlement before us for approval.

The sixth factor – the risks of maintaining the class – calls for the Court to weigh the possibility that a class would be decertified prior to trial. The risk of decertification at this stage, after resolution of the cross-motions for summary judgment, is quite negligible.[4] Therefore, this factor does not weigh in favor of the Proposed Settlement Agreement in any significant way.

The seventh factor, Defendants' ability to withstand a greater judgment, weighs in favor of settlement because, by any estimation, DPW is subject to significant budgetary constraints as recognized by the Court and the parties throughout this case. The terms of the Proposed Settlement Agreement require DPW to develop and implement phased-in community placements. While these may ultimately result in future cost reduction, they will undoubtedly require upfront

---

[4]On August 25, 2011, Carl A. Solano, Esq., who objected on behalf of his sister, Diane Solano, and presented argument at the hearing, submitted a letter and supplemental authority. (Doc. 279.) Specifically, Mr. Solano submitted the Third Circuit's August 25, 2011 Opinion in *Gates v. Rohm and Haas, Co.*, No. 10-2108, in which the Third Circuit held that it would be improper to certify a class if the requirement of cohesiveness was not satisfied. Presumably, Mr. Solano is suggesting that the Court should *sua sponte* reevaluate its certification decision because of the objections to the Proposed Settlement Agreement. We note, again, that those who oppose the Proposed Settlement Agreement are those who oppose community placement and the certified class includes those who do not, or would not oppose community placement. Thus, although the rights of those who are non-class members must be vigilantly protected, their objections do not destroy the cohesiveness of the class members. We thus find *Gates* inapt as it relates to the task at hand.

costs.  Any relief designed by this Court – a body certainly far less well-versed in the intricacies and necessities of planning for community integration than the parties – will almost necessarily result in much greater costs and budgetary burdens on DPW and the Commonwealth.

Finally, the range of reasonableness in light of the best possible recovery by Plaintiffs and the attendant risks of litigation weighs in favor of settlement.  As Plaintiffs aptly note, "[a]ssessing the value of a settlement and the 'best possible recovery' is particularly difficult in a case seeking injunctive, rather than monetary relief."  (Doc. 261 p. 20.)  The Proposed Settlement Agreement confers upon Plaintiffs the benefits they sought – the opportunity to have a reasonable prospect of discharge from institutionalization.  The Proposed Settlement Agreement develops a reasoned plan to ensure Plaintiffs receive the relief they sought through a process that is rationally measured in scope, duration, and cost.  Rejection of the settlement will only result in further delay in implementing relief for the Plaintiffs. As we would then have to return to the proverbial "drawing board", the Court would be tasked to conduct a hearing on remedies in light of the violations, compelled to spend a considerable amount of time deciding the precise relief, and thereafter the parties would presumably spend a substantial amount of time preparing for or conducting the discharge of proper Plaintiffs.  Forcing upon the parties an

injunction and resulting policy to which they did not agree via arms-length

negotiation could also presumably result in further litigation to ensure its

enforcement, draining the resources of the Plaintiffs, the Commonwealth, and this

Court.  Perhaps most importantly, the sooner the Proposed Settlement Agreement

can be implemented, the faster Plaintiffs can benefit from its mandate and achieve

real consideration for appropriate community placements.

### 2.    Conclusion

Thus, the ultimate balance of the *Girsh* factors weigh in favor of approval of

the Proposed Settlement Agreement, and we find that it is fair, adequate, and

reasonable.  Although we give our approval to Proposed Settlement Agreement and

its terms, we advise the parties to implement the settlement with caution.  To our

admittedly untrained eye, it appears as though the assessment protocol that has been

developed to effectuate the Proposed Settlement Agreement may imply an

unintended bias towards community placement.  Reviewing the questionnaire to be

utilized causes us to entertain serious doubts as to whether it is the proper tool for

gauging whether the profoundly disabled, and especially those with no guardian to

speak for them, are opposed to community placement.  Indeed, we wonder about the

wisdom of defaulting such individuals into a no preference category without greater

analysis.  And we have no doubt that the stated fears of many objectors, including

those contained in the eloquent presentation by Mr. Solano on behalf of his sister, are heartfelt and entirely real. We urge those responsible for implementing the policy to consider these concerns, and if necessary revise the protocols in question. As to the other oft-articulated objection, that this settlement is simply a stalking-horse for DPW's plan to close all ICF/MRs, we reiterate that this issue is not before us today, nor is it a facet of the settlement. To the extent that any Objectors believe that there is an overarching policy to close ICF/MRs by DPW, their recourse lies not with this Court, but through their elected representatives and those who make policy within DPW. At the end of the day, the Settlement we are approving is the necessary result of violations of class members' legal rights by Defendants. We are thus duty-bound to place our imprimatur on a reasonable resolution that remedies those violations. No remedy in a world such as this, where family members must make wrenching decisions regarding loved ones who are in many cases profoundly impaired, will be perfect. However, the settlement presented to us is worthy of our approval for all of the reasons aforestated.

