# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANKLIN BENJAMIN, *et al.*, | : | 1:09-cv-1182 |
| | : | |
| Plaintiffs | : | Hon. John E. Jones III |
| | : | |
| and | : | |
| | : | |
| CRAIG SPRINGSTEAD, *et al.*, | : | |
| | : | |
| Intervenors | : | |
| | : | |
| v. | : | |
| | : | |
| DEPARTMENT OF PUBLIC | : | |
| WELFARE OF THE | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA and BEVERLY | : | |
| MACKERETH, in her official capacity | : | |
| as Secretary of Public Welfare of the | : | |
| Commonwealth of Pennsylvania, | : | |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM</u>

### September 25, 2014

This class action, filed under the Americans with Disabilities Act and Rehabilitation Act, originated in this Court in 2009. Now, over five years since the initiation of this litigation and after several procedural turns, we are again tasked to assess the fairness of the final settlement agreement amongst the parties and, also, Plaintiffs' and Intervenors' bids for attorneys' fees and costs.

## I.     BACKGROUND

Plaintiffs are a class of individuals with intellectual disabilities who are institutionalized in state intermediate care facilities for persons with intellectual disabilities ("ICFs/ID").  They filed a complaint alleging that they were appropriate for, and not opposed to, community-based services and arguing that Defendants' failure to offer and provide community alternatives violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131-12134, and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794.  Plaintiffs sought both declaratory and injunctive relief.

Intervenors, who joined in this action at the remedy stage of the proceeding, are a group of individuals who are also institutionalized but do not desire community placement.

### A.     Procedural History

As we outlined in our Memorandum of September 2, 2011,

> Plaintiffs initiated the action on June 22, 2009.  Pursuant to an unopposed motion predicated upon Federal Rule of Civil Procedure 23(b)(2), we thereafter certified the following class:

>> All persons who: (1) currently or in the future will reside in one of Pennsylvania's state-operated intermediate care facilities for persons with mental retardation; (2) could reside in the community with appropriate

services and supports; and (3) do not or would
not oppose community placement.

(Doc. 17.)  Defendants subsequently filed a Motion to
Dismiss (Doc. 20) that the Court denied by our Order of
January 25, 2010.  (Doc. 38.)

While the Motion to Dismiss was pending, a group
of individuals filed a Motion to Intervene in the
litigation.  (Doc. 27.)  These individuals, referred to
throughout this litigation as the "Springstead
Intervenors", alleged that, although they were opposed to
community-based services and support, they were
nonetheless *de facto* members of the certified class.  The
Springstead Intervenors alleged that the resolution of the
class action in Plaintiffs' favor would limit the
Springstead Intervenors' rights to choose ICF/[ID] care.
We denied the Motion to Intervene on March 10, 2010,
finding that the Springstead Intervenors were explicitly
excluded from the class by virtue of their opposition to
community-based care.  (Doc. 41.)  The Springstead
Intervenors appealed that decision, and the United States
Court of Appeals for the Third Circuit affirmed our
denial in April 2011.  *See Benjamin v. Dep't of Pub.
Welfare*, 2011 WL 1243683 (3d Cir. 2011) (unpublished
opinion).

The parties completed extensive discovery and
filed cross-Motions for Summary Judgment.  (Docs. 48,
51.)  In January 2011 we issued a Memorandum and
Order that denied Defendants' Motion for Summary
Judgment, granted Plaintiffs' Motion for Summary
Judgment, and declared that [Defendants] violated the
integration mandates of the ADA and RA.  (Doc. 88.) . . .
[B]ecause at that juncture the Court was reluctant to draft
such extensive injunctive relief as would be required, and
in effect construct a policy that was better left for the
parties to develop in the first instance, we encouraged the
parties to attempt to resolve the remedy amicably.

. . . [W]e referred the parties to mediation with

3

> Magistrate Judge Martin Carlson in February 2011.  The
> parties met twice with Judge Carlson and continued
> arms-length negotiations on their own.  The parties
> eventually finalized the Proposed Settlement Agreement,
> and we granted preliminary approval of said Agreement
> on May 27, 2011.  (Doc. 106.)  Notice was either hand-
> delivered to nearly all ICF/[ID] residents or mailed to
> involved family and guardians of residents by June 24,
> 2011, and interested persons had the opportunity to
> object to the Settlement by August 2, 2011.  The Court
> received numerous objections . . ..