### B.    Attorneys' Fees and Costs

When evaluating an award of attorney's fees, in most instances courts apply the "American Rule". This bedrock principle requires that each litigant pays his or her own costs or attorneys fees, unless a statute or contract provides otherwise.

Often, statutory fee-shifting provisions will deviate from the American Rule and permit a court to award attorney's fees to a "prevailing party."  The fee-shifting statutes at issue *sub judice*, 42 U.S.C. § 12205 under the ADA and 29 U.S.C. § 794a(b), authorize the payment of reasonable attorneys' fees and costs to a prevailing party who has filed suit under these acts.  It is within the Court's discretion to award fees to a prevailing party, although "it is well established that a prevailing party should recover an award of attorney's fees absent special circumstances."  *Truesdell v. Philadelphia Hous. Auth.*, 290 F.3d 159, 163 (3d Cir. 2002) (reviewing and reversing a denial of attorney's fees under 42 U.S.C. § 1988). Because a plaintiff may be a "prevailing party" for attorney's fees purpose "if they succeed on any significant issue in the litigation which achieves some of the benefit the parties sought in bringing suit", *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), the Court has no doubt that Plaintiffs *sub judice* are the "prevailing party" in this litigation because they already fully succeeded on the merits prior to this proceeding to approve a final settlement.  Therefore, we shall evaluate whether the requested fees and costs in the amount of $432,500 are reasonable.

### 1. Calculating the Lodestar

Plaintiffs assert they incurred total attorneys' fees in the amount of $430,715 and, as mentioned, are requesting an award of a portion of that amount.  "In general,

a reasonable fee is one which is adequate to attract competent counsel, but which does not produce windfalls to the attorneys." *Pub. Interest Research Grp. v. Windall*, 51 F.3d 1179, 1185 (3d Cir. 1995) (internal quotation omitted).  A court typically calculates the appropriate award by determining a lodestar.  The lodestar is calculated by determining the product of an appropriate hourly rate and a reasonable number of hours expended.  The party seeking fees has the burden of producing "sufficient evidence of what constitutes a reasonable market rate for the essential character and complexity of the legal services rendered. . . ." *Knight v. Drye*, 2009 U.S. Dist. LEXIS 82369 (M.D. Pa. Sept. 10, 2009) (quoting *McCutcheon v. America's Servicing Co.*, 560 F.3d 143, 150 (3d Cir. 1990)).  Once the prevailing party's burden has been met, the opposing party bears the burden of producing sufficient evidence to challenge that amount.  *McCutcheon*, 560 F.3d at 150.  If the opposing party does not challenge the amount, or does not provide sufficient evidence to challenge the amount, the district court need not make an independent lodestar determination, though the calculation of fees nonetheless is within the court's discretion.  *Id.*  Notably, Defendants do not oppose the Motion for Fees and Costs and thus do no challenge the reasonableness of the amount petitioned.  Indeed, this amount was the result of extensive negotiations as stated by counsel at the fairness hearing.  However, in an abundance of caution we will briefly articulate

our independent lodestar determination.

### a.    Reasonable Hourly Rate

A reasonable hourly rate is typically based on the prevailing rates in the

relevant community, and "[t]he court should assess the experience and skill of the

prevailing party's attorneys and compare their rates to the rates prevailing in the

community for similar services. . . ."  *Maldonado v. Houstoun*, 256 F.3d 181, 184

(3d Cir. 2001).  "Thus determination of the market rate first requires determination

of the relevant market."  *Windall*, 51 F.3d at 1186.  In determining the reasonable

hourly rate, courts can start by considering "the attorney's usual billing rate, but this

is not dispositive."  *Maldonado*, 256 F.3d at 185 (quoting *Windall*, 51 F.3d at

1185).  As previously mentioned, the prevailing party bears the burden of

establishing "by way of satisfactory evidence in addition to the attorney's own

affidavits that the requested hourly rates meet [the above-mentioned] standard."  *Id.*

(quoting *Washington v. Philadelphia Cty. Ct. of Common Pleas*, 89 F.3d 1031,

1035 (3d Cir. 1996)) (internal quotation omitted).