(Doc. 280, pp. 3-5).

In addition to the objections, two motions to intervene were filed by

Attorney Carl Solano, objecting on behalf of his sister, Diane Solano, and the

previously mentioned Springstead Intervenors.  (Docs. 179, 253). Both motions

sought intervention for the limited purpose of presenting and having the Court

consider objections to the proposed class action settlement.  (Doc. 179, p. 1; Doc.

253, p. 1).  We issued an Order on August 16, 2011 (Doc. 273), denying the

motions to intervene but noting that we would fully consider all objections lodged

on the record and permit counsel to participate in the fairness hearing and question

the respective witnesses.

We conducted a fairness hearing and filed a Memorandum and Order on

September 2, 2011 (Docs. 280, 281), approving the settlement agreement and

awarding attorneys' fees and costs to Plaintiffs' counsel.

4

Ms. Solano and the Springstead Intervenors later filed an appeal in the Court of Appeals for the Third Circuit, challenging our denial of their motions to intervene at the remedy stage and, also, our approval of the class action settlement. Agreeing with the intervenors, the Third Circuit issued a judgment on December 12, 2012 (Doc. 299), vacating our Order of August 16, 2011, insofar as it denied the motions to intervene as of right in the remedy stage of the litigation.  The judgment also vacated our September 2, 2011 order, which had granted final approval of the parties' settlement agreement.  The Third Circuit remanded the matter to this Court, instructing that we grant the motions to intervene in the remedy stage and permit the intervenors to challenge the settlement agreement and seek decertification of the class.

In accordance with the appellate court's order, we granted the motions to intervene of Ms. Solano and the Springstead Intervenors and convened a status conference on January 31, 2013, at which the parties advised that they were working towards settlement but required more time for discussion.  (Doc. 301). Over the course of more than a year, the parties continued in negotiations towards an amicable resolution of this matter, monitored by the Court through periodic status reports.

Through commendable commitment and diligence, the parties reached

agreement on all terms of a comprehensive settlement agreement.  As to attorneys'
fees and costs, Plaintiffs and Defendants were able to achieve consensus, and, with
the able assistance of Magistrate Judge Schwab, Intervenors and Defendants later
came to agreement, as well.[1]

All matters being resolved, pursuant to Plaintiffs' unopposed motions, we
granted preliminary approval of the proposed settlement agreement and approval of
the class notice, and, also, granted certification of the settlement class on June 12,
2014.  (Docs. 341, 342).  Notice was hand-delivered to all ICF/ID residents and
sent by first-class mail to any guardians, involved family members, and substitute
decision-makers.  Objections and requests to participate were due by September 9,
2014.  The Court received no objections and just one request to participate by John
Bastek, the father and guardian of Daniel Bastek, who is one of the Springstead
Intervenors.  (Doc. 343).

Thereafter, Plaintiffs submitted an Unopposed Motion for Final Approval of
the Proposed Revised Class Action Settlement Agreement (Doc. 345), and
Plaintiffs and Intervenors submitted motions for attorneys' fees, litigation
expenses, and costs (Docs. 348, 350).  Those three motions remain pending before

---

[1] We would be remiss if we did not highlight the invaluable services provided by this
Court's United States Magistrate Judges Schwab and Carlson.  In typical fashion, both judges
helped immeasurably in moving this protracted and complex case to its present posture.

this Court.

We held a fairness hearing on September 23, 2014, participated in by counsel for Plaintiffs, Defendants, the Springstead Intervenors, and Ms. Solano. All counsel made statements in support of the Settlement Agreement, urging the Court's blessing.  In general, counsel commented that the present Agreement is the fruit of much earnest, attentive, and inclusive negotiation, representing an exercise in establishing trust among the parties, and that, as a result, the Agreement itself is far more robust and detailed than the one submitted in 2011.  In addition and notably, counsel for Defendants clarified that DPW has no present plans to close any of the state ICFs/ID.   Also at the hearing, the Springstead Intervenors offered the testimony of Mr. John Bastek, who eloquently described the level of care his son has received as a resident of a public ICF/ID.