Applying the lodestar, Plaintiffs assert the following respective hourly rates

charged and hours expended by each attorney from Disability Rights Network:

| Attorney | Hours | Rate | Lodestar |
|----------|-------|------|----------|
| Robert W. Meek | 467.8 | $475 | $222,205.00 |
| Mark J. Murphy | 69.0 | $450 | $31,050.00 |
| Robin Resnick | 443.65 | $400 | $177,460.00 |

In considering the expertise and skill of each respective attorney, as well as the relevant market rate, we find that the rates claimed are not excessive. As attorneys Meek, Murphy, and Resnick have demonstrated in their submissions, they have practiced law for approximately 33, 28, and 25 years, respectively. Most of those years were with the Disability Rights Network, or its predecessor, the Disabilities Law Project. (*See* Doc. 262, Exhibits E-G.) All counsel have extensive demonstrated experience in the subject matter of this litigation – disabilities law – and have participated in the seminal cases upon which we relied in deciding this action under the ADA's integration mandate. *See, e.g., Frederick L. v. Dep't of Pub. Welfare*, 422 F.3d 151 (3d Cir. 2005); *Frederick L. v. Dep't of Pub. Welfare*, 402 F.3d 374 (3d Cir. 2004).

With respect to the prevailing market rate, the Third Circuit has previously noted:

> In establishing a standardized fee schedule the court will encounter the problem of selecting hourly rates for visiting lawyers from other parts of the country litigating in this forum. The Task Force [appointed by the Third Circuit] reviewed the current practices of the various circuits and concluded that the best rule is the "forum rate" rule. Hence an out-of-town lawyer would receive not the hourly rate prescribed by his district but rather the hourly rate prevailing in the forum in which the litigation is lodged. Deviation from this rule should be permitted only when the need for "the special expertise of counsel from a distant district" is shown or when local counsel are unwilling to handle the case.

*Windall*, 51 F.3d at 1186 (quoting Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 260-62 (1986)).  Thus, the typical measure of a market rate is based upon the forum of the litigation, unless Plaintiffs can demonstrate that they "required the particular expertise of counsel from another vicinage, or that local counsel were unwilling to take on the litigation." *Interfaith Cmty. Org. v. Honey-well Intn'l, Inc.*, 426 F.3d 694, 699 (3d Cir. 2005).

Candidly, the rates requested by Mr. Meek, Mr. Murphy, and Ms. Resnick ($475, $450, and $400, respectively), give the Court some pause at first blush when comparing those rates to the prevailing market rates in the Middle District.  Mr. Meek declares in his Affidavit (Doc. 262, Exhibit A), and we have no reason to doubt, that these rates are entirely consistent in the Philadelphia legal community. Although the rates are not commensurate with the local market rates, three considerations inform our decision that the rates requested are ultimately reasonable.  First, this complex litigation required a very high level of expertise by counsel.  As Mr. Meek avers, the litigation "required knowledge of operation and funding of Pennsylvania's mental retardation service system, the Medical Assistance system, and the legal issues under the ADA and the RA."  (Doc. 262-1 p. 5.)  The learned counsel at DRN quite clearly has this expertise.  Second, it is doubtful that local counsel would have been willing or able to take on a class action

21

lawsuit that required as much time and up-front costs with no monetary award even prayed for. Finally, equally importantly, and as noted, this Motion is uncontested and the product of Defendants' searching examination of Plaintiffs' counsels' charges. Therefore, the rates therein are not only uncontested, but have been thoroughly vetted as well. For these reasons, we find the hourly rates represented therein to be reasonable.

### b.    Reasonable Hours Expended

In addition to determining a reasonable hourly rate, a court is charged with calculating the hours that are reasonably expended by the prevailing party. "Hours are not reasonably expended if they are excessive, redundant, or otherwise unnecessary." *Rode v. Dellarciprete*, 802 F.2d 1177, 1183 (3d Cir. 1990). As such, a party should not be responsible for those hours that are not reasonable or are excessive under the circumstances. Counsel for Plaintiffs collectively spent 980.45 hours on this litigation. In reviewing the time sheets attached to the Motion (Docs. 262, Exhibits B-E) and considering the length and development of this vigorously-contested litigation,[5] we find that there were no excessive expenditures of time.