### B.    The Proposed Settlement and Attorneys' Fees

The proposed Settlement Class encompasses "[a]ll individuals who have resided or will reside in a state ICF/ID at any time from the Effective Date of the Settlement Agreement until the termination of the Settlement Agreement[.]" (Doc. 342, ¶ 4).  The Settlement Agreement provides, among other things, that no party will seek to remove any class member from a state ICF/ID and place him or her in a community placement, and, also, that no party will seek to restrict the ability of

any class member to move to a community placement other than in accordance with the Agreement.  (Doc. 345-1, ¶ 2).  The Agreement sets forth a process for choosing community placement, outlining a procedure to make or change a choice of community placement by the class member and/or guardian or substitute decision-maker, and, also, a process by which to voluntarily return to an ICF/ID. (*Id.* ¶¶ 3-9, 21).  In answer to Intervenors' long-standing concerns, the Agreement additionally provides a detailed decision-making procedure where a class member does not have a guardian or substitute decision-maker.  (*Id.* ¶ 10).

Those class members choosing community placement will be placed on a Planning List for development of an Individual Support Plan, which plan will include the types of services required by the individual, any needs for accommodation, and, if necessary, a transition plan to address any challenges as the individual moves from a state ICF/ID to the community.  (*Id.* ¶¶ 20).  DPW will be required to take various, concrete actions in support of integration, and must provide community placements to class members on the Planning List according to the following schedule:  80 class members (or the number of class members on the Planning List if fewer than 80) by June 30, 2015; and 50 class members on the Planning List (or the number of class members on the Planning List if fewer than 50) in each of fiscal years 2015-16 through 2017-18.  (*Id.* ¶¶ 14-

19).

As to those class members wishing to remain in an ICF/ID, the Agreement provides that DPW will continue to maintain the level of care currently offered to class members in those facilities, that class members may seek to challenge the closure of an ICF/ID but that the Agreement does not confer such a right, and that DPW will not use monies appropriated to fund ICFs/ID to fund community services and supports. (*Id.* ¶¶ 11-13).

In terms of oversight of the implementation of the Agreement, the parties have agreed to monitoring by a neutral third party and that DPW will provide periodic status reports to counsel for Plaintiffs and Intervenors. (*Id.* ¶¶ 22-25). The parties have further agreed that this Court should retain jurisdiction over the case for purposes of interpretation and enforcement of the Settlement Agreement. (*Id.* ¶ 32). In case of certain instances of noncompliance, a party may seek specific performance after providing requisite notice to Defendants. (*Id.* ¶¶ 33-37). Ultimately, the Agreement will terminate on June 30, 2018, or 30 days after Defendants' counsel notifies counsel for Plaintiffs and Intervenors, respectively, that the last class member on the Planning List as of June 30, 2018, has moved to the community, whichever is later. (*Id.* ¶ 40).

Turning to attorneys' fees, the parties have agreed that Defendants will pay

Plaintiffs' counsel a total of $532,500.00 for attorneys' fees, expenses, and costs incurred through the final approval of the Agreement.  (*Id.* ¶ 38).  Defendants will pay Intervenors' counsel a sum of $399,500.00 for the same, half of which is to be paid to Sidley Austin LLP and the other half to Schnader Harrison Segal & Lewis LLP.  (*Id.* ¶ 39).

## II.   DISCUSSION

In examining the issues before us, we turn first to the reasonableness of the proposed settlement agreement, and then to the appropriateness of the attorneys' fees requested by counsel for Plaintiffs and Intervenors respectively.

### A.   The Proposed Settlement Agreement

A district court may approve a class action settlement upon a finding that it is "fair, reasonable, and adequate."  FED. R. CIV. P. 23(e)(2).  The court's role is as "a fiduciary who must serve as a guardian of the rights of absent class members." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liability Litig.*, 55 F.3d 768, 785 (3d Cir. 1995) (citation and internal quotation marks omitted).

An initial presumption of fairness attaches to an agreement where the negotiations occurred at arm's length, discovery was sufficient, the backers of the agreement have experience in similar litigation, and only a small percentage of the class lodged objections.  *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516,

535 (3d Cir. 2004) (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n. 18 (3d Cir. 2001)).

Here, it is undisputed – and we independently agree – that the instant litigation meets all of these criteria (*see* Doc. 347, p. 20; Doc. 345-1, ¶¶ 2-3, 8-11), and, thus, that the Settlement Agreement is entitled to a presumption of fairness.