---

[5]The hours claimed include, *inter alia*, time spent in pre-complaint investigation, drafting the Complaint, researching and drafting the Motion for Class Certification, responding to the Motion to Dismiss, Motion to Intervene, conducting and responding to discovery, pursuing the Motion for Summary Judgment. Review of the time-sheets likewise demonstrates that counsel consistently strived to avoid duplication of efforts.

### c.    Other Considerations

The amount reached by employing this framework and calculating the

lodestar is typically "presumptively reasonable."  *Interfaith Cmty. Org. v.*

*Honeywell Int'l, Inc.*, 426 F.3d 694, 703 n.5 (3d Cir. 2005).  Nonetheless, after

calculating the lodestar, a district court's discretion then comes into play and the

court may then increase or decrease the total award based upon other factors such as

the relative success of the prevailing party.  *See In re Diet Drugs*, 582 F.3d 524, 540

(3d Cir. 2009).

We do not find it prudent to disturb the amount requested by Plaintiffs.  As

we have emphasized, the amount of fees requested is a portion of a bargained-for

settlement that the Court encouraged the parties to reach.  Furthermore, the total

fees requested by Plaintiffs are in fact less than Plaintiffs' lodestar.[6]  Finally, and

very significantly in our view, Plaintiffs are not requesting compensation for fees

incurred after June 30, 2011.  Therefore, we find the amount requested to be

reasonable and shall approve and award the total amount of fees requested  by

Plaintiffs.

### 2.    Costs

---

[6]The portion of the total amount requested in the Motion for Fees and Costs attributable to attorney's fees is $363,677.74, and the remainder is attributable to litigation costs incurred by Plaintiffs' counsel.  The total amount of fees actually accumulated by Mr. Meek, Mr. Murphy, and Ms. Resnick was $430,715.00.

As noted, in addition to the attorney's fees, the $432,500.00 requested also includes $68,822.26 in costs.  The litigation expenditures are itemized by Plaintiffs as follows:

| Expenses | Amount |
|---|---|
| Filing Fee | $350.00 |
| Depositions | $6,074.95 |
| Expert Witnesses | $58,883.75 |
| Defendants' Expert Deposition Fee | $1,943.00 |
| Postage | $9.94 |
| Travel | $435.35 |
| Photocopying | $1,125.27 |

Once again, we find that these costs are entirely reasonable considering the length and complexity of the underlying litigation, and will approve the same.

### 3.    Conclusion

Plaintiffs and Defendants engaged in arms-length negotiations with respect to the final relief in this litigation.  Plaintiffs agreed to request an award of fees and costs in an amount that was measurably less than what was actually incurred.  Defendants have agreed to pay that amount.  After calculating the lodestar and considering the complexity of the litigation, the Court can divine no reason to disturb this bargained-for agreement.  Therefore, we find that an award of $432,500 to Plaintiffs for fees and costs as the prevailing party in this litigation is reasonable.

## IV.   CONCLUSION

To reiterate, we are placing our imprimatur on this settlement only after much consideration and deliberation.  The objections we received were not only numerous, but some were also cogently expressed and many were at times quite eloquent and even poignant.  The depth of emotion expressed in these objections could easily lead us to neglect the real task at hand, which is to consider the proposed remedy in light of the violations of Plaintiffs' rights.  Our foremost duty, however, is to consider the present posture of those individuals who brought this litigation to vindicate their legal rights.  As we have previously found, DPW has consistently marginalized Plaintiffs and relegated them to a class of persons who received integrated services only after every other person who was not in that class was served.  Plaintiffs are thus entitled to the remedies as agreed to by the parties.  This Settlement Agreement seeks to discontinue practices that have systematically violated Plaintiffs' rights, and we thus find that it is a fair, adequate, and reasonable way to achieve that end, although admittedly imperfect.

In closing however, we note the following for the benefit of the non-class Objectors and for those rightfully concerned citizens and elected officials who have voiced opposition: we are not approving this Settlement Agreement to force individuals who do not wish to live in the community out of the ICF/MRs, and we are certainly not effectuating a closing any of the Commonwealth's ICF/MRs.

25

Rather, we are approving the Settlement Agreement to ensure that the integration

mandates of the ADA and related laws are implemented and followed.

Accordingly, we shall grant Plaintiffs' Unopposed Motion for Final Approval of the

Proposed Class Action Settlement Agreement (Doc. 260) and Plaintiffs' Unopposed

Motion for Attorneys' Fees and Litigation Expenses and Costs (Doc. 262).  An

appropriate Order shall follow.