In finally assessing an agreement, the Third Circuit has adopted a nine-factor test to guide courts, referred to as the *Girsh* test, which considers:

> (1) the complexity and duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation.

*GMC Trucks*, 55 F.3d at 785 (citing *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)).  The proponents of the settlement agreement bear the burden to demonstrate that these factors weigh in favor of approval.  *See id.*

As to the first factor, the complexity and duration of the litigation, this inquiry is meant "to capture 'the probable costs, in both time and money, of continued litigation.'" *GMC Trucks*, 55 F.3d at 812 (quoting *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 801 (3d Cir. 1974)).  As an initial observation, this

11

suit already bears a lengthy procedural history, initiated over five years ago with judgment as to liability entered in favor of Plaintiffs more than three years ago. Following appeal, the Third Circuit authorized Intervenors to argue against the prior settlement agreement and certification of the class.  Such proceedings would have required substantial investment of time and resources and may have resulted in further appeals.  As settlement has eliminated potential delay, mitigated expenses, and will provide immediate benefit to the class, this factor weighs in favor of approval. *See In re Certainteed Fiber Cement Siding Litig.*, No. 2270, 2014 WL 1096030, at *17 (E.D. Pa. March 20, 2014) ("That a settlement would eliminate delay and expenses and provide immediate benefit to the class militates in favor of approval." (citation omitted)).

The second factor, the reaction of the class, also militates in favor of approval.  Not a single objection was filed protesting the agreement.  In terms of other correspondence pertaining to the settlement, Plaintiffs report that they received a total of three letters: two from families of two of the intervenors stating their intent to attend and participate in the fairness hearing, and another from the mother of an individual residing at one of the ICFs/ID who desires that her daughter remain at the facility.  As to the letter requesting continued placement at a state-run facility, we note that the Agreement protects that interest, and hence that

the comment is not adverse to the settlement.

The third consideration queries the stage of the proceeding and examines "the degree of case development that class counsel [had] accomplished prior to settlement" so that courts may "determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *Warfarin*, 391 F.3d at 537 (citation and internal quotation marks omitted). As ably described by Plaintiffs in their brief, the Settlement Agreement "follows the completion of fact and expert discovery, the entry of summary judgment for Plaintiffs, the disposition of an appeal that provided Intervenors with the right to challenge class certification and participate in the remedy phase, and extensive negotiations among Plaintiffs, DPW, and Intervenors that aired numerous factual and legal contentions." (Doc. 347, p. 24; *see also* Doc. 345-1, ¶¶ 2-3, 10). We find that counsel had ample understanding of the merits of the action, pointing towards approval of the settlement.

Fourth, as to the risks of establishing liability, the court should "examine what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them." *Cendant*, 264 F.3d at 237 (quoting *GMC Trucks*, 55 F.3d at 814) (internal quotation marks omitted). In undertaking this inquiry, courts must not conduct a mini trial and should, to

some degree, credit the appraisal of class counsel as to the case's probability of success and the potential defenses that may have been raised against their causes of action.  *See Parks v. Portnoff Law Assoc.*, 243 F. Supp. 2d 244, 251 (E.D. Pa. 2003).  Notably, the Court has already decided the question of liability in Plaintiffs' favor.  However, Plaintiffs maintain that Defendants may have appealed the decision absent a settlement and, also, highlight that Intervenors were positioned to challenge class certification, potentially limiting the impact of the liability ruling to the named plaintiffs.  (Doc. 347, p. 25).  These concerns appear somewhat remote, and we find this factor to be neutral.

The fifth consideration, regarding the risks of establishing damages, "attempts to measure the expected value of litigating the action rather than settling it at the current time."  *Cendant*, 264 F.3d at 238 (quoting *GMC Trucks*, 55 F.3d at 816) (internal quotation marks omitted).  Here, Plaintiffs sought injunctive relief alone.  Plaintiffs reflect that the Agreement provides much of the relief that they had sought, highlighting that it delineates concrete steps DPW must take to comply, imposes a time-line requiring community placements to begin in less than a year, and outlines specific protections for those individuals choosing community integration and those wishing to remain in a state ICF/ID.  Had the Court held a hearing on the appropriate remedy and rendered a ruling, Plaintiffs maintain, the

14

contours of the final order may not have been so favorable to Plaintiffs, especially with regard to the specific constraints imposed upon Defendants. Indeed, upon determining liability in this matter, we encouraged Plaintiffs and Defendants to return to negotiations to themselves shape the appropriate injunctive relief. (Doc. 88, p. 23 n. 12). We agree that had the relief be born of an adversarial proceeding rather than cooperative negotiation, it may not have been as propitious from Plaintiffs' standpoint.

The sixth factor, the risks of maintaining a class action, favors approval of the instant agreement. The Third Circuit specifically authorized Intervenors to challenge class certification, and, absent a settlement agreement addressing their concerns, it is not unlikely that they would have moved to decertify.

Turning to the final three factors – pertaining to the ability of Defendants to withstand a greater judgment, the range of reasonableness of the settlement in light of the best recovery, and the range of reasonableness of the settlement in light of all the attendant risks of litigation – we note that these considerations "deal with monetary judgments and settlement funds, and thus are inappropriately evaluated here." *Inmates of Northumberland Cnty. Prison v. Reish*, No. 08-cv-345, 2011 WL 1627951, at *3 (M.D. Pa. April 29, 2011); *see also Pastrana v. Lane*, No. 08-468, 2012 602141, at *5 (E.D. Pa. Feb 24, 2012); *Williams v. City of Phila.*, No. 08-

1979, 2011 WL 3471261, at *3 n.1 (E.D. Pa. Aug. 8, 2011).  Even so, in applying

the spirit of those factors to the Settlement Agreement under review, we find that

those factors, too, indicate in favor of approval.  It is inarguable that DPW is

subject to significant budgetary constraints.  In addition, the Agreement is

exceptionally comprehensive, and, as Plaintiffs observe, confers benefits upon

them comparable to the best possible recovery that Plaintiffs could have secured.

(Doc. 347, p. 29).

In sum, the balance of the *Girsh* factors weighs in favor of approval of the

proposed Settlement Agreement.  Having blessed the agreement itself, we next

evaluate the petitions for attorneys' fees.

### B.    Attorneys' Fees, Litigation Expenses, and Costs

The ADA and RA both contain fee-shifting provisions permitting a district

court, in its discretion, to award attorneys' fees and costs to a prevailing party.  *See*

42 U.S.C. § 12205; 29 U.S.C. § 794a(b).  Parties are considered "prevailing

parties" if "they succeed on any significant issue in litigation which achieves some

of the benefits the parties sought in bringing suit."  *People Against Police Violence*

*v. City of Pittsburgh*, 520 F.3d 226, 232 (3d Cir. 2008) (citing *J.O. ex rel. C.O. v.*

*Orange Twp. Bd. of Educ.*, 287 F.3d 267, 271 (3d Cir. 2002)).  A party may

prevail, for example, by securing a judgment on the merits or by achieving a

settlement enforced through a consent decree.  *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dept. of Health & Human Resources*, 532 U.S. 598, 604 (2001). Intervenors may also qualify as prevailing parties and be awarded fees.  *See generally* 10-54 MOORE'S FED. PRAC. § 54.173(2)(b) (stating that "an intervenor is generally eligible for an award of fees just as if the intervenor were an original party to the litigation" and "whether fees should be awarded turns upon whether the original party and the intervenor are 'prevailing parties'").

Here, we have little trouble concluding that both Plaintiffs and Intervenors are eligible for attorneys' fees, noting that Plaintiffs secured a judgment on the merits and that both parties successfully negotiated the instant Settlement Agreement, which, as previously discussed, provides substantial benefits and guarantees to them respectively.  Having concluded that such fees are due, we must then determine whether the amount of fees requested is reasonable.

Generally speaking, "a reasonable fee is one which is 'adequate to attract competent counsel, but which does not produce windfalls to attorneys.'" *Public Interest Research Grp. of N.J., Inc. v. Windall*, 51 F.3d 1179, 1185 (3d Cir. 1995) (quoting *Student Public Interest Research Grp. of N.J., Inc. v. AT&T Bell Labs.*, 842 F.2d 1436, 1448 (3d Cir. 1988)) (alteration omitted).  "The most useful starting point for determining the amount of a reasonable fee is the number of

17

hours reasonably expended on the litigation multiplied by a reasonable hourly rate," *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), which is known as the lodestar amount, *see PIRG*, 51 F.3d at 1185.

In determining the number of hours reasonably expended, we "review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are 'excessive, redundant, or otherwise unnecessary.'" *Maldonado v. Houstoun*, 256 F.3d 181, 184 (3d Cir. 2001) (quoting *PIRG*, 51 F.3d at 1188).  Typically, a reasonable hourly rate is calculated with reference to the prevailing market rates in the relevant community, *see Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990), and in general, the relevant community is the forum of litigation, pursuant to the so-called forum rate rule, *see Interfaith Cmty. Org. v. Honeywell Intern., Inc.*, 426 F.3d 694, 705 (3d Cir. 2005).  However, an extra-jurisdictional rate may pertain where the need for special expertise of counsel from another district is demonstrated or  local counsel are unwilling to handle the case.  *See id.*

The party seeking fees bears the initial burden to demonstrate that the fees are reasonable.  *See id.*

### 1.    Plaintiffs' request for attorneys' fees, expenses, and costs

In their unopposed Motion for Attorneys' Fees, Litigation Expenses, and

Costs (Doc. 348), Plaintiffs request that Defendants pay a total amount of $532,500.00, even though they actually incurred $621,726.26 in fees and expenses. Although, as noted, Defendants do not challenge Plaintiffs' request, we nonetheless review the requested fees and costs for reasonableness.

Plaintiffs' counsel represent that they spent 1,272.55 hours litigating this heavily contested case over a period of more than five years.[2]  They delineate in detail, and provide billing records for, the tasks they properly performed in conducting this litigation.  (Doc. 348, ¶ 12.a).  Significantly, they exclude certain time from their fees request as conceivably unnecessary or duplicative.  (*Id.*¶ 12.c). As to their hourly rates, Mr. Meek billed at $475; Mr. Murphy billed at $450; Ms. Resnick billed at $400; Ms. Darr billed at $355; and Ms. Haubert billed at $165. (*Id.* ¶ 11).  We note that Attorneys Meek, Murphy, Resnick, Darr, and Haubert have practiced law for approximately 36, 31, 28, 17, and 2 years, respectively, and collectively demonstrate extensive experience in disabilities law.  While the hourly rates charged may be somewhat higher than the typical rate here in the Middle District, the rates are in step with those prescribed as reasonable under the Community Legal Services fee schedule (Doc. 348-8, p. 20, 21), which courts in

---

[2]  Specifically, individual counsel expended time as follows:  Mr. Meek at 579.80 hours; Mr. Murphy at 69.00 hours; Ms. Resnick at 559.75 hours; Ms. Darr at 63.10 hours; and Ms. Haubert at .90.

our District have deemed instructive.  *See Stockport Mtn. Corp., LLC v. Norcross Wildlife Found., Inc.*, No. 11-cv-514, 2014 WL 131604, at *4 (M.D. Pa. Jan. 13, 2014); *Brown v. TrueBlue, Inc.*, No. 10-cv-514, 2013 WL 5947499, at *2 (M.D. Pa. Nov. 5, 2013).  In considering the expertise and skill of each attorney, as well as the relevant market rate, we find that the rates claimed are not excessive.

Multiplying the hours expended by counsels' hourly rates, we calculate a lodestar amount of $552,904.00.  Finding this amount to be reasonable, it is easy for us to conclude that the $532,500.00 requested – which figure itself includes $68,822.26 in costs – is well within reason.

With respect to costs, as stated, Plaintiffs report a total of $68,822.26.  Such costs were incurred before 2012 (Plaintiffs do not seek reimbursement for any expenses subsequent to 2011) and represent the expense of filing court documents, depositions, expert witnesses, postage, travel, and photocopying.  (*Id.* ¶ 14).  As we found in our Memorandum of 2011, we once again find that these costs are entirely reasonable considering the length and complexity of the underlying litigation, and will approve the same.

## 2.   Intervenors' request for attorneys' fees, litigation expenses, and costs

In their unopposed Motion for Attorneys' Fees, Litigation Expenses, and Costs (Doc. 350), Intervenors request that Defendants pay a total amount of

$399,500.00, to be divided and paid as follows: $199,750.00 to Sidley Austin LLP (counsel for Springstead Intervenors), and $199,750.00 to Schnader Harrison Segal & Lewis LLP (counsel for Ms. Solano).  They state that they actually incurred a total of $823,649.88, consisting of fees and expenses incurred by Sidley of $424,401.61, and fees and expenses incurred by Schnader of $399,248.27.  Though Intervenors' Motion is undisputed, we pause to conduct our own examination.

As to hours expended, counsel for the Springstead Intervenors report 857.8 hours,[3] and counsel for Ms. Solano report 753.7 hours,[4] for a total of 1,611.5 hours expended by Intervenors collectively before 2014.  Significantly, Intervenors do not submit hours expended subsequent to December 31, 2013, even though extensive settlement negotiations occurred after that time.  Intervenors maintain that the hours spent were reasonable in light of the many substantial and challenging tasks they performed in order to prevail in this matter, including preparing extensive objections to the original settlement; briefing and litigating motions to intervene; participating in the 2011 fairness hearing; filing and litigating a successful appeal in the Third Circuit; and negotiating the instant settlement

---

[3] Eleven timekeepers at Sidley worked on this matter, with lead counsel, Mr. Hoffart, spending 653.2 hours.

[4] Six timekeepers at Schnader worked on this litigation, with Mr. Solano as lead counsel spending a total of 670.2 hours.

21

agreement.

Turning to the hourly rates charged, we note for example that, over three years of litigation, lead counsel Mr. Hoffart billed at rates of $475, $555, and $625 per hour, and lead counsel Mr. Solano billed at rates of $530, $555, and $575 per hour.  Mr. Hoffart has practiced law for six years, works in Sidley's New York City office, and has a present hourly rate of $700, which was reduced for purposes of this public interest action.  Intervenors allege that his rate is comparable to other attorneys in the New York City market.  Mr. Solano has been practicing law for 38 years with considerable appellate experience and state- and nation-wide recognition for the same.  He works in Philadelphia and currently bills at $720 per hour, also discounting his rate for this litigation.  Intervenors claim that Mr. Solano's rate is comparable to the rates of other similar lawyers in the Philadelphia market.

In recognition that their rates exceed the usual rates in the Middle District of Pennsylvania, Intervenors maintain that an exception to the forum rate rule applies based on local counsels' unwillingness to take the case.  Intervenors highlight that no area firms came forward to represent Intervenors and argue that such firms would have been unlikely to advance the necessary costs and resources to obtain the relief that was ultimately secured.

22

With reference to the cited exception to the forum rate rule, and at the same time noting that counsel billed at reduced rates and omitted substantial hours from their fees request, we find that the requested award of $399,500.00, which figure notably also includes expenses and costs, is reasonable.

With regard to expenses and costs specifically, counsel for the Springstead Intervenors indicate costs of $25,519.61 and counsel for Ms. Solano report costs of $3,567.77, for a total of $29,087.38.  These expenses were incurred, *inter alia*, for legal support services, legal research services, travel expenses, filings fees, court reporters, telephone charges, and postage.  (Doc. 350-2, ¶ 15; Doc. 350-3, ¶ 18). Considering the length and nature of this litigation, we find these costs reasonable.

## III.   CONCLUSION

The Settlement Agreement we bless today is a far cry from the one approved three years ago.  Even as we accepted that agreement back in 2011, we harbored reservations and misgivings that certainly gave us pause, but candidly should have stopped us in our tracks.  In hindsight, we realize that we failed to appreciate the depth of Intervenors' mistrust that their wishes and decisions would be protected by an agreement negotiated without their unique input.  While we regret that all parties had to invest additional time and resources to steward the case back to this Court and further negotiations, we perceive the fruits of that process as extremely

salutary.

Indeed, the Agreement approved today is substantially more robust and comprehensive than its predecessor, and, significantly, the result of a far more inclusive process.  We sincerely commend counsel and the parties for their commitment to cooperation, which we observe to involve genuine efforts to understand one another's perspectives and positions.  In particular, all counsel have distinguished themselves by their exemplary work in a case that evoked justifiable passion.  Their spirit of collaboration has resulted in a meticulously drafted agreement which very tellingly is supported by all, including this Court.

An appropriate Order shall issue